

Unsealed 12/12/02

DE 935



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

IN RE: TERAZOSIN HYDROCHLORIDE
ANTITRUST LITIGATION

|  |  |  |
|---|---|---|
| THIS DOCUMENT RELATES TO: | : | MASTER FILE NO. 99-MDL-1317 |
|  | : | MDL DOCKET NO. 1317 |
| *United Wisconsin Services, Inc., et al. v. Abbott Laboratories*, N.D. Ill. C.A. No. 99-C-7410(JBZ) | : | Seitz/Bandstra |
| *Grosskrueger v. Abbott Laboratories, et al.*, N.D. Ill. C.A. No. 99C-7883(JBZ) | : | **FILED UNDER SEAL** |
| *Reid v. Abbott Laboratories, et al.*, D.D.C. C.A. No. 00-323 | : |  |
| *Scafani v. Abbott Laboratories, et al.*, N.D. Cal. C.A. No. 00-00508-SBA | : |  |
| *Mednick v. Abbott Laboratories, et al.*, No. 2:00-3468 | : |  |
| *O'Neal v. Abbott Laboratories, et al.*, No. 00-J-1504-S | : |  |
| *Grund v. Abbott Laboratories, et al.*, No. _____ | : |  |
| *Blue Cross and Blue Shield of Alabama, Inc. v. Abbott Laboratories, et al.*, No. 00-1303-Civ.-Lenard | : |  |
| *Bernstein v. Abbott Laboratories*, E.D. Mich. C.A. No. 2:00-CV-72974 | : |  |
| *Blue Cross and Blue Shield of Michigan v. Abbott Laboratories, et al.*, No. 5:01-CV-95 | : |  |



## COORDINATED FOURTH AMENDED CLASS ACTION COMPLAINTS

Plaintiffs, on behalf of themselves and all others similarly situated, in this, their Coordinated

Fourth Amended Class Action Complaints, seek declaratory relief, damages, both actual and treble,

and equitable relief in the nature of disgorgement and/or restitution for Defendants' violations of

state statutes proscribing unfair methods of competition and unfair trade practices and/or under

common law principles of unjust enrichment. For the convenience of the parties and the Court,

Plaintiffs assert their claims in one coordinated pleading and make their individual prayers for relief at the end. Plaintiffs allege, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as follows:

## I.   ALLEGATIONS COMMON TO ALL COMPLAINTS – NATURE OF ACTION

1.      Hytrin is the brand name of terazosin hydrochloride ("terazosin") manufactured and sold by defendant Abbott Laboratories ("Abbott"). Terazosin is a once-a-day alpha blocker anti-hypertensive drug approved for use in the treatment of hypertension and benign prostatic hyperplasia (enlarged prostate).

2.      Until August 13, 1999, when Geneva Pharmaceuticals, Inc. ("Geneva") began to sell a generic bioequivalent of Hytrin, Abbott made 100% of all United States sales of terazosin. This case arises out of the unlawful efforts of Defendants to prevent entry into the terazosin market by manufacturers of generic terazosin. Those efforts include, but are not necessarily limited to, a pattern of baseless and repetitive patent litigation by Abbott against potential generic competitors, including defendants Zenith Goldline Pharmaceuticals, Inc. ("Zenith") and Geneva, and misrepresentations made to the United States Food and Drug Administration ("FDA"). The anticompetitive efforts also included independently unlawful agreements between Abbott and Zenith and Abbott and Geneva. Under these agreements, Abbott paid both Zenith and Geneva millions of dollars a year not to market terazosin.

3.      On or about March 31, 1998, Abbott entered into an agreement with Zenith, its prospective horizontal competitor, to allocate Abbott's terazosin monopoly between Zenith and Abbott and ensure that no other company could introduce a generic version of Hytrin in the United States (the "Abbott-Zenith Agreement"). On April 1, 1998, two days after it was granted FDA approval to market its generic terazosin capsules, Geneva, Abbott's prospective horizontal competitor, entered into an agreement with Abbott to allocate Abbott's terazosin monopoly between

Geneva and Abbott and ensure that no other company could introduce a generic version of Hytrin in the United States (the "Abbott-Geneva Agreement").  Pursuant to these agreements,[1] Abbott agreed to pay Zenith $6 million per quarter and Geneva $4.5 million per month <u>not</u> to market generic bioequivalent versions of Hytrin, and to block other drug manufacturers from introducing their own generic bioequivalent versions of Hytrin in the United States.

4.    After the United States Federal Trade Commission ("FTC") began to investigate the circumstances surrounding Abbott's agreements with Zenith and Geneva, Geneva terminated its agreement with Abbott, and launched its generic version of Hytrin on August 13, 1999.

5.    The effects of the foregoing illegal acts by Defendants have been to prolong the monopoly enjoyed by Abbott in the United States market for Hytrin and its generic bioequivalents, thereby prolonging Abbott's ability to fix the price of terazosin at supra-competitive levels while retaining 100% market share, free from the stabilizing forces of generic competition.

6.    Through such illegal and inequitable acts, Defendants have enriched themselves unjustly at the expense of, and caused damages to, Plaintiffs, the individual terazosin users and "third-party payers" (including, but not limited to managed care health benefit plans, health insurance companies, and self-funded employers) (collectively "end-payers") who, collectively, pay for almost the entire cost of terazosin sold in the following jurisdictions: Alabama, California, District of Columbia, Florida, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin (referred to collectively as the "Indirect Purchaser States").

---

[1] The Abbott-Geneva and Abbott-Zenith Agreements are horizontal market allocation agreements and have been held as illegal <u>per se</u> under controlling federal case law.  <u>In re Terazosin Hydrochloride Antitrust Litig.</u>, 164 F.Supp.2d 1340 (S.D.Fla. 2000)

## II.     ALLEGATIONS COMMON TO ALL COMPLAINTS –
JURISDICTION AND VENUE

7.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332.  The amount in controversy as to the claims of Plaintiffs exceeds the sum or value of $75,000, exclusive of interest and costs.

## III.    ALLEGATIONS UNIQUE TO THEIR RESPECTIVE COMPLAINTS –
THE PLAINTIFFS

8.      Plaintiffs are purchasers of Hytrin and its AB-rated generic bioequivalents ("generic bioequivalents") in the Indirect Purchaser States.

### A.     Alabama

9.      Plaintiff Blue Cross and Blue Shield of Alabama ("BCBS Alabama"), Case No. 00-1303-CIV-Lenard/Turnoff (S.D.Fla.), is a non-profit, non-stock insurance company created pursuant to Ala. Code § 10-4-100, and exists for the "purpose of establishing, maintaining and operating a health care service plan under which health services are furnished to such of the public who become subscribers to such plan pursuant to contracts . . . ." Ala. Code § 10-4-100.  BCBS Alabama provides managed health care coverage, including prescription drug coverage, to its members.  During the period October 15, 1995 through the present, Plaintiff BCBS Alabama purchased Hytrin and its AB-rated generic bioequivalents in Alabama other than for resale and was injured by the illegal conduct alleged herein.

10.     During the period October 15, 1995 through the present, Plaintiff Willie O'Neal, Case No. 00-J-1504-S (N.D.Ala.), purchased Hytrin and its AB-rated generic bioequivalents in Alabama other than for resale and was injured by the illegal conduct alleged herein.

### B.     California

11.     Plaintiff Victor Scafani, Case No. C 00-00508 SBA (N.D. Cal.), is a resident of California.  During the period October 15, 1995 through the present, Mr. Scafani purchased Hytrin

and its AB-rated generic bioequivalents in California other than for resale and was injured by the illegal conduct alleged herein.

12.    Plaintiff William Mednick, Case No. 2:00-3468 (C.D. Cal.), is a resident of California. During the period October 15, 1995 through the present, Mr. Mednick purchased Hytrin and its AB-rated generic bioequivalents in California other than for resale and was injured by the illegal conduct alleged herein.

13.    Plaintiff United Wisconsin Services, Inc., now known as Cobalt Corporation ("Cobalt"), Case No. 99-C-7410 (N.D.Ill.) (JBZ), is a corporation organized under the laws of the State of Wisconsin with its principal place of business at 401 West Michigan Street, Milwaukee, Wisconsin.   Cobalt provides managed health care coverage to its members through various subsidiaries and affiliates, including Blue Cross and Blue Shield of Wisconsin, Inc., Compcare Health Insurance Corporation, Unity Health Plans Insurance Corporation and Valley Health Plan Incorporated (collectively "Wisconsin Blue Cross"). During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in California other than for resale, and was injured by the illegal conduct alleged herein.

**C.**     **District of Columbia**

14.    Plaintiff Clarence E. Reid, Case No. 00-323 (D.D.C.), is a resident of Clinton, Maryland. During the period October 15, 1995 through the present, Mr. Reid purchased Hytrin in Washington D.C. other than for resale and was injured by the illegal conduct alleged herein.

**D.**     **Florida**

15.    Plaintiff Antonio Lopez-Souto, Case No. 00-323 (D.D.C.), is a resident of Miami, Florida. During the period October 15, 1995 through the present, Mr. Lopez-Souto purchased Hytrin and its AB-rated generic bioequivalents in Florida other than for resale and was injured by the illegal conduct alleged herein.

16.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Florida other than for resale, and was injured by the illegal conduct alleged herein.

**E.      Illinois**

17.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Illinois other than for resale, and was injured by the illegal conduct alleged herein.

**F.      Kansas**

18.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Kansas other than for resale, and was injured by the illegal conduct alleged herein.

**G.      Maine**

19.     Plaintiff David Grund is a resident of Auburn, Maine. During the period October 15, 1995 through the present, Mr. Grund purchased Hytrin and its AB-rated generic bioequivalents in Maine other than for resale and was injured by the illegal conduct alleged herein.

**H.      Michigan**

20.     Plaintiff Martin Bernstein, Case No. 2:00-CV-72974 (E.D.Mich.), is a resident of Birmingham, Michigan. During the period of October 15, 1995 through the present, Mr. Bernstein purchased Hytrin and its AB-rated generic bioequivalents in Michigan other than for resale and was injured by the illegal conduct alleged herein.

21.     Plaintiff Blue Cross/Blue Shield of Michigan, Case No. 5:01-CV-95 (W.D. Mich.) maintains its corporate headquarters in Detroit, Michigan. During the period of October 15, 1995 through the present, Blue Cross/Blue Shield of Michigan purchased Hytrin and its AB-rated generic

bioequivalents in Michigan other than for resale and was injured by the illegal conduct alleged herein.

**I.        Minnesota**

22.        During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Minnesota other than for resale, and was injured by the illegal conduct alleged herein.

**J.        Mississippi**

23.        During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Mississippi other than for resale, and was injured by the illegal conduct alleged herein.

**K.        Nevada**

24.        During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Nevada other than for resale, and was injured by the illegal conduct alleged herein.

**L.        New Mexico**

25.        During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in New Mexico other than for resale, and was injured by the illegal conduct alleged herein.

**M.        New York**

26.        Plaintiff Albert J. Meyer, Case No. 00-342 (D.D.C.), is a resident of Wesley Hills, New York.  During the period October 15, 1995 through the present, Mr. Meyer purchased Hytrin and its AB-rated generic bioequivalents in New York other than for resale and was injured by the illegal conduct alleged herein.

27.     Plaintiff Lloyd Latona, Case No. 00-342 (D.D.C.), is a resident of Jamestown, New York.  During the period October 15, 1995 through the present, Mr. Latona purchased Hytrin and its AB-rated generic bioequivalents in New York other than for resale and was injured by the illegal conduct alleged herein.

28.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in New York other than for resale, and was injured by the illegal conduct alleged herein.

**N.     North Carolina**

29.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in North Carolina other than for resale, and was injured by the illegal conduct alleged herein.

**O.     North Dakota**

30.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in North Dakota other than for resale, and was injured by the illegal conduct alleged herein.

**P.     South Dakota**

31.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in South Dakota other than for resale, and was injured by the illegal conduct alleged herein.

**Q.     West Virginia**

32.     During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in West Virginia other than for resale, and was injured by the illegal conduct alleged herein.

### R.    **Wisconsin**

33.    During the period October 15, 1995 through the present, Cobalt purchased Hytrin and its AB-rated generic bioequivalents in Wisconsin, other than for resale, and was injured by the illegal conduct alleged herein.

34.    Plaintiff Lavera Grosskrueger, on behalf of her husband Ewald Grosskrueger, (Case No. 00-C-7883 (N.D.Ill.)(JBZ)), is a resident of Loganville, Wisconsin.  During the period October 15, 1995 through August 12, 1999, Mr. Grosskrueger purchased Hytrin and its AB-rated generic bioequivalents in Wisconsin other than for resale and was injured by the illegal conduct alleged herein.

## IV.    **ALLEGATIONS COMMON TO ALL COMPLAINTS – DEFENDANTS**

35.    Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois.  Abbott is a leading U.S. pharmaceutical company and the manufacturer of several top-selling brand-name prescription drugs, including Hytrin.  In 1998, Abbott's net sales worldwide were approximately $12.5 billion, and sales of Hytrin represented 20% of Abbott's net sales of pharmaceutical products, or $481 million.  Hytrin was the 33rd best-selling prescription drug in the United States by dollar volume.

36.    Defendant Geneva is a New Jersey corporation with its principal place of business in Broomfield, Colorado.  Geneva develops, manufacturers and markets generic drugs.

37.    Defendant Zenith Goldline Pharmaceuticals, Inc. is a Florida corporation with its principal place of business in Miami, Florida.  Zenith is a wholly-owned subsidiary of Ivax Corporation. Zenith develops, manufacturers and markets generic drugs.

38.     Other persons and/or entities not named as Defendants herein have participated as co-conspirators in the conspiracy described below and have performed acts and made statements in furtherance thereof.

## V.     ALLEGATIONS COMMON TO ALL COMPLAINTS – CLASS ALLEGATIONS

39.     Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring their respective antitrust, consumer protection and unjust enrichment actions on behalf of the following individual state classes:

> All persons and entities who or which have at any time from October 15, 1995 to the present paid all or part of the purchase price of Hytrin or its AB-rated generic bioequivalents other than for resale, in the following states: Alabama, California, the District of Columbia, Florida, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia or Wisconsin, or via mail order for residents of such states.

40.     Excluded from the Classes are the Defendants; their officers and directors; their direct and indirect parent and subsidiary corporations and their officers and directors; government entities; entities which purchased Hytrin and its generic bioequivalents for resale to the extent of such purchases for resale; and direct purchasers of Hytrin and its generic bioequivalents from Defendants, to the extent of such direct purchases.

41.     The members of the respective state-wide classes are so numerous that joinder of all members is impracticable.  While the exact number of members of each Class is unknown to Plaintiffs at the present time, each is believed to number at least in the thousands.

42.     Common questions of law and fact exist as to all members of each Class. Defendants' illegal and inequitable methods, acts and trade practices have targeted and affected all members of the Classes in a similar manner, i.e., they overpaid for Hytrin due to the absence of

competing FDA-approved AB-rated generic versions of Hytrin in the marketplace, and have paid and will continue to pay supra-competitive prices for Hytrin and its generic bioequivalents until the prices of Hytrin and its generic bioequivalents stabilize from market saturation, which has been illegally and unfairly delayed by Defendants.  Among the questions of law and fact common to the Classes are:

      a.      Whether, under common principles of antitrust and trade practice laws, Defendants' methods, practices and acts, as alleged _infra_, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, violated the applicable laws of the respective Indirect Purchaser States;

      b.      Whether Defendants' acts, contract, combination and conspiracy restrained competition for the sale of Hytrin and its generic bioequivalents and prevented or delayed introduction of any AB-rated generic version of Hytrin in the United States;

      c.      Whether, under common principles of antitrust laws, the Abbott-Zenith and/or Abbott-Geneva Agreements constitute _per se_ violations of each of the applicable respective Indirect Purchaser States' applicable laws or is properly analyzed under the "rule of reason" standard;

      d.      Whether, using a "rule of reason" analysis, Abbott had monopoly power over the relevant markets for Hytrin and its generic bioequivalents;

      e.      Whether, using a "rule of reason" analysis, the United States market for Hytrin and its generic bioequivalents is a relevant market;

      f.      Whether Plaintiffs and the Classes suffered antitrust injury for purposes of their claims under each of the respective Indirect Purchaser States' applicable laws;

      g.      Whether the Defendants' acts complained of constituted threats and/or attempts and/or conspiracies to monopolize the market for Hytrin and its generic

bioequivalents under each of the respective Indirect Purchaser States' applicable laws;

h.      Whether, and the amount by which, Defendants' illegal, inequitable and unfair trade practices have inflated the prices paid by members of the Classes for Hytrin and its generic bioequivalents over the amounts they would have paid in a competitive market unaffected by Defendants' illegal acts; and

i.      Whether, under common principles of unjust enrichment, Defendants unjustly enriched themselves to the detriment of Plaintiffs and the Classes, entitling Plaintiffs and the Classes to disgorgement of all benefits derived therefrom, including the monies paid by Abbott to Zenith and Geneva.

43.     Plaintiffs' claims are typical of those of the respective Classes they represent, because Plaintiffs and all of the class members sustained damages in the same way arising out of Defendants' illegal and unfair methods, acts and practices and wrongful conduct in the conspiracy complained of herein, i.e., they have paid and continue to pay supra-competitive prices, until the market for generic bioequivalents of Hytrin is no longer affected by Defendants' illegal acts.

44.     Plaintiffs' claims are peculiarly susceptible to class action treatment due to the high degree of regulation, standardization, and record-keeping which characterize the prevalent managed-care health care environment and the sale of prescription drugs through each level of distribution.

45.     Plaintiffs will fully and adequately protect the interests of all members of the respective classes they represent. Plaintiffs have retained and this Court has appointed counsel who are experienced in class action and unfair trade practice litigation. Plaintiffs have no interests which are adverse to or in conflict with other members of the respective Classes.

46.     The questions of law and fact common to the members of each Class predominate over any questions affecting only individual members.

47.     Class actions are superior to all other available methods for the fair and efficient adjudication of these controversies.  Plaintiffs know of no difficulty to be encountered in the management of these actions that would preclude their maintenance as class actions.  Indeed, under the prevalent managed-care health care environment, the detailed record-keeping prevalent at every level of prescription drug distribution makes these class actions more manageable than most.

## VI.     ALLEGATIONS COMMON TO ALL COMPLAINTS – FEDERAL REGULATION OF THE PHARMACEUTICAL BUSINESS

48.     The statute regulating the manufacture and distribution of drugs and medical devices in the United States is the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. (the "FD&C Act").  Under the FD&C Act, approval by the FDA, the governmental body charged with the regulation of the pharmaceutical industry, is required before a company may begin selling a new drug in interstate commerce in the United States. 21 U.S.C. § 355(a).  Premarket approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FD&C Act demonstrating that the drug is safe and effective for its intended use.

49.     New drugs that are approved for sale in the United States by the FDA are typically covered by patents, which provide the patent owner with the right to exclude others from making, using or selling that new drug in the United States for the duration of the patents, plus any extension of the original patent period ("FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 ("Hatch-Waxman Act").

50.     Pursuant to 21 U.S.C. § 355(b), the drug manufacturer must list all patents in its NDA that claim the drug for which FDA approval is being sought, or that claim a method of using the drug, and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug.

51.     Once the NDA is approved, any claimed patents are listed with the NDA in a publication known as Approved Drug Products With Therapeutic Equivalence Evaluations. This publication is commonly called the "Orange Book."

52.     Pursuant to 21 U.S.C. § 355(c)(2), if, after its NDA is approved, the drug manufacturer is issued a new patent that claims the drug or methods of its use, the drug manufacturer must supplement its NDA by listing the new patent within 30 days of issuance, whereupon the FDA publishes the new patent in a supplement to the Orange Book. The FDA is required to accept as true patent information it obtains from patent holders, such as patent expiration dates, and to withhold its approval of a subsequent generic drug application, whenever the patent holder presents a litigated dispute (whether genuine or not) regarding the validity or infringement of the patent. If an unscrupulous patent holder is willing to provide false information to the FDA or to file frivolous patent infringement actions to, for example, delay the onset of generic competition, the FDA is powerless to stop it.

53.     Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a doctor who writes a prescription, specifying the drug, which must be purchased from a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug specified by the physician unless a generic version is available that has been approved by the FDA for substitution as "AB" bioequivalent.

54.     Generic drugs are drugs that the FDA has found to be bioequivalent to their corresponding brand name drug. A generic drug provides the identical therapeutic benefits as its corresponding brand name drug.

55.     Accordingly, once a doctor writes a prescription for a brand-name drug such as Hytrin, that prescription defines and limits the market available to consumers, third-party payers, and pharmacies, to the drug named or its AB-rated generic equivalent. Only drugs which carry the

FDA's "AB" generic rating may be substituted by a pharmacist for a doctor's prescription for a pioneer drug.

56.     Due to Defendants' illegal and unfair methods, acts and practices and restraints of trade, no AB-rated generic version of Hytrin was available in the United States until the Abbott-Geneva Agreement was terminated on or about August 13, 1999. Until that time, prescriptions for Hytrin could only be filled in United States with Abbott's drug.

57.     Generic drugs invariably cost substantially less than the branded drugs to which they are bioequivalent. Typically, the first AB-rated generic drug is introduced at a substantial discount to the brand name drug, followed by increasingly steeper discounts as more companies begin selling AB-rated generic versions of the brand name drug. The beneficiaries of this competition are the patients and third-party payers who pay for prescription drugs. Prices of the branded drug are also constrained by generic competition.

58.     Third-party payers encourage patients to use FDA-approved AB-rated generic bioequivalents by, among other things, requiring lower co-payments from members who receive such generics than the co-payments they must pay for equivalent branded drugs, and by limiting the amount they will pay pharmacies for the brand name drug or its generic bioequivalent to a single price based upon the lower price of a generic bioequivalent, and by paying higher dispensing fees to pharmacies for filling prescriptions with such generics.

59.     Moreover, if an approved, generic version of a brand name drug exists, and the physician has not specifically indicated on the prescription "dispense as written" (or a similar instruction), and the consumer is covered by a typical third-party payer plan, the pharmacist will substitute, or at least offer to substitute, the generic drug.

60.     The branded drug ordinarily loses substantial sales to generics within a relatively short time after the introduction of a generic equivalent, primarily as a result of crossovers to generics by patients in third-party payer plans.

## A.     Drug Applications For Generic Drugs

61.     Under the Hatch-Waxman Act, a generic drug manufacturer may seek expedited FDA approval to market a generic version of a brand name drug with an approved NDA by filing an Abbreviated New Drug Application ("ANDA") pursuant to 21 U.S.C. § 355(j).  An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand name drug.  One of Congress' central goals in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible." Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

62.     The Hatch-Waxman Act permits generic companies to make or use a patented product prior to the expiration of patents covering the product.  35 U.S.C. § 271(e)(1).  It also permits ANDA applicants to perform all necessary testing, submit an application for approval, and receive tentative approval before the relevant patents expire.  Thus, assuming approval, generic versions of patented drugs can be marketed immediately following patent expiration.  Prior to the Hatch-Waxman Act, a generic applicant had to wait until all patents had expired prior to beginning the approval process or otherwise face an infringement suit.

## B.     Paragraph IV ANDA Certifications

63.     After an applicant has submitted its ANDA to the FDA, it must file a patent certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii).  There are four different types of certifications:

I.      The brand name manufacturer has not filed patent information with the FDA (a "Paragraph I Certification");

II.     The patent or patents filed in the Orange Book have expired (a "Paragraph II Certification");

III.    The patent will expire on a date in the future, and the generic manufacturer does not seek to market its generic version of the drug prior to the date of expiration (a "Paragraph III Certification"); or

IV.     The patent is invalid or not infringed by the generic manufacturer's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii).

64.     A certification under Paragraphs I, II or III does not allow the branded drug manufacturer to sue for patent infringement.   An ANDA applicant making a Paragraph IV certification must provide notice to the branded drug manufacturer.   The notice includes a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent listed in the Orange Book as claiming the branded drug is not valid or will not be infringed.   21 U.S.C. § 355(j)(2)(B)(ii).   A Paragraph IV certification is a technical or artificial act of infringement and gives rise to a cause of action under the patent laws.

### C.     The Drug Patent Holder's Ability to Delay Paragraph IV Certification ANDA Applicants For Up to Thirty Months

65.     The branded drug company, upon receiving a Paragraph IV Certification from an ANDA applicant, has 45 days to initiate a patent infringement suit against the generic applicant. 21 U.S.C. § 355(j)(5)(B)(iii).   If no action is initiated within 45 days, the process for FDA approval of the generic product is not delayed by patent issues.   Id.   However, if a patent infringement suit is brought within the 45-day window, FDA approval of the ANDA is automatically postponed until the earlier of (i) the expiration of the patents, (ii) 30 months from the patent holder's receipt of the Paragraph IV Certification notice (the "30-Month Hatch-Waxman Litigation Period"), or (iii) a court decision holding the patent, which is the subject of the Paragraph IV certification, invalid or not infringed by the ANDA.

66.     Accordingly, a branded drug's patent holder need only file a patent infringement lawsuit within 45 days of receipt of an ANDA applicant's Paragraph IV Certification in order to block an ANDA applicant's generic drug from entering the market for up to 30 months. This period of delay can be repeated each time a new patent is listed in the Orange Book as claiming the branded drug.

67.     In what has become a widespread abusive and unfair business practice, the drug patent holders whose drugs have significant sales and no AB-rated generic equivalent have routinely exploited this option in bad faith by (a) improperly obtaining and ultimately listing in the Orange Book numerous patents of little merit but with expiration dates long after the expiration date of the patent for the active ingredient, and (b) initiating patent infringement suits within the 45-day window against virtually every ANDA filer, irrespective of the merits of the suits and without significant risk of any meaningful penalty (when weighed against the rewards of perpetuating their monopolies) for a wrongful assertion. These later listed patents are known in the drug industry as "add-ons." Often, as is the case here, the meritless "add-on" patents are first listed on the eve of an anticipated ANDA application, and many of the ensuing patent lawsuits are brought with no reasonable basis or belief that the drug patent holder will succeed on the merits, but rather solely to delay generic competition and prolong the pioneer drug patent holder's monopoly. In most such cases, the branded drug manufacturer calculates that the generic company lacks the financial resources to match the branded drug manufacturer's litigation efforts or the ability to survive an adverse judgment. In virtually every case, regardless of the merits, these practices result in the brand manufacturer extending its monopoly for at least 30 months. The results of this form of bad faith procedural gamesmanship are that end payers are denied generic choice and the consequent ability to pay less for drug formulations, long after the basic active drug ingredient patents have expired. Abbott acted in exactly this manner to prolong their Hytrin monopoly.

68.     Defendant Geneva understood the risk of a brand name drug manufacturer taking advantage of these rules when it wrote the FDA a letter on October 5, 1995 concerning Abbott's listing of patents as claiming Hytrin:

> Re: Terazosin Tablets Irrelevant Patent Information Submitted . . .
>
> If an NDA holder lists irrelevant patents in the Orange Book, there is great potential for the NDA holder to abuse the process and improperly attempt to extend their monopoly on the drug product beyond the expiration of their legitimate patent rights. For example, as the expiration of relevant patents, which legitimately prevent competition, approaches, an unscrupulous NDA holder could attempt to prevent generic competition by listing an irrelevant patent and then filing a meritless lawsuit; not to defend their legitimate patent rights, but to illegally attempt to prevent competition.

Letter from Beth Brannan, Geneva's Director of Drug Regulatory Affairs, to FDA Center For Drug Evaluation and Research.  GN_FTC0404133.

### D.     The First ANDA Filer's 180-Day Head Start Over Other Generics

69.     The first ANDA applicant that submits a Paragraph IV Certification as to a particular patent may receive the benefit of a 180-day period of generic marketing exclusivity.  The 180-day period begins either upon commercial marketing of the generic drug or upon a court decision on the issue of non-infringement or invalidity in the patent infringement suit, whichever occurs first.  Thus, the first generic ANDA applicant has the opportunity to compete directly with the pioneer drug owner for 180 days without competition from other generic producers. 21 U.S.C. § 355(j)(4)(B)(iv).

## VII.    ALLEGATIONS COMMON TO ALL COMPLAINTS – THE ECONOMIC MODEL OF PRESCRIPTION DRUG PURCHASES AND SALES

70.     A prescription drug is typically sold in capsule or tablet form through a distribution chain of manufacturers to wholesalers to retail pharmacies which deliver the product to an end payer.  The drug passes in unaltered form through the chain from manufacturer to user.  The price paid by end payers is directly and inextricably intertwined with the wholesale prices charged by drug

manufacturers, as the end payers are the source of drug manufacturers' revenues and the targets of drug manufacturers' marketing actions, including illegal and inequitable actions such as those described herein. This is the case with Hytrin and its AB-rated generic bioequivalents.

71.   Although a minority of consumers do not have third-party-payer health care benefits, in approximately 80% of the cases the consumer is a dual payer consisting of a health benefits plan member and a third-party payer. According to U.S. Census Bureau statistics for 1998, the estimated population of the Indirect Purchaser States, compared to the total United States population, and percentage of citizens of the Indirect Purchaser States who had third-party payer health benefits are as follows:

| State/District | Population | % of U.S. Population | % of Residents With Third-Party Payer Benefits |
|---|---|---|---|
| Alabama | 4,201,000 | 1.54 | 83.7 |
| California | 33,375,000 | 12.28 | 77.9 |
| District of Columbia | 512,000 | 0.19 | 83.0 |
| Florida | 14,908,000 | 5.49 | 82.5 |
| Illinois | 12,295,000 | 4.52 | 85.0 |
| Kansas | 2,654,000 | 0.98 | 89.7 |
| Maine | 1,266,000 | 0.47 | 87.3 |
| Michigan | 10,041,000 | 3.70 | 86.8 |
| Minnesota | 4,833,000 | 1.78 | 90.7 |
| Mississippi | 2,769,000 | 1.02 | 80.0 |
| Nevada | 1,862,000 | 0.69 | 78.8 |
| New Mexico | 1,829,000 | 0.67 | 88.9 |
| New York | 18,420,000 | 6.78 | 82.7 |
| North Carolina | 7,427,000 | 2.73 | 85.0 |
| North Dakota | 646,000 | 0.02 | 85.8 |
| South Dakota | 733,000 | 0.27 | 85.7 |
| West Virginia | 1,750,000 | 0.67 | 86.8 |
| Wisconsin | 5,129,000 | 1.89 | 88.2 |

72.   The success of the Defendants' conspiracy and unfair acts, practices and methods of illegal monopolization has caused and will continue to cause (until full generic market saturation)

massive monetary damage to virtually all the end payers for Hytrin and its generic bioequivalents dispensed in the United States.

73. Since managed care became prevalent in the United States (which occurred before the start of the damages period alleged herein), a manufacturer of a branded prescription drug typically sells the drug in tablet or capsule form, ready for consumption, to wholesalers and large pharmacies at a discount to the manufacturer's published "Average Wholesale Price" ("AWP"), which is a published price set by the manufacturer and widely available on a current basis from well-known data service providers. Wholesalers in turn typically sell the brand name drug to retail pharmacies at a slightly smaller discount from AWP, thereby achieving a small percentage markup.

74. Virtually all United States pharmacies have dispensing contracts with third-party payer plans or their agents. Pursuant to these contracts, for drugs dispensed to members of third-party payer plans, pharmacies typically charge the two co-payers (the third-party payer and the member, i.e., the patient using the drug) a retail price based on a set percentage of AWP, plus a dispensing fee of $1.00 to $2.50 per prescription. The pharmacies typically collect a co-payment (or deductible) from the members, which typically ranges from $5-35 (with a lower co-payment for generic drugs) and the balance from the third-party payer.

75. After AB-rated bioequivalents of a branded drug become available, third-party payers typically reduce the amount the third-party payer will pay to the pharmacy to a price based on the lower price of the available generic, sometimes called the "Maximum Allowable Cost" ("MAC").

76. Thereafter, the third-party payer's members either accept the lower-priced generic (which generally also reduces the amount of his or her co-payment) or else pay a higher co-payment based upon the difference between the branded drug's retail price minus the third-party payer's MAC-based co-payment.

77.     Pharmacies pay substantially less for AB-rated generics than they pay for the branded equivalent drug and generally receive a higher dispensing fee (typically, approximately $.50-$1.00 more) from the third-party payers for dispensing generics than they receive for dispensing branded drugs.

78.     Some health benefit plan members have a dual-payment relation which, instead of a flat co-payment by the consumer, consists of the member paying a percentage of the prescription cost and the third-party payer paying the balance.

79.     For the minority of consumers without a third-party co-payer, the entire price of prescription drug is paid by such consumers.

## VIII.   ALLEGATIONS COMMON TO ALL COMPLAINTS – TERAZOSIN-BASED PRESCRIPTION DRUGS

### A.     Abbott's Terazosin

80.     Hytrin, a dihydrous (containing two water molecules) form of terazosin, belongs to a group of drugs known as alpha blockers. Alpha blockers are used to treat hypertension. Terazosin also has additional properties that make it well-suited to treat benign prostatic hyperplasia ("BPH") (enlarged prostate). Both hypertension and BPH are chronic conditions that afflict millions of United States citizens. During at least some part of the period between October 1995 and August 1999, Hytrin was the highest-margin product of Abbott's Pharmaceutical Products Division. In the four years from 1995 through 1998, Abbott's total sales of Hytrin were in excess of $1.75 billion.

### B.     Abbott's Terazosin Patents

81.     Abbott holds a number of patents for terazosin formulations. In 1977, the United States Patent and Trademark Office (the "PTO") issued Abbott U.S. Patent No. 4,026,894 (the "'894 Patent"), covering the only active ingredient in Hytrin, the compound terazosin itself ("Form I"). The '894 patent expired on or about May 31, 1994.

82.    In 1978, the PTO issued Abbott U.S. Patent No. 4,112,097 (the "'097 Patent"), covering terazosin in combination with other ingredients, as well as a method of treating hypertension by the administration of terazosin. The '097 patent was set to expire on September 5, 1995, seventeen years from its issuance. However, under the terms of the Uruguay Round Agreements Act (URAA), the terms of patents in force on June 8, 1995 were extended to the greater of seventeen years from issue or twenty years from filing the application. The URAA had the effect of extending the term of the '097 Patent until October 14, 1995.

83.    In 1981, the PTO granted Abbott U.S. Patent No. 4,251,532 (the "'532 Patent"), covering a dihydrate form of terazosin. Since approximately 1987, Abbott has marketed the dihydrate form of terazosin as Hytrin in the United States. The '532 Patent expired on February 17, 2000.

84.    On or about May 18, 1993, the PTO granted Abbott U.S. Patent No. 5,212,176 (the "'176 Patent") covering a form of dihydrous terazosin. This patent was not listed in the FDA's Orange Book until on or about April, 1995, well after 30 days following its issuance, thereby making it an invalid ground on which to initiate a Paragraph IV Certification patent infringement action against a pending ANDA pursuant to 21 U.S.C. § 355(c)(2).

85.    On or about March 15, 1994, the PTO issued Abbott U.S. Patent No. 5,294,615 (the "'615 patent") claiming an anhydrous crystalline polymorph of terazosin known as Form II. Abbott did not submit the '615 Patent for listing in the Orange Book as claiming Hytrin until April 24, 1995, again, well after 30 days following its issuance, thereby making it an invalid ground on which to initiate a Paragraph IV Certification patent infringement action against a pending ANDA pursuant to 21 U.S.C. § 355(c)(2).

86.    On May 2, 1995, the PTO issued Abbott U.S. Patent No. 5,412,095 (the "'095 Patent"), claiming an anhydrous crystalline polymorph of terazosin known as Form III.

87.     On April 2, 1996, the PTO issued Abbott U.S. Patent No. 5,504,207 (the "'207 Patent"), claiming an anhydrous crystalline polymorph of terazosin known as Form IV.

88.     Prior to March, 1995, the '894, '097 and '532 Patents were the only patents claiming applicability to Hytrin that Abbott had submitted to the FDA with its Hytrin NDA for listing in the Orange Book.

### C.     AB-Rated Generic Terazosin

89.     Abbott knew that the availability of low-priced generic versions of terazosin would severely impact its terazosin sales. In July 1997 Abbott estimated that generic competition would take 80.7% of the terazosin market within one year after generic entry. To prevent this drastic reduction in market share for its best-earning drug, Abbott took unfair advantage of the FDA regulations that assume patent owners will act in good faith when listing patents in the Orange Book. Abbott's anticompetitive actions described herein were simple to execute because the FDA accepts at face value the information patent owners supply about their own patents.

90.     Abbott's initial arsenal to protect its terazosin product from competition consisted of the '894, '097 and '532 Patents. If these were the only patents associated with Abbott's terazosin, potential competitors would have faced no patent hurdles to market after October 14, 1995, the date the '097 Patent expired.

91.     To delay the extinction of its cash cow, Abbott began to wrongfully supplement the Orange Book listings with meritless "add-on" patents that Abbott knew would not be infringed by the forms of terazosin for which its generic competition was seeking FDA approval.

92.     On January 12, 1993, Geneva filed the first ANDA with the FDA for a generic version of terazosin in tablet form. At the time Geneva filed its tablet ANDA, Abbott had listed three patents in the Orange Book as claiming Hytrin, the '894, '097 and '532 Patents.

93.     Geneva made a Paragraph IV certification as to the '532 patent claiming that there was no infringement of the '532 Patent because its ANDA was for an anhydrous form of terazosin, not the dihydrous form covered by the '532 Patent that was to expire in February, 2000.[2]

94.     Geneva made a Paragraph III certification as to the '894 and '097 Patents indicating that it would wait until the '894 and '097 Patents had expired before marketing its generic.

95.     On December 22, 1993, Novopharm, Ltd., a generic drug manufacturer, filed an ANDA with the FDA seeking approval for a generic version of terazosin in tablet form.  Novopharm made a Paragraph IV certification as to the '532 Patent and a Paragraph III certification as to the '097 Patent.

96.     Zenith filed an ANDA application for terazosin tablets in June, 1994.  Zenith made Paragraph III certifications as to the '097 and '894 Patents and a Paragraph IV certification as to the '532 Patent.  Abbott did not sue Zenith based on the '532 Patent.

97.     On April 8, 1995, Invamed, a generic drug manufacturer, filed an ANDA with the FDA seeking approval for a generic version of terazosin in tablet form.

98.     On or about May 3, 1995, Lemmon Corporation, a generic drug manufacturer, filed an ANDA with the FDA seeking approval for a generic version of terazosin in tablet form.

**IX.     ALLEGATIONS COMMON TO ALL COMPLAINTS –
DEFENDANTS ENGAGE IN ANTICOMPETITIVE ACTIVITIES, UNFAIR TRADE
PRACTICES, AND OTHER INEQUITABLE ACTS TO PREVENT COMPETITION
IN THE MARKET FOR HYTRIN AND ITS BIOEQUIVALENT GENERICS**

**A.     Abbott's Unlawful Extension of Its Terazosin Monopoly By
Misusing The '615 Patent, By Engaging In Baseless Litigation
And By Ignoring FDA Regulations**

---

[2] Abbott sued Geneva in February, 1993 based on its Paragraph IV certification of the '532 Patent because the terazosin Geneva provided Abbott as part of the Paragraph IV certification was a dihydrous version of terazosin and not an anhydrous version as Geneva had asserted in its Paragraph IV certification. The suit was dismissed in November, 1993 when Geneva agreed to submit a corrected anhydrous version.

99.     After Geneva settled the '532 Patent litigation with Abbott in November of 1993, there were no patents impeding the launch of another terazosin product once the '097 Patent expired on September 5, 1995, later extended to October 14, 1995 by the URAA.  After the settlement of the '532 Patent litigation, the only requirements that needed to be met before generic terazosin could be sold were a showing that the generic was bioequivalent (i.e., that the generic version delivers the same amount of active ingredient into a patient's bloodstream in the same amount of time as Abbott's terazosin product) (21 U.S.C. § 355(j)(2)(A)) and the approval of the labeling and manufacturing process.

100.    Without a patent to prevent competition after September 5, 1995, later extended to October 14, 1995, Abbott began implementing its meritless "add-on" patent strategy for the purpose of preventing competition from other terazosin products.

**B.      Abbott's Misuse of the '615 Patent**

101.    The first patent Abbott utilized as part of its meritless "add-on"patent strategy was the '615 Patent.  Abbott did not apply for the '615 Patent until April 29, 1993, despite having allegedly discovered the crystalline version of terazosin (Form II) that was the subject of the '615 Patent in 1991.  Abbott's filing occurred approximately three months after Geneva's ANDA was filed in January, 1993.  Abbott had not even considered filing the patent application that resulted in the issuance of the '615 Patent until after Geneva filed its ANDA.  The '615 Patent was issued March 15, 1994.  Abbott did not list the '615 Patent in the Orange Book until April 24, 1995.

102.    Abbott had thirty days from issuance of the '615 Patent to list it with the FDA in the Orange Book as claiming Abbott's terazosin:

> [I]f the holder of an approved application could not file patent information under [§ 355(b)] because no patent had been issued when an application was filed or approved, **the holder shall file such information under this subsection not later than thirty days after**

**the date the patent involved is issued**. Upon submission of patent information under this subsection, the Secretary shall publish it.

21 U.S.C. § 355(c)(2) (emphasis added).  FDA regulations specifically do not require an ANDA applicant to amend its ANDA to include a certification for the late-listed patent.  21 C.F.R. § 314.94(a)(12)(vi)(1995).

103.    In establishing a 30-day listing period, the FDA rejected the alternative of granting branded drug manufacturers the option to list patents at any time, fearing that patent holders would manipulate the filing system in a way that would delay the approval of otherwise approvable ANDAs. Abbott Laboratories v. Zenith Laboratories, Inc., 934 F. Supp. 925, 935 (N.D. Ill.1995).

104.    Abbott did not amend its NDA by making a timely filing of the '615 Patent with the FDA as required by 21 U.S.C. § 355(c)(2).  To validly amend its NDA, Abbott was required to have the '615 Patent listed in the Orange Book on or before May 14, 1994.

105.    Abbott's delayed listing of the '615 Patent in the Orange Book was improper in any event because the '615 Patent did not claim Abbott's terazosin product.

106.    In fact, the same day Abbott submitted the '615 Patent to the FDA for listing in the Orange Book, Abbott filed a brief with the Court of Appeals for the Federal Circuit stating that "[b]ecause the '615 Patent does not claim the form of the drug used in Abbott's HYTRIN® product, and Abbott did not market the anhydrous form of terazosin covered by the '615 Patent, Abbott did not list the '615 Patent in the Orange Book." Abbott's Motion for Expedited Review and for Order Preserving the Status Quo Pending Appeal at p. 12.

107.    FDA regulations are clear that patent information can be submitted for listing in the Orange Book only if the patents claim the approved drug product, the drug substance used in that approved product, or methods of use of that drug substance and drug product.  21 C.F.R.

§ 314.53(b). The '615 Patent claims an anhydrous form of terazosin while Hytrin is a dihydrous version.

108.    Nonetheless, Abbott sued Geneva on September 15, 1994 in the Northern District of Illinois (94 C 5634) and Zenith on November 14, 1994 in the same District for infringement of the '615 Patent (94 C 6792). Abbott knew that these were baseless claims for three reasons: (1) the '615 Patent had not yet been listed in the Orange Book as claiming Abbott's terazosin and it was too late to do so, (2) the '615 Patent did not claim Abbott's product or a method of using it, and (3) neither Abbott or any generic manufacturer was marketing a terazosin product at the time Abbott initiated the suits.

109.    Abbott's baseless '615 Patent infringement suit against Zenith was promptly dismissed by the Court on March 15, 1995 for failure to state a claim. The '615 Patent infringement suit against Geneva was dismissed on July 17, 1995 when Geneva represented on June 16, 1995 that Geneva would not seek approval for a generic version of terazosin in the anhydrous crystalline form (Form II) represented by the '615 Patent, but rather in another anhydrous crystalline polymorph form outside the scope of the '615 Patent. Rather than be delayed 30 months, Novopharm decided to switch the form of their anhydrous terazosin from Form II ('615 Patent) to Form IV.

110.    Abbott, having decided that the '615 Patent should be now listed in the Orange Book as claiming Hytrin, sued Zenith again in the Northern District of Illinois on June 6, 1995 for infringement of the '615 Patent (95 C 3328). This time Abbott had the '615 Patent listed in the Orange Book before suing. Abbott's second '615 Patent suit against Zenith was, like its earlier '615 Patent action against Zenith, dismissed for failure to state a claim because the '615 Patent had not been timely listed. Abbott Laboratories v. Zenith Laboratories, Inc., 934 F. Supp. 925 (N.D. Ill. Sept. 28, 1995). The court recognized that Abbott's '615 Patent listing was nearly a year too late. See 21 U.S.C. § 355(c)(2).

111.    Despite the court's ruling, Abbott continued to delay generic competition through the misuse of the '615 Patent.  On November 17, 1995, although at least all three of Abbott's '615 infringement suits had been dismissed, Abbott rejected Geneva's challenge pursuant to 21 CFR § 314.53(f) to remove Abbott's listing of the '615 Patent (as well as the '095 and '176 Patents) as claiming Abbott's terazosin.  Abbott rejected the challenge on November 17, 1995, simply stating:

> [I]f Abbott does not agree with the challenges, does not agree to withdraw or amend the patent information for the '095, '615, and '176 patents, and hereby reaffirms that the patent information in the Orange Book for those patents is relevant and correct.  Consequently, pursuant to 21 CFR § 314.53(f) the [FDA] cannot change the patent information submitted by Abbott, and Geneva's application for an ANDA "must, despite any disagreement as to the correctness of the patent information, contain an appropriate certification for each listed patent."

Letter from Marilou Reed, Abbott's Associate Director, Regulatory Affairs to George R. Scott, Center for Drug Evaluation and Research, FDA.

112.    Abbott continued to abuse the '615 Patent by suing generic manufacturers for infringement pursuant to the generics' Paragraph IV certifications for their capsule ANDAs.

C.    **Abbott's Misuse of the '097 Patent**

113.    Several ANDA applicants, including Geneva and Zenith, had made Paragraph III certifications for Abbott's '097 Patent.  As a result, any FDA approval of their ANDAs could not occur until the expiration of the '097 Patent on September 5, 1995, later extended to October 14, 1995 by the URAA.

114.    On or about July 6, 1995 Abbott submitted to the FDA a new expiration date for the '097 Patent.  Abbott's submission to the FDA represented that the '097 Patent had been extended pursuant to the URAA until January 21, 1997.  This representation was knowingly false, and was designed by Abbott to further delay generic terazosin competition.

115.    The FDA, as it was required to do, revised the listed expiration date for the '097 Patent in the Orange Book from September 5, 1995 to January 21, 1997. The FDA instructed all ANDA applicants to amend their ANDAs to respond to the extended patent expiration dates.

116.    Geneva amended its ANDA on October 5, 1995 by filing a Paragraph IV certification for the '097 Patent. Abbott sued Geneva on November 16, 1995 in the Northern District of Illinois for infringement of the '097 Patent (95 CV 6657).[3]

117.    On March 15, 1996, the court ruled that Abbott's '097 Patent had expired on October 14, 1995. Notwithstanding this ruling, Abbott did not correct its fraudulent listing in the Orange Book. Generic competitors had to get an order from the court forcing Abbott to correct the expiration date. On April 9, 1996, the court amended its judgment by ordering Abbott to delist the expired '097 Patent from the Orange Book. Abbott appealed both rulings and, on January 14, 1997, the United States Court of Appeals for the Federal Circuit affirmed the district court rulings in all respects. Abbott Labs v. Novopharm, Ltd., 104 F.3d 1305 (Fed. Cir. 1997).[4]

**D.     Abbott's Misuse of the '207 Patent**

118.    Abbott's '207 Patent application was filed by Abbott on or about October 18, 1994 and issued on April 2, 1996. The '207 Patent covered another anhydrous crystalline polymorph form of terazosin (Form IV).

119.    Facing the certainty of being forced to delist the '097 Patent from the Orange Book and the possibility that there would be no patent listed in the Orange Book with which Abbott could block approval of a tablet terazosin ANDA, Abbott immediately upon the issue of the '207 Patent,

---

[3] Abbott also sued other ANDA applicants based on its extension of the '097 Patent: Warner Lambert on January 26, 1996 and Novopharm on February 1, 1996.

[4] Abbott's '097 Patent suit against Geneva had been consolidated with the similar action filed by Abbott against Novopharm.

submitted the '207 Patent to the FDA for listing in the Orange Book. Like the '615, '176, and '095 Patents, the '207 Patent was another "add-on" patent which did not claim the form of the drug used in Hytrin, nor did Abbott market the anhydrous form of terazosin covered by the '207 Patent.

120.    In addition, the '207 Patent should never have been issued to Abbott because the form of anhydrous terazosin represented by the '207 Patent was publicly sold in the United States in 1989-90 and in 1991 and was thus in the public domain when Abbott filed its application in October 1994. Abbott knew or should have known its '207 Patent was invalid under the "on sale bar" rule of patent law, because Abbott conducted its own tests in 1995 of lots of the allegedly infringing terazosin which Geneva had purchased in 1990 and 1991 and found that it was the same form as claimed by Abbott in the '207 Patent.

121.    As a result of the listing of the '207 Patent in the Orange Book, terazosin ANDA applicants such as Geneva were forced to amend their tablet and capsule[5] ANDAs to include a Paragraph IV Certification stating that their tablet and capsule generic terazosin products did not infringe the '207 Patent. On April 29, 1996, Geneva sent notification to Abbott of its Paragraph IV certification for both its tablet and capsule ANDAs. Novopharm made its '207 Patent Paragraph IV certification on August 7, 1996.

122.    On June 4, 1996 Abbott sued Geneva in the Northern District of Illinois claiming that Geneva's tablet ANDA infringed the '207 Patent (96 c 3331). Zenith, rather than amend its ANDA to include a certification for the '207 Patent, sued Abbott in the District of New Jersey to force Abbott to, among other things, de-list the '207 Patent from the Orange Book. Abbott, by mistake

---

[5] Geneva submitted an ANDA for terazosin capsules in December 1995, as did other generic manufacturers after Geneva, as Abbott began marketing a capsule version of Hytrin in February 1995.

it claims, did not sue Geneva for infringement based on Geneva's capsule Paragraph IV certification for the '207 Patent.

123.    On September 1, 1998, the court in the Geneva action held that the '207 Patent was invalid due to application of the "on sale bar" rule of patent law.  Abbott appealed this decision to the United States Court of Appeals for the Federal Circuit.  The Federal Circuit upheld the decision of the district court on July 1, 1999, holding that "significant quantities of Form IV terazosin were publicly sold in the United States in 1989-90 and in 1991 and were thus in the public domain when Abbott filed its application in October 1994."  On January 10, 2000, the United States Supreme Court denied Abbott's writ of certiorari.  In sum, Abbott filed a knowingly false submission with the FDA to list the '207 Patent in the Orange Book for its terazosin and a knowingly baseless patent infringement case against Geneva and other terazosin ANDA applicants based on the invalid '207 Patent.  Abbott benefitted from these anticompetitive acts because they further delayed the FDA's approval of terazosin ANDAs (which was Abbott's sole intention) and thereby delayed introduction of competition in the terazosin market.

**E.    The '095 Patent**

124.    The '095 Patent, issued to Abbott on May 2, 1995 and on May 8, 1995 submitted by Abbott to the FDA for listing in the Orange Book as claiming Hytrin, was another crystalline polymorph version of anhydrous terazosin (Form III).  ANDA applicants had to certify that their ANDAs did not infringe the '095 Patent.  While Abbott listed the '095 Patent within the required thirty days, the '095 Patent should not have been listed in the Orange Book.  The '095 Patent, like the '615 and the '176 Patents (and the later-issued and -listed '207 Patent), does not cover Abbott's terazosin or a method of using it.

125.    Because Abbott had the '095 Patent listed in the Orange Book, the FDA required all ANDAs applicants to amend their ANDA to include a certification for the '095 Patent.  Geneva

1418 / CMP / 00058264.WPD v1
**FILED UNDER SEAL**                                     32

submitted a Paragraph IV certification rightly indicating that its ANDA did not infringe the '095 Patent. Abbott then sued Geneva for infringement of the '095 Patent as the second claim in Abbott's November 16, 1995 suit (95 C 6657) against Geneva. Abbott also sued other generic manufacturers that had made Paragraph IV certifications as to the '095 Patent.

126.    Abbott's '095 Patent infringement suit against Geneva was dismissed by agreement on February 16, 1996.

### F.    The Abbott-Zenith Agreement

127.    With a final decision imminent in the action Zenith brought against Abbott to delist the '207 Patent, Abbott and Zenith reached an agreement (the "Abbott-Zenith Agreement"). Under the Abbott-Zenith Agreement, Abbott began in April 1998 making payments totaling $6 million per quarter to Zenith in return for Zenith's agreement not to manufacture and sell terazosin until the expiration of the '532 Patent on February 17, 2000 (or earlier if a generic was sold by someone other than Zenith). The Abbott-Zenith Agreement also contained Zenith's agreement to recognize all of Abbott's terazosin patents including the two patents ('095 and '207) that Zenith had attempted to delist. Zenith had never before been sued by Abbott based on infringement of the '532 Patent, and Zenith's ANDA was for an anhydrous form of terazosin, not the dihydrous form represented by the '532 Patent. The main purpose and effect of the Zenith-Abbott agreement was to allocate the market for terazosin 100% to Abbott, while paying Zenith not to market its product.

128.    Zenith had the potential to bring a new terazosin product to market before Geneva. Other manufacturers' terazosin certifications put them behind Geneva. To avoid the strong possibility of Zenith winning its delisting claim and thereby marketing its tablet form of terazosin ahead of Geneva as the law allowed at the time, Abbott paid Zenith to get back in line behind Geneva.

### G.    The Abbott-Geneva Agreement

129.    As Abbott did not sue Geneva for infringement of the '207 Patent by its capsule
ANDA, Geneva pushed ahead with plans to market its generic terazosin capsule product as soon as
it received final FDA approval.  In anticipation of final approval Geneva: (1) instructed its supplier
to manufacture commercial quantities of terazosin, (2) contacted customers to inform them of an
impending launch, (3) entered into distribution contracts with customers, (4) prepared papers to
oppose any effort by Abbott to block Geneva's entry, and (5) worked to validate with the FDA the
process for manufacturing its terazosin capsules.

130.    The FDA granted Geneva final approval to market terazosin capsules on March 30,
1998.  In addition, the FDA had determined Geneva was entitled to the 180-day exclusivity period
pursuant to the Hatch-Waxman Act.  The 180-day exclusivity period would not be triggered until
Geneva began marketing its terazosin capsules.  In addition, Abbott had sued for infringement all
the other generic manufacturers that had amended their terazosin capsule ANDAs by making
Paragraph IV certifications for the '207 Patent, and therefore they were subject to the 30-month
Hatch-Waxman period as well as Geneva's 180-day exclusivity period.

131.    Geneva, less than three years before in or about November 1995, faced a nearly
identical situation with the drug Captopril.  Bristol-Myers Squibb Co. ("Bristol-Myers"), the
manufacturer of the brand name drug Captopril, mistakenly did not sue Geneva for infringement
pursuant to a Paragraph IV certification by Geneva.  As a result Geneva launched its generic version
of Captopril upon final approval from the FDA.  However, soon after launching, Bristol-Myers
received a temporary restraining order and within a few days of launching Geneva and Bristol-
Myers agreed to a settlement similar to the Abbott-Geneva agreement.  Bristol-Myers agreed to pay
Geneva $20 million to not market its generic version of Captopril until the patent expired early in
1996.

132.    On March 30, 1998, the very day Geneva was granted FDA approval to market its generic terazosin capsules, Geneva contacted Abbott and announced that it would launch its generic terazosin capsules unless it was paid by Abbott not to enter the market.

133.    From Abbott's perspective, a launch of Geneva's terazosin capsule product would have had a significant adverse impact on Abbott's financial performance. Abbott had forecasted that entry of another terazosin product on April 1, 1998 would have eliminated over $185 million in Abbott's terazosin sales in just six months. Because its terazosin sales were highly profitable, Abbott sought to keep from the market Geneva's generic terazosin capsule and all other potential generic terazosin competition, until at least February 2000.

134.    Over the course of two days, representatives of Abbott and Geneva negotiated the framework for an agreement, whereby Abbott would pay Geneva not to enter the terazosin market.

135.    On April 1, 1998, Abbott and Geneva entered into a written agreement (the "Abbott-Geneva Agreement"), pursuant to which Geneva agreed not to enter the terazosin market until the earlier of: (1) the final resolution of the patent infringement litigation involving Geneva's terazosin tablet ANDA, including review through the Supreme Court; or (2) the entry of another terazosin product. Geneva also agreed – at Abbott's insistence – not to transfer, assign, or relinquish its right to a 180-day exclusivity period for either tablets or capsules.

136.    In exchange, Abbott agreed to pay Geneva $4.5 million per month in non-refundable payments until a district court judgment in the parties' tablet patent infringement litigation. Abbott and Geneva agreed that if the district court declared that Geneva's tablet product did not or would not infringe any valid and enforceable claim of the '207 Patent, Abbott would thereafter pay the $4.5 million monthly payments into an escrow fund until the final resolution of the litigation. Under the Abbott-Geneva Agreement, the party prevailing in the tablet litigation would receive the money in

the escrow fund. The district court hearing the tablet patent litigation was not made aware of the Abbott-Geneva Agreement.

137.   In the words of Geneva's CEO at the time the Abbott-Geneva Agreement was signed, the agreement represented to Geneva the "best of all worlds," because Geneva obtained a risk-free "monetary settlement on an ongoing basis until the litigation was resolved" and still could market its product exclusively for 180 days after the litigation was over.

138.   In accordance with the terms of the Abbott-Geneva Agreement, in April 1998, Geneva refrained from entering the terazosin market with its capsules, and instead began receiving monthly payments of $4.5 million from Abbott.

139.   On September 1, 1998, the United States District Court for the Northern District of Illinois granted Geneva's motion for summary judgment in the tablet patent litigation with Abbott, invalidating Abbott's patent under the on-sale provision of 35 U.S.C. § 102(b). The district court's decision invalidating Abbott's patent only strengthened Geneva's litigation position. Nonetheless, Geneva, in accordance with the terms of the Abbott-Geneva Agreement, did not enter the terazosin market even after the 30-month Hatch-Waxman period expired on its tablet ANDA and the subsequent FDA final approval to market as a result.

140.   Geneva's refusal to market or license its generic terazosin tablets after receiving final approval from the FDA on December 31, 1998 had the effect of preventing any other generic terazosin tablet manufacturer from marketing their product.

141.   On July 1, 1999, the United States Court of Appeals for the Federal Circuit affirmed the summary judgment in favor of Geneva. Under the Abbott-Geneva Agreement, Geneva still could not enter the terazosin market until after the Supreme Court either denied Abbott's petition for certiorari or disposed of the patent infringement litigation. Nonetheless, after at least five months of investigation by the Federal Trade Commission ("FTC"), Abbott and Geneva canceled

their agreement, and on August 13, 1999, Geneva finally began marketing its terazosin capsules. The Supreme Court denied certiorari on January 10, 2000.

142.    The purpose and effect of the Abbott-Geneva Agreement was to ensure that Geneva would not take any steps, including transferring its right to a 180-day exclusivity period, to permit or facilitate the entry of competitors into the terazosin market.  As of February 1999, at least one other terazosin manufacturer had satisfied the FDA's requirements for approval but was barred from entering the market because Geneva's 180-day exclusivity period had not begun to run.

143.    Abbott took full advantage of the delay in competition caused by the Abbott-Geneva Agreement.  In the nine months following the agreement, Abbott raised the AWP for its terazosin capsules by 11.8%.

144.    In contrast, Geneva initially sold its terazosin capsules at an AWP 46% lower than Abbott's AWP.  The subsequent entry of Mylan's terazosin capsule in February 2000 caused the generic AWP to drop even further in some cases, to less than 16% of Abbott's AWP by April 2000.

## H.    **FTC Action**

145.    On March 16, 2000, the FTC announced that it had settled complaints against Abbott and Geneva related to the Abbott-Geneva Agreement.  The settlement provided that neither Abbott nor Geneva would enter into an agreement in which a generic company with a first-filed ANDA agrees with a manufacturer of a branded drug that the generic company will not (1) give up or transfer its exclusivity, or (2) bring a non-infringing drug to market.  In addition, agreements involving payments to a generic company to stay off the market would have to be approved by the court when undertaken during the pendency of patent litigation, and when such agreements are reached in situations other than patent litigation, the companies would have to give the FTC 30 days notice before entering into such an agreement.  The settlement also required Geneva to waive its 180-day exclusivity it held for terazosin tablets effective March 23, 2000.  This allowed subsequent

tablet ANDA filers to get final approval from the FDA since Geneva had not marketed terazosin tablets and therefore blocked entry of other generic terazosin tablets by not exhausting its 180 days of exclusivity.

## X.    ALLEGATIONS COMMON TO ALL COMPLAINTS – RELEVANT PRODUCT MARKET

146.    At all material times, the relevant product market is the manufacture and sale of terazosin-based prescription drugs.

147.    At all material times, the relevant geographic market is the United States.

148.    At all material times, before Geneva's entry on August 13, 1999, Abbott's share of the relevant market was 100%.

## XI.    ALLEGATIONS COMMON TO ALL COMPLAINTS – ANTICOMPETITIVE AND INEQUITABLE EFFECTS

149.    The acts and practices of Abbott, Geneva and Zenith, as herein alleged, have had the purpose and effect of restraining competition unreasonably and injuring competition by preventing the entry of competitive products into the terazosin market.  Abbott's exclusionary conduct, including its conspiracy with Defendants Zenith and Geneva, unlawfully protected its terazosin product from competition since October 1995. But for Abbott's illegal conduct, a competitor would have begun marketing terazosin in October 1995, at which time end-payers would have been free to substitute a lower-priced generic for the higher-priced brand name drug, and Abbott would have been forced to reduce its prices to a level closer to those of its competitors.  By preventing competitors from entering the market, Defendants have deprived Plaintiffs and the other end-payers of the benefits of the competition that the federal and state antitrust laws were designed to preserve.

150.    Earlier entry of an AB-rated generic terazosin product would have had a significant impact on the cost of terazosin.  Pharmacists generally are permitted, and in some instances required, to substitute generic drugs for their branded counterparts, unless the prescribing physician

has directed that the branded product be dispensed. In addition, there is a ready market for generic products because certain third-party payers of prescription drugs (e.g., managed care plans) encourage or insist on the use of generic drugs wherever possible. A generic product can quickly and efficiently enter the marketplace at substantial discounts, generally leading to a significant erosion of the branded drug's sales within the first year. For example, Abbott's forecasts projected that competitors' terazosin would capture roughly 70% of Abbott's sales within the first six months. Abbott's forecasts were almost right on target.

151.    Since Geneva's launch of a terazosin product in August 1999, generic terazosin has achieved significant market penetration. For example, within four months of Geneva's entry, generic terazosin accounted for 70% of the retail pharmacy chain Albertson's Inc.'s terazosin sales. Another large retail pharmacy chain, Walgreens, reached the 70% level within ten months. Abbott's share of the terazosin market is expected to further erode due to the entry of competitive products.

152.    Abbott's actions as alleged above were willful, and served to unlawfully extend Abbott's monopoly over the market for Hytrin and its generic bioequivalents in the Indirect Purchaser States and the United States.

153.    Plaintiffs and the Class members are the sole victims and targets of Defendants' conduct.

## XII.    **CLAIMS AND PRAYERS FOR RELIEF FOR EACH ACTION**

### A.    **ALABAMA CLASS**

***Blue Cross and Blue Shield of Alabama, etc. v. Abbott Laboratories, et al.***
Case No. 00-1303-CIV (S.D.Fla.)

***Willie O'Neal v. Abbott Laboratories, et al.***, Case No. 00-J-1504-S (N.D. Ala.)

## FIRST CLAIM FOR RELIEF

## (Restitution/Disgorgement for Unjust Enrichment/Assumpsit/Money Had and Received)

## (Against All Defendants)

154.    Alabama Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott has benefitted from the overcharges it has been able to levy for Hytrin, resulting from acts alleged in this Complaint, and resulting in overpayments by Plaintiffs and the Class for Hytrin.

b.      Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derived from Plaintiffs' and the Class' overpayments for Hytrin.

c.      Plaintiffs and the Class have conferred upon Defendants an economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiffs and the Class, as Plaintiffs and the Class paid these anticompetitive sums to Defendants during the Class Period, when Defendants used anticompetitive measures to block generic entry into the market.

f.      It would be inequitable for Zenith or Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreements.

g.      It would be inequitable for Abbott to be permitted to retain any of the Plaintiffs' and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements and the acts alleged herein, designed to prevent introduction of generic bioequivalents to Hytrin into the market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.      granting Plaintiffs and the Class relief in the nature of restitution or disgorgement of Defendants' unjust enrichment;

B.      granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

C.      granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

**B.      CALIFORNIA CLASS**

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.) (JBZ)

***Victor Scafani v. Abbott Laboratories, et al.***
Case No. C 00-00508 SBA (N.D. Cal.)

***William Mednick v. Abbott Laboratories, et al.***
Case No. 2:00-3468 (C.D. Cal.)

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva Agreements Each Amount To a *Per Se* Violation Under Section 16720 of California's Business and Professions Code (California's Cartwright Act)

### (Against All Defendants)

155.    California Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    California's Cartwright Act, § 16720, provides:

Trust Defined

A trust is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

(a)    To create or carry out restrictions in trade or commerce.

(b)    To limit or reduce the production, or increase the price of merchandise or of any commodity.

(c)    To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

\*    \*    \*

(e)    To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any combination of the following:

\*    \*    \*

(f)    Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

b.    Section 16722 of the Cartwright Act further provides:

Any contract or agreement in violation of this chapter is absolutely void and is not enforceable at law or in equity.

c.    Section 16726 of the Cartwright Act further provides:

Except as provided in this chapter, every trust is unlawful, against public policy and void.

d.    Section 16750(a) of the Cartwright Act also provides:

Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction . . . and to recover three times the damages sustained by him or her, interest on his or her actual damages pursuant to Section 16761, and preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by the courts generally under the laws of this state and the rules governing these proceedings, and shall be awarded a reasonable attorneys' fee together with the costs of the suit.

e.    The Abbott-Zenith and Abbott-Geneva Agreements each constitute a "trust" as an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade. Such an allocation is a classic example of a trust as defined as a "combination of capital, skills or acts by two or more persons for . . . [the purpose of] (a) . . . creat[ing] or carry[ing] out restrictions in trade or commerce; (b) . . . limit[ing] [and] reduc[ing] the production . . . or increase the price of merchandise or of any commodity; (c) . . . prevent[ing] competition in manufacturing, making, . . . sale . . . of merchandise [and] any commodity" which is per se prohibited under The Cartwright Act §§ 16720(a), (b) & (c) as "unlawful, against public policy and void" pursuant to § 16726. The Abbott-Zenith and Abbott-Geneva Agreements are each also a "trust" as Abbott and each of Defendants Zenith and Geneva "ma[de][,] enter[ed] into [and] execute[d] [and] carr[ied] out . . . [in] which [they] . . . (4) agree[d] to pool, combine[d] [and] directly [and] indirectly unite[d] any interests that they [had] connected with the sale . . . of any such article or commodity, that its price might in any manner be affected" in violation of The Cartwright Act § 16720 (e)(4).

f.      Plaintiffs and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are per se violations of The Cartwright Act §§ 16720(a), (b), (c) & (e)(4).

**SECOND CLAIM FOR RELIEF**

**(Action For Damages Under Section 16750(a) of The Cartwright Act)**

**(Against All Defendants)**

156.    California Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in California, Abbott first monopolized, and then later combined with Zenith and Geneva in the form of a trust and a conspiracy, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and has thereby succeeded in restraining trade in California for Hytrin and its generic equivalents.

b.      The foregoing conduct violates the Cartwright Act § 16720.  Plaintiffs and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations.

c.      Under the Cartwright Act § 16750(a), Plaintiffs and the Class are entitled to have the Abbott-Zenith and Abbott-Geneva Agreements declared void and are also entitled to three times the damages sustained by them, interest thereon, and reasonable attorneys' fees and costs of the suit.

## THIRD CLAIM FOR RELIEF

### (Action For Damages Under Section 17200 of The Business and Professions Code)

### (Against Abbott)

157.    California Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiffs and the Class for terazosin remained supra-competitive.

b.    Under the California Business and Professions Code § 17200 et seq., Defendants' conduct alleged herein is unfair, fraudulent, and would violate 15 U.S.C. § 2.  Plaintiffs and the Class, therefore, seek an order of the Court requiring Abbott to disgorge its gains therefrom and award Plaintiffs and the Class full restitution of all monies obtained as a result of the effects of the prosecution and continuation of its baseless litigation against its prospective horizontal competitors.  Plaintiffs and the Class also seek interest on these disgorged and restituted funds, and attorneys' fees pursuant to, inter alia, § 1021.5 of the California Code of Civil Procedure.

## FOURTH CLAIM FOR RELIEF

**(Action For Disgorgement to Class Members of All Monies Obtained By
Defendants As A Result of Defendants' Acts of Unfair Competition Under
B&P Code §§ 17203 and 17204 and Abbott's Illegal and Inequitable Acts
Designed to Prolong Abbott's Monopoly Over Hytrin and its Generic Bioequivalents)**

### (Against Abbott)

158.    California Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint, except the class action allegations with the same force and effect as if fully set forth herein.

a.    Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiffs and the Class for terazosin remained supra-competitive.

b.    Plaintiffs and the citizens of California have been and will continue to be injured directly and purposely in their money and property by Abbott's illegally secured monopoly over Hytrin and its generic bioequivalents by the absence of any competition in this market.

c.    Pursuant to B&P Code §§ 17203 and 17204, Plaintiffs and the Class seek an order of this Court requiring Abbott to disgorge all ill-gotten gains and awarding Plaintiffs and the Class full restitution of all monies obtained as a result of the effects of Abbott's prosecution and continuation of its baseless and ill-motivated litigation against its prospective horizontal competitors, on grounds that such acts violate § 17200 of the B&P Code and California public policy against unfair competition, plus interest and attorneys' fees pursuant to, inter alia, Section 1021.5 of the California Code of Civil Procedure, so as to restore any and all monies to Plaintiffs, the Class, and the general public which were acquired and obtained by means of such conduct by Abbott and which ill-gotten gains are still retained by Abbott.

## FIFTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

159.    California Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiffs and the Class for Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the monies received under the Abbott-Zenith and Abbott-Geneva Agreements. The funds for such payments by Abbott were derived from Plaintiffs' and the Class' overpayment for Hytrin.

c.    Plaintiffs and the Class have conferred upon Defendants an economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate result of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.    The benefit held by Abbott rightfully belongs to Plaintiffs and the Class, as Plaintiffs and the Class paid these anti-competitive sums to Defendants during the Class Period, when Abbott used anti-competitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the monies they received under the Abbott-Zenith or Abbott-Geneva Agreement.

g.   It would be inequitable for Abbott to be permitted to retain any of the Plaintiffs' and the Class' overpayment for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including but not limited to the Abbott-Zenith and Abbott-Geneva Agreements, and the other acts alleged herein regarding efforts to prevent the introduction of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.   declaring that the Abbott-Zenith and Abbott-Geneva Agreements are _per se_ violations of the Cartwright Act §§ 16720(a), (b), (c) and (e)(4);

B.   granting Plaintiffs and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.   awarding Plaintiffs and the Class treble damages, jointly and severally, for Defendants' violations of the Cartwright Act §§ 16720(a), (b), (c) and (e)(4), in an amount to be determined at trial;

D.   requiring the Defendants to disgorge all monies illegally and inequitably acquired, and awarding Plaintiffs and the Class full restitution of all monies wrongfully acquired by Defendants pursuant to §§ 17200 _et seq._;

E.   requiring the Defendants to disgorge to the Class all monies illegally and inequitably acquired pursuant to §§ 17203 and 17204;

F.   granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs, pursuant to, _inter alia_, § 1021.5 of the California Code of Civil Procedure; and

G.   granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

C.      **DISTRICT OF COLUMBIA CLASS**

*Clarence Reid, etc. v. Abbott Laboratories, et al.*
Case No. 00-342 (D.D.C.)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Market Allocation
Agreements Amount To *Per Se* Violations Under
Section 28-4502 of The District of Columbia's Code)**

### (Against All Defendants)

160.    District of Columbia Plaintiffs repeat and reallege each and every prior allegation

contained in this Complaint with the same force and effect as if fully set forth herein.

a.      The District of Columbia Code, § 28-4502 provides:

Every contract, combination in the form of a trust or otherwise, or
conspiracy in restraint of trade or commerce all or any part of which
is within the District of Columbia is declared to be illegal.

b.      The District of Columbia Code, § 28-4503 also provides:

It shall be unlawful for any person to monopolize, attempt to
monopolize, or combine or conspire to monopolize any part of trade
or commerce, all or part of which is within the District of Columbia.

c.      The District of Columbia Code § 28-4508 further provides:

(a)     Any person who is injured in that person's business or property
by reason of anything forbidden by this chapter may bring a civil
action for damages . . . . In such an action, . . . the court shall award
as monetary relief: (1) threefold the total damage sustained by such
person; and (2) as determined by the court, the costs of suit including
reasonable attorney's fees.

*        *        *

(c)     In any class action brought under this section by purchasers or
sellers, the fact of injury and the amount of damages sustained by the
members of the class may be proven on a class-wide basis, without
requiring proof of such matters by each individual member of the
class. The percentage of total damages attributable to a member of
such class shall be the same as the ratio of such member's purchases
or sales of the class as a whole.

d.    The District of Columbia Code § 28-4509(a) further provides:

(a)    Any indirect purchaser in the chain of manufacture, production, or distribution of goods and services, upon proof of payment of all or any part of any overcharge for such goods and services, shall be deemed to be injured within the meaning of this chapter.

e.    The Abbott-Zenith and Abbott-Geneva Agreements are each an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.   Such an allocation is a classic example of a "contract, combination in the form of a trust . . . [and] conspiracy in restraint of trade [and] commerce . . . ." which is per se prohibited under The District of Columbia Code § 28-4502.

f.    Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of The District of Columbia Code § 28-4502.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Section 28-4502 of The District of Columbia Code)

### (Against All Defendants)

161.    District of Columbia Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in the District of Columbia, Abbott first monopolized, and then later combined with Zenith and Geneva in the form of a trust and a conspiracy, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and has thereby succeeded in restraining trade in the District of Columbia for Hytrin and its generic equivalents.

b.    The foregoing conduct violates the District of Columbia Code §§ 28-4502 and 28-4503.

c.    Plaintiffs and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for their injuries caused by these flagrant violations.

## THIRD CLAIM FOR RELIEF

## (Claim for Damages Under Section 28-4503 of The District of Columbia Code)

## (Against Abbott)

162.    District of Columbia Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiffs and the Class for terazosin remained supra-competitive.

b.    The foregoing conduct violates the District of Columbia Code § 28-4503.

c.    Under the District of Columbia Code § 28-4508(a), Plaintiffs and the Class are entitled to three times the damages sustained by them as a result of Abbott's acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

## (Restitution For Unjust Enrichment)

## (Against All Defendants)

163.    District of Columbia Plaintiffs repeat and reallege each and every prior allegation
contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has been able to levy for Hytrin
resulting from acts alleged in this Complaint and the overpayments by Plaintiffs and the Class for
Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this
Complaint to the extent of the monies received under the Abbott-Zenith and Abbott-Geneva
Agreements.  The funds for such payments by Abbott were derived from Plaintiffs' and the Class'
overpayment for Hytrin.

c.    Plaintiffs and the Class have conferred upon Defendants an economic benefit
in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic
detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is
a direct and proximate result of the Defendants' anticompetitive behavior restricting competition
as set forth above.

e.    The benefit held by Abbott rightfully belongs to Plaintiffs and the Class, as
Plaintiffs and the Class paid these anti-competitive sums to Defendants during the Class Period,
when Abbott used anti-competitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of
the monies they received under the Abbott-Zenith or Abbott-Geneva Agreement.

g.    It would be inequitable for Abbott to be permitted to retain any of Plaintiffs'
and the Class' overpayment for Hytrin derived from its unfair and unconscionable methods, acts and
trade practices, including but not limited to the Abbott-Zenith and Abbott-Geneva Agreements, and

the other acts alleged herein regarding efforts to prevent the introduction of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.      declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a <u>per se</u> violation of the District of Columbia Code §§ 28-4502 & 28-4503;

B.      granting Plaintiffs and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.      awarding Plaintiffs and the Class treble damages, jointly and severally, for Defendants' violations of the District of Columbia Code §§ 28-4502 & 28-4503, in an amount to be determined at trial;

D.      granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.      granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

**D.**      **FLORIDA CLASS**

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

***Antonio Lopez-Souto, etc. v. Abbott Laboratories, et al.,***
Case No. 00-342 (D.D.C.)

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Market Allocation Agreements
Amount To *Per Se* Violations Under the Florida Deceptive
and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*)**

## (Against All Defendants)

164.    Florida Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Fla. Stat. § 501.204 provides:

(1)  Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2)   It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).

b.    Fla. Stat. § 501.211(1) provides:

Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

c.    The Abbott-Zenith and Abbott-Geneva Agreements are each an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.   Such an allocation is a classic example of a "contract, combination in the form of a trust . . . [and] conspiracy in restraint of trade [and] commerce . . . ." which is per se prohibited under Fla. Stat. § 501.204.

d.    Plaintiffs and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure, 18 U.S.C. § 2201(a), and Fla. Stat. § 501.211(1), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Fla. Stat. § 501.204.

## SECOND CLAIM FOR RELIEF

## (Action For Damages Under Fla. Stat. Ch. 501.211(2))

## (Against All Defendants)

165.   Florida Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   Fla. Stat. § 501.211(2) provides:

In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in § 501.2105.

b.   With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Florida, Abbott first monopolized, and then later combined with Zenith and Geneva in the form of a trust and a conspiracy, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and has thereby succeeded in restraining trade in the Florida for Hytrin and its generic equivalents.

c.   The foregoing conduct violates Fla. Stat. § 501.204.

d.   Plaintiffs and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for their injuries caused by these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Claim for Damages Under Fla. Stat. § 501.211(2))

### (Against Abbott)

166.   Florida Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.   By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally

maintained its 100% market share and ensured that prices paid by Plaintiffs and the Class for terazosin remained supra-competitive.

      b.    The foregoing conduct violates Fla. Stat. § 501.204.

      c.    Under Fla. Stat. § 501.211(2), Plaintiffs and the Class are entitled to damages sustained by them as a result of Abbott's acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

167.    Florida Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

      a.    Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiffs and the Class for Hytrin.

      b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements. The funds for such payments by Abbott derive from Plaintiffs' and the Class' overpayment for Hytrin.

      c.    Plaintiffs and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic detriment.

      d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.    The benefit held by Defendants rightfully belongs to Plaintiffs and the Class, as Plaintiffs and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiffs' and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.    declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Fla. Stat. § 501.204;

B.    granting Plaintiffs and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.    awarding Plaintiffs and the Class treble damages, jointly and severally, for Defendants' violations of Fla. Stat. § 501.204, in an amount to be determined at trial;

D.    granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.    granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

### E.     ILLINOIS CLASS

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

### FIRST CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

168.    Illinois Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.    Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.      It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.      It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.      granting Plaintiff and the Class relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

B.      granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

C.      granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

F.      **KANSAS CLASS**

*United Wisconsin Services, Inc., et al., v. Abbott Laboratories*
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva Agreements Each Amount To *a Per Se* Violation Under Kan. Stat. Ann. §§ 50-101, *et seq.*

### (Against All Defendants)

169.   Kansas Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   Kan. Stat. Ann. § 50-101 provides:

A trust is a combination of capital, skill, or acts, by two or more persons, for either, any or all of the following purposes:

First. To create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

Second. To increase or reduce the price of merchandise, produce or commodities, or to control the cost or rates of insurance.

Third. To prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or to prevent competition in aids to commerce.

Fourth. To fix any standard or figure, whereby such person's price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state

Fifth. To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which such person shall: (a) Bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure; (b) agree in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure; (c) in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity; or (d) agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that such person's price in any

manner is affected. Any such combinations are hereby declared to be against public policy, unlawful and void.

b.      Kan. Stat. Ann. § 50-108 further provides:

[A]ny person that may be damaged by any such agreement, trusts or combinations described in [Kan. Stat. Ann. §§] 50-101 and 50-102, and amendments thereto, may sue for and recover in any court of competent jurisdiction in this state, of any person operating such trust or combination, such damages sustained, together with reasonable attorney fees.

c.      Kan. Stat. Ann. § 50-112 provides:

All arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, . . . and all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, . . . are hereby declared to be against public policy, unlawful and void.

d.      Kan. Stat. Ann. § 50-115 also provides:

[A]ny person injured or damaged by any such arrangement, contract, agreement, trust or combination, described in [Kan. Stat. Ann. §§] 50-112 and 50-113, and amendments thereto, may sue for and recover in any court of competent jurisdiction in this state, of any person, the full consideration or sum paid by such person for any goods, wares, merchandise and articles included in or advanced or controlled in price by such combination, or the full amount of money borrowed.

e.      The Abbott-Zenith and Abbott-Geneva Agreements each constitute a "trust" as an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade. Such an allocation is a classic example of a trust as defined as a "combination of capital, skill, or acts, by two or more persons for . . . [the purpose of] First. . . . creat[ing] or carry[ing] out restrictions in trade or commerce; Second. . . . increas[ing] . . . the price of merchandise . . . or commodities; Third. . . . prevent[ing] competition in manufacture, making, [or] . . . sale . . . of merchandise [or] commodities" which is per se

prohibited under Kan. Stat. Ann. § 50-101, and "against public policy, unlawful and void" pursuant to § 50-112. The Abbott-Zenith and Abbott-Geneva Agreements are each also a "trust" as Abbott and each of Defendants Zenith and Geneva made, entered into, executed and carried out, contracts or agreements by which Zenith and Geneva agreed not to sell or manufacture a generic bioequivalent of Hytrin, and by which Defendants affected the price of terazosin in agreeing to "pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of" Hytrin or its AB-rated generic bioequivalents, all in violation of § 50-101.

    f.  Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are per se violations of Kan. Stat. Ann. §§ 50-101 and -112.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Kan. Stat. Ann. § 50-108)

### (Against All Defendants)

  170.  Kansas Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

    a.  With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Kansas, Abbott first monopolized, and then later combined with Zenith and Geneva in the form of a trust and a conspiracy, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and has thereby succeeded in restraining trade in Kansas for Hytrin and its generic equivalents.

    b.  The foregoing conduct violates Kan. Stat. Ann. § 50-101. Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations.

    c.    Under Kan. Stat. Ann. § 50-108, Plaintiff and the Class are entitled to have the Abbott-Zenith and Abbott-Geneva Agreements declared void and are also entitled to the damages sustained by them, interest thereon, and reasonable attorneys' fees and costs of the suit.

## THIRD CLAIM FOR RELIEF

### (Action For Damages Under Kan. Stat. § 50-115)

### (Against all Defendants)

171.    Kansas Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

    a.    The foregoing conduct also violates Kan. Stat. Ann. § 50-112. Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations.

    b.    Under Kan. Stat. Ann. § 50-115, Plaintiff and the Class are entitled to have the Abbott-Zenith and Abbott-Geneva Agreements declared void and are also entitled to the damages sustained by them, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

172.    Kansas Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

    a.    Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiffs and the Class for Hytrin.

    b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva

Agreements.  The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.      Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.      It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.      It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.      declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Kan. Stat. Ann. §§ 50-101 and -112;

B.     granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.     awarding Plaintiff and the Class damages, jointly and severally, for Defendants' violations of Kan. Stat. Ann. §§ 50-101 and -112, in an amount to be determined at trial;

D.     granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

E.     granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

## G.    MAINE CLASS

### *David Grund v. Abbott Laboratories, et al.*

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva Agreements Each Amount To a *Per Se* Violation Under Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*)

### (Against All Defendants)

173.    Maine Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.     Me. Rev. Stat. Ann. tit. 10, § 1101 provides:

Every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce in this State is declared to be illegal . . .

b.     The Abbott-Zenith and Abbott-Geneva Agreements each constitute a "contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce" and is per se prohibited under Me. Rev. Stat. tit. 10, § 1101. The Abbott-Zenith and Abbott-Geneva Agreements are each also a "trust" as Abbott and each of Defendants Zenith and Geneva made,

entered into, executed and carried out, contracts or agreements by which Zenith and Geneva agreed not to sell or manufacture a generic bioequivalent of Hytrin, and by which Defendants affected the price of terazosin in agreeing to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of Hytrin or its AB-rated generic bioequivalents, all in violation of § 1101.

        c.     Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are per se violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

## SECOND CLAIM FOR RELIEF

### (Action for Damages Under Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*)

### (Against All Defendants)

174.    Maine Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

        a.     Me. Rev. Stat. Ann. tit. 10, § 1104(1) provides:

> Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action. If the court finds for the plaintiff, the plaintiff shall recover 3 times the amount of the damages sustained and cost of suit, including necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorney's fees.

        b.     With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Maine, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-

Geneva Agreements, and have thereby succeeded in restraining trade in Maine for Hytrin and its generic bioequivalents.

      c.    The foregoing conduct violates Me. Rev. Stat. Ann. tit. 10, §§ 1101, <u>et seq.</u>

      d.    Plaintiff and the Class have been damaged by Defendants' acts and seek the civil damages permitted by law for these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*)

### (Against All Defendants)

175.    Maine Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

      a.    Me. Rev. Stat. Ann. tit. 5, § 207 provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.

      b.    Me. Rev. Stat. Ann. tit. 5 § 207(1) further provides:

It is the intent of the Legislature that in construing this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act 15 U.S.C. 45(a)(1) ), as from time to time amended.

      c.    With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Maine, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in Maine for Hytrin and its generic bioequivalents.

d.    The foregoing conduct violates Me. Rev. Stat. Ann. tit. 5, §§ 205-A, et seq.

e.    Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum civil damages permitted by law for these flagrant violations.

## FOURTH CLAIM FOR RELIEF

### (Action for Damages Under Me. Rev. Stat. Ann. tit. 10, §§ 1101, et seq.)

### (Against Abbott)

176.    Maine Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

a.    Me. Rev. Stat. Ann. tit. 10, § 1102 provides:

Whoever shall monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce of this State shall be guilty of a Class C crime.

b.    Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

c.    The foregoing conduct violates Me. Rev. Stat. Ann. tit. 10, § 1102.

d.    Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum civil damages permitted by law for these flagrant violations.

## FIFTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

177.    Maine Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.   The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.    Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.    The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements,

and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.    declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101 et seq.;

B.    granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.    awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of Me. Rev. Stat. Ann. tit. 10, §§ 1101, et seq., and Me. Rev. Stat. Ann. tit. 5, §§ 205-A, et seq., in an amount to be determined at trial;

D.    granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

E.    granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

H.    **MICHIGAN CLASS**

*United Wisconsin Services, Inc., et al., v. Abbott Laboratories*
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

*Martin Bernstein, etc. v. Abbott Laboratories, et al.*
Case No. 2:00-CV-72974 (E.D.Mich.)

*Blue Cross and Blue Shield of Michigan v. Abbott Laboratories, et al.,*
Case No. 5:01-CV-95 (W.D. Mich.)

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That The Abbott-Zenith and Abbott-Geneva Agreements Each Amounts To A *Per Se* Violation Under Section 445.772 of Michigan's Consolidated Laws (Michigan's Antitrust Reform Act ("MARA"))

### (Against All Defendants)

178.   Michigan Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   MARA, MCL § 445.772, provides:

Sec. 2.  A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.

b.   MARA, MCL § 445.778(2), also provides:

Any other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring action for appropriate injunctive or other equitable relief against immediate irreparable harm, actual damages sustained by reason of a violation of the act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees.  If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act.

c.   The Abbott-Zenith and Abbott-Geneva Agreements described hereinabove each is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.  Such an allocation is a classic example of a "contract . . . between 2 or more persons in restraint of . . . trade and commerce" which is per se prohibited under MARA, MCL § 445.772.

d.   Plaintiffs and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of MARA, MCL § 445.772.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Section 445.772 of MARA)

#### (Against All Defendants)

179.   Michigan Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Michigan, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in Michigan for Hytrin and its generic bioequivalents.

b.   The foregoing conduct violates MARA, MCL §§ 445.772.

c.   Plaintiffs and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action For Damages Under Section 445.773 of MARA)

#### (Against Abbott)

180.   Michigan Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   MARA, MCL § 445.773 provides:

Sec. 3.  The establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful.

b.      Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiffs and the Class for terazosin remained supra-competitive.

c.      Under MARA, MCL § 445.778(2), Plaintiffs and the Class are entitled to three times the damages sustained by them as a result of Abbott's flagrant acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

### FOURTH CLAIM FOR RELIEF

### (Disgorgement and Restitution For Unjust Enrichment)

### (Against All Defendants)

181.    Michigan Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiffs and the Class for Hytrin.

b.      Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derive from Plaintiffs' and the Class' overpayment for Hytrin.

c.      Plaintiffs and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiffs and the Class, as Plaintiffs and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.      It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.      It would be inequitable for Abbott to be permitted to retain any of the Plaintiffs' and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.      declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Section 445.772 of Michigan's Consolidated Laws (Michigan's Antitrust Reform Act ("MARA"));

B.      granting Plaintiffs and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.      awarding Plaintiffs and the Class treble damages, jointly and severally, for Defendants' violations of Sections 445.772 and 445.773 of MARA, in an amount to be determined at trial;

D.      granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.      granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

## I.      MINNESOTA CLASS

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

### FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That The Abbott-Zenith and Abbott-Geneva Agreements Each Amounts To A *Per Se* Violation Under Minnesota's Antitrust Law of 1971, Minn. Stat. §325D.51)

### (Against All Defendants)

182.    Minnesota Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      Minn. Stat. § 325D.51 provides:

A contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful.

b.      Minn. Stat. § 325D.53 also provides:

Without limiting section 325D.51, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:

(1)     A contract, combination, or conspiracy between two or more persons in competition:

(a)   for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service;

(b)   affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service; or

(c)   allocating or dividing customers or markets, functional or geographical, for any commodity or service.

c.   The Abbott-Zenith and Abbott-Geneva Agreements described hereinabove each is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade. Such an allocation is a classic example of a "contract . . . between 2 or more persons in restraint of . . . trade and commerce" which is per se prohibited under Minn. Stat. §§ 325D.51 & .53.

d.   Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of Minn. Stat. §§ 325D.51 & .53.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Minn. Stat. § 325D.57)

### (Against All Defendants)

183.   Minnesota Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.   Minn. Stat. § 325D.57 provides:

Any person, any governmental body, or the state of Minnesota or any of its subdivisions or agencies, injured directly or indirectly by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees.

b.      With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Minnesota, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in Minnesota for Hytrin and its generic bioequivalents.

c.      The foregoing conduct violates Minn. Stat. §§ 325D.51 and 53.

d.      Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations.

## THIRD CLAIM FOR RELIEF

## (Action For Damages Under Minn. Stat. § 325D.57)

## (Against Abbott)

184.    Minnesota Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      Minn. Stat. § 325D.52 provides:

The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful.

b.      Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally

maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

      c.    Under Minn. Stat. § 325D.57, Plaintiff and the Class are entitled to three times the damages sustained by them as a result of Abbott's flagrant acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

185.    Minnesota Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

      a.    Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

      b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements. The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

      c.    Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

      d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.      It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.      It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.      declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Minnesota's Antitrust Law of 1971, Minn. Stat. §§ 325D.51 & .53.

B.      granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.      awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of Minn. Stat. §§ 325D.51, et seq., in an amount to be determined at trial;

D.      granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

E.      granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

### J.    MISSISSIPPI CLASS

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva Agreements Each Amount To *a Per Se* Violation Under Miss. Code Ann. §§ 75-21-1, *et seq.* )**

### (Against All Defendants)

186.    Mississippi Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

    a.    Miss. Code Ann. § 75-21-1 provides:

A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be:

(a)    To restrain trade;

(b)    To limit, increase or reduce the price of a commodity;

(c)    To limit, increase or reduce the production or output of a commodity;

(d)    To hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;

(e)    To engross or forestall a commodity; [or]

\*    \*    \*

(i)    To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity, contrary to the spirit and meaning of this chapter.

b.      Miss. Code Ann. § 75-21-3 further provides:

Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall accomplish such results to a degree inimical to public welfare, and shall thus:

(a)      Restrain or attempt to restrain the freedom of trade or production;

(b)      Or shall monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business;

(c)      Or shall engross forestall or attempt to engross or forestall any commodity;

                    *      *      *

shall be deemed and held a trust and combine within the meaning and purpose of this section, and shall be liable to the pains, penalties, fines, forfeitures, judgments, and recoveries denounced against trusts and combines and shall be proceeded against in manner and form herein provided, as in case of other trusts and combines.

c.      Miss. Code Ann. § 75-21-11 further provides:

Every contract or agreement to enter into or pursue any trust and combine, and every contract or agreement made by another with any trust and combine, or with any member of a trust and combine for any purpose relative to the business of such trust and combine, is void, and cannot be enforced in any court.

d.      The Abbott-Zenith and Abbott-Geneva Agreements each constitute a "trust"

as an agreement between horizontal competitors in the same chain of distribution, which has the

effect of allocating market share and restraining trade.  Such an allocation is a classic example of

a trust as defined as

[a] "combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons . . . the effect of which would be . . . (a) To restrain trade; (b) To limit, increase or reduce the price of a commodity; (c) To limit, increase or reduce the production or output of a commodity; (d) To hinder competition in the production,

> importation, manufacture, transportation, sale or purchase of a commodity; (e) To engross or forestall a commodity; [or] . . . (i) To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity,"

which is per se prohibited under Miss. Code Ann. § 75-21-1, and void and unenforceable pursuant to § 75-21-11. The Abbott-Zenith and Abbott-Geneva Agreements are each also a "trust" as Abbott and each of Defendants Zenith and Geneva constituted an association of persons that resulted in "restrain[ing] or attempt[ing] to restrain the freedom of trade or production," in violation of Miss. Code Ann. § 75-21-3.

        e.      Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are per se violations of Miss. Code Ann. §§ 75-21-1, et seq.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Miss. Code Ann. § 75-21-9)

### (Against All Defendants)

    187.    Mississippi Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

        a.      With the specific intent to prevent competition from producers of generic Hytrin  and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Mississippi, Abbott first monopolized, and then later combined with Zenith and Geneva in the form of a trust and a conspiracy, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and has thereby succeeded in restraining trade in Mississippi for Hytrin and its generic equivalents.

b.    The foregoing conduct violates Miss. Code Ann. §§ 75-21-1, et seq. Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations pursuant to Miss. Code. Ann. § 75-21-9, which provides:

> Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00), by suit in any court of competent jurisdiction. Said suit may be brought against one or more of the parties to the trust or combine and one or more of the officers and representatives of any corporation a party to the same, or one or more of either.  Such penalty may be recovered in each instance of injury.  All recoveries herein provided for may be sued for in one suit.

c.    Plaintiff and the Class are entitled to have the Abbott-Zenith and Abbott-Geneva Agreements declared void and are also entitled to damages sustained by them, interest thereon, penalties, and reasonable attorneys' fees and costs of the suit.

### THIRD CLAIM FOR RELIEF

### (Action For Damages Under Miss. Code. Ann. § 75-21-9)

### (Against Abbott)

188.    Mississippi Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

b.      The foregoing conduct violates Miss. Code Ann. §§ 75-21-1, et seq. Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for these flagrant violations pursuant to Miss. Code. Ann. § 75-21-9.  Plaintiff and the Class are entitled to have the Abbott-Zenith and Abbott-Geneva Agreements declared void and are also entitled to damages sustained by them, interest thereon, penalties, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

189.    Mississippi Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.      Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.      Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.  The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.  It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.  It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.  declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of Miss. Code Ann. §§ 75-21-1, et seq.;

B.  granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.  awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of Miss. Code Ann. §§ 75-21-1, et seq., in an amount to be determined at trial;

D.  granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

E.  granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

**K.     NEVADA CLASS**

*United Wisconsin Services, Inc., et al., v. Abbott Laboratories*
Case No. 99-C-7410 (N.D.Ill.) (JBZ)

### FIRST CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

190.    Nevada Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.      Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.      Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.      It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.      It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.      granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

B.      granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

C.      granting such other relief as this Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

## L.      **NEW MEXICO CLASS**

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories,***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva Agreements Each Amount To A *Per Se* Violation Under N.M. Stat. Ann. §§ 57-1-1, *et seq.*)

### (Against All Defendants)

191.    New Mexico Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      N.M. Stat. Ann. § 57-1-1 provides:

Every contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful.

b.      N.M. Stat. Ann. § 57-1-3(A) further provides:

All contracts and agreements in violation of Section 57-1-1 or 57-1-2 NMSA 1978 shall be void, and any person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57- 1-1 or 57-1-2 NMSA 1978 may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees.

c.      The Abbott-Zenith and Abbott-Geneva Agreements each constitute a "contract, agreement, combination or conspiracy in restraint of trade or commerce" and is per se prohibited under N.M. Stat. Ann. §§ 57-1-1, et seq.

d.      Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements are per se violations of N.M. Stat. Ann. §§ 57-1-1, et seq.

## SECOND CLAIM FOR RELIEF

### (Action for Damages Under N.M. Stat. Ann. §§ 57-1-1, *et seq.*)

### (Against All Defendants)

192.    New Mexico Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

a.    With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in New Mexico, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in New Mexico for Hytrin and its generic bioequivalents.

b.    The foregoing conduct violates the New Mexico Antitrust Act, N.M. State Ann. §§ 57-1-1, et seq.

c.    Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum civil damages permitted by law for these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under New Mexico Statutes Sections 57-12-1, *et seq.*)

### (Against All Defendants)

193.    New Mexico Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

a.    N.M. Stat. Ann. § 57-12-3 provides:

Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful.

b.    N.M. Stat. Ann. § 57-12-4 provides:

It is the intent of the legislature that in construing Section 3 [57-12-3 NMSA 1978] of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts.

c.    N.M. Stat. Ann § 57-12-10 provides:

\*    \*    \*

B.    Any person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater. Where the trier of fact finds that the party charged with an unfair or deceptive trade practice or an unconscionable trade practice has willfully engaged in the trade practice, the court may award up to three times actual damages or three hundred dollars ($300), whichever is greater, to the party complaining of the practice.

C.    The court shall award attorneys' fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if he prevails. . . .

D.    The relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this state.

E.    In any class action filed under this section, the court may award damages to the named Plaintiffs as provided in Subsection B of this section and may award members of the class such actual damages as were suffered by each member of the class as a result of the unlawful method, act or practice.

d.    With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in New Mexico, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in New Mexico for Hytrin and its generic bioequivalents.

e.    The foregoing conduct violates the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, et seq.

f.    Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum civil damages permitted by law for these flagrant violations.

## FOURTH CLAIM FOR RELIEF

### (Action for Damages Under N.M. Stat. Ann. §§ 57-1-1, *et seq.*,)

### (Against Abbott)

194.    New Mexico Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

a.      N.M. Stat. Ann. § 57-1-2 provides:

It is hereby declared to be unlawful for any person to monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, trade or commerce, any part of which trade or commerce is within this state.

b.      Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

c.      The foregoing conduct violates N.M. Stat. Ann. § 57-1-2.

d.      Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum civil damages permitted by law for these flagrant violations.

## FIFTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

195.    New Mexico Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.     Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.     Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.   The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.     Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.     The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.     The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.     It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.     It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.    declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a *per se* violation of New Mexico Antitrust Act, N.M. State Ann. §§ 57-1-1, et seq.

B.    granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.    awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of New Mexico Antitrust Act, N.M. State Ann. §§ 57-1-1 et seq. and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 et seq., in an amount to be determined at trial;

D.    granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.    granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

M.    ## NEW YORK CLASS

*United Wisconsin Services, Inc., et al., v. Abbott Laboratories*
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

*Albert J. Meyer v. Abbott Laboratories, et al.*
Case No. 00-342 (D.D.C.)

*Lloyd Latona v. Abbott Laboratories, et al.*
Case No. 00-342 (D.D.C.)

## FIRST CLAIM FOR RELIEF

## (Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva Agreements Each Amounts To A *Per Se* Violation Under Section 340 of the New York General Business Law ("Donnelly Act"))

## (Against All Defendants)

196.    New York Plaintiffs repeat and reallege each and every prior allegation contained in

this Complaint with the same force and effect as if fully set forth herein.

a.    New York's Donnelly Act, § 340(1) of the General Business Law, provides,

in pertinent part:

> 340.  Contracts or agreements for monopoly or in restraint of trade
> illegal and void
>
> (1)    Every contract, agreement, arrangement or combination
> whereby a monopoly in the conduct of any business, trade or
> commerce or in the furnishing of any service in this state, is or may be
> established or maintained, or whereby
>
> Competition or the free exercise of any activity in the conduct of any
> business, trade or commerce or in the furnishing of any service in this
> state is or may be restrained or whereby
>
> For the purpose of establishing or maintaining any such monopoly or
> unlawfully interfering with the free exercise of any activity in the
> conduct of any business, trade or commerce or in the furnishing of any
> service in this state any business, trade or commerce or the furnishing
> of any service is or may be restrained, is hereby declared to be against
> public policy, illegal and void.

b.    New York's Donnelly Act, § 340(5) of the General Business Law also

provides:

> (5)    An action to recover damages caused by a violation of this
> section must be commenced within four years after the cause of action
> has accrued. . . . [A]ny person who shall sustain damages by reason of
> any violation of this section, shall recover three-fold the actual
> damages sustained thereby, as well as costs not exceeding ten
> thousand dollars, and reasonable attorneys' fees . . ..

c.    The Abbott-Zenith and Abbott-Geneva Agreements each is an agreement

between horizontal competitors in the same chain of distribution, which has the effect of allocating

market share and restraining trade. Such an allocation is a classic example of a "contract, agreement,

arrangement [and] conspiracy . . . whereby a monopoly in the conduct of business, trade [and]

commerce is established . . ." which is per se prohibited under the Donnelly Act, New York General Business Law § 340(1).

        d.    Plaintiffs and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of the Donnelly Act, New York General Business Law § 340(1).

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Sections 340 of the Donnelly Act)

### (Against All Defendants)

197.    New York Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

        a.    With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in New York, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in New York for Hytrin and its generic bioequivalents.

        b.    The foregoing conduct violates the Donnelly Act, New York General Business Law § 340, et seq..

        c.    Plaintiffs and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for their injuries caused by these violations.

## THIRD CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

198.    New York Plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiffs and the Class for Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.    The funds for such payments by Abbott derive from Plaintiffs' and the Class' overpayment for Hytrin.

c.    Plaintiffs and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.    The benefit held by Defendants rightfully belongs to Plaintiffs and the Class, as Plaintiffs and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiffs' and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva

Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.    declaring that the Abbott-Zenith and Abbott-Geneva Agreements each is a <u>per se</u> violation of Section 340(1) of the Donnelly Act, New York General Business Law;

B.    granting Plaintiffs and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.    awarding Plaintiffs and the Class treble damages, jointly and severally, for Defendants' violations of Sections 340(1) of the Donnelly Act, New York General Business Law, in an amount to be determined at trial;

D.    granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.    granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

N.    **NORTH CAROLINA CLASS**

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Market Allocation
Agreements Amount To A *Per Se* Violation Under Sections
75-1, 75-1.1 and 75-2 of North Carolina General Statutes and
Article I, Section 34 of the North Carolina Constitution)**

**(Against All Defendants)**

199.    North Carolina Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

    a.    North Carolina General Statutes § 75-1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal. Every person or corporation who shall make any such contract expressly or shall knowingly be a party thereto by implication, or who shall engage in any such combination and conspiracy shall be guilty of a Class H felony.

    b.    North Carolina General Statutes § 75-1.1 also provides:

It is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize, any part of trade or commerce in the State of North Carolina.

    c.    North Carolina General Statutes § 75-2 further provides:

Any act, contract, combination in the form of trust, or conspiracy in restraint of trade or commerce which violates the principles of the common law is hereby declared to be in violation of G.S. § 75-1.

    d.    North Carolina General Statutes § 75-8 further provides:

Where the things prohibited in this Chapter are continuous, then in such event, after the first violation of such provision hereof, each week that the violation of such provision shall continue shall constitute a separate offense.

    e.    North Carolina General Statutes § 75-16 further provides:

If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

    f.    Article I, Section 34 of the North Carolina Constitution provides:

Perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed.

g.      The Abbott-Zenith and Abbott-Geneva Agreements each is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.  Such an allocation is a classic example of a "contract [and] combination in the form of a trust . . . [and] conspiracy in restraint of trade [and] commerce . . ." which is per se prohibited under North Carolina General Statutes § 75-1.  Further, the agreements are each a "combin[ation] and conspir[acy] . . . to monopolize . . . trade [and] commerce . . .", which is per se prohibited under North Carolina General Statutes § 75-1.1.  Further, as such agreements were illegal under common law and constitute a monopoly, the Abbott-Zenith and Abbott-Geneva Agreements are per se illegal under North Carolina General Statutes § 75-2 and Article I, Section 34 of the North Carolina Constitution.

h.      Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of North Carolina General Statutes §§ 75-1, 75-1.1 and 75-2 and Article I, Section 34 of the North Carolina Constitution.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under North Carolina General Statutes §§ 75-1, 75-1.1, 75-2 and Article I, Section 34 of the North Carolina Constitution)

### (Against All Defendants)

200.   North Carolina Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in North Carolina, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-

Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in North Carolina for Hytrin and its generic bioequivalents.

      b.     The foregoing conduct violates North Carolina General Statutes §§ 75-1 et seq., and Article 1, Section 34 of the North Carolina Constitution.

      c.     Plaintiff and the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial, and are entitled to have such damages trebled pursuant to North Carolina General Statute § 75-16.

      d.     Defendants' willful acts and conduct, as described above, amount to an unwarranted refusal to fully resolve the matter which constitutes the basis of this lawsuit, and as such, entitle Plaintiff and the Class to an award of attorneys' fees pursuant to North Carolina General Statute § 75-16.

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under North Carolina General Statutes § 75-1.1 and Article I, Section 34 of the North Carolina Constitution)

### (Against Abbott)

201.    North Carolina Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

      a.     Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents. By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

b.      Under North Carolina General Statutes §§ 75-16 and 75-16.1, Plaintiff and the Class are entitled to three times the damages sustained by them as a result of Abbott's acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

202.    North Carolina Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.      Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.      Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period,

when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

      f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

      g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.    declaring that the Abbott-Zenith and Abbott-Geneva Agreements each is a <u>per se</u> violation of North Carolina General Statute §§ 75-1, 75-1.1 & 75-2 and Article 1, Section 34 of the North Carolina Constitution;

B.    granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.    awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violation of North Carolina General Statutes §§ 75-1, 75-1.1 & 75-2, in an amount to be determined at trial;

D.    granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.    granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

O.      **NORTH DAKOTA CLASS**

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.) (JBZ)

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment That the Abbott-Zenith and Abbott-Geneva
Agreements Each Amounts to a *Per Se* Violation Under Sections 51-08.1-01
*et.seq.* of the North Dakota Century Code ("Uniform State Antitrust Act"))**

**(Against All Defendants)**

203.    North Dakota Plaintiff repeats and realleges each and every prior allegation contained
in this Complaint with the same force and effect as if fully set forth herein.

a.      North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-02,
provides in pertinent part:

> A contract, combination, or conspiracy between two or more persons
> in restraint of, or to monopolize, trade or commerce in a relevant
> market is unlawful.

b.      North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-03,
provides in pertinent part:

> The establishment, maintenance, or use of a monopoly, or an attempt
> to establish a monopoly, of trade or commerce in a relevant market by
> any person, for the purpose of excluding competition or controlling,
> fixing, or maintaining prices, is unlawful.

c.      North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-08,
provides in pertinent part:

> 2.      A person threatened with injury or injured in that person's
> business or property by a violation of this chapter may bring an action
> for appropriate injunctive or other equitable relief, damages sustained
> and, as determined by the court, taxable costs and reasonable
> attorney's fees.  If the trier of fact finds that the violation is flagrant,
> it may increase recovery to an amount not in excess of three times the
> damages sustained.

d.      The Abbott-Zenith and Abbott-Geneva Agreements each is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.   Such an allocation is a classic example of a "contract, combination, or conspiracy . . . in restraint of or to monopolize trade"  which is per se prohibited under North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-02.

e.      Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-02.

## SECOND CLAIM FOR RELIEF

### (Action for Damages Under North Dakota Century Code Sections 51-08.1-01 *et seq.*)

### (Against All Defendants)

204.    North Dakota Plaintiff repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

a.      With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in North Dakota, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in North Dakota for Hytrin  and its generic bioequivalents.

b.      The foregoing conduct violates North Dakota Cent. Code §§ 51-08.1-01 et seq. (1999).

c.      Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum civil damages permitted by law for these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under North Dakota Century Code Section 51-08.1-03)

### (Against Abbott)

205.   North Dakota Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.   Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents. By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

b.   Under North Dakota Cent. Code § 51-08.1-08 (2), Plaintiff and the Class are entitled to three times the damages sustained by them as a result of Abbott's acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

206.   North Dakota Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.   Abbott has benefitted from the overcharges it has been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

1418 / CMP / 00058264.WPD v1
**FILED UNDER SEAL**

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.   The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.    Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.    The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during both the Conspiracy and Monopolization Class Periods, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.   declaring that the Abbott-Zenith and Abbott-Geneva Agreements are each a per se violation of North Dakota Cent. Code §§ 51-08.1-01 et seq. (1999);

B.   granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.   awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of North Dakota Cent. Code §§ 51-08.1-01 et seq. (1999), in an amount to be determined at trial;

D.   granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.   granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

### P.   SOUTH DAKOTA CLASS

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Market Allocation Agreements
Amount To A *Per Se* Violation Under S.D. Codified Laws §§ 37-1-3.1, *et seq.*)**

### (Against All Defendants)

207.   South Dakota Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.   S.D. Codified Laws § 37-1-3.1 provides:

A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful.

b.   S.D. Codified Laws § 37-1-14.3 also provides, in pertinent part:

A person injured in his business or property by a violation of this chapter may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees. The trier of facts shall increase recovery under this section to three times the damages sustained.

c.    The Abbott-Zenith and Abbott-Geneva Agreements each is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.   Such an allocation is a classic example of a "contract, combination, or conspiracy between two or more persons in restraint of trade or commerce . . ." which is per se prohibited under S.D. Codified Laws § 37-1-3.1.

d.    Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of S.D. Codified Laws § 37-1-3.1.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under S.D. Codified Laws §§ 37-1-3.1, et seq.)

### (Against All Defendants)

208.    South Dakota Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.    With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in South Dakota, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in South Dakota for Hytrin and its generic bioequivalents.

b.    The foregoing conduct violates S.D. Codified Laws § 37-1-3.1, et seq.

c.       Plaintiff and the Class have been damaged by Defendants' acts and seek the

maximum damages permitted by law for their injuries caused by these violations.

### THIRD CLAIM FOR RELIEF

### (Action for Damages Under S.D. Codified Laws §§ 37-1-3.1, *et seq*)

### (Against Abbott)

209.    South Dakota Plaintiff repeats and realleges each and every allegation of this

Complaint with the same force and effect as if fully set forth herein.

a.       S.D. Codified Laws 37-1-3.2 provides:

The monopolization by any person, or an attempt to monopolize, or
combine, or conspire with any other person or persons, to monopolize
any of the trade or commerce within this state shall be unlawful.

b.       Abbott engaged in the submission of false patent information to the FDA, and

the initiation and continued prosecution of baseless, sham patent infringement actions against

prospective horizontal competitors, including Zenith and Geneva,  solely for the purpose of delaying

the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic

bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally

maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin

remained supra-competitive.

c.       Under S.D. Codified Laws § 37-1-14.3, Plaintiff and the Class are entitled to

three times the damages sustained by them as a result of Abbott's acts referenced herein, interest

thereon, and reasonable attorneys' fees and costs of the suit.

### FOURTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

210.    South Dakota Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.   The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

c.    Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.    The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva

1418 / CMP / 00058264.WPD v1
**FILED UNDER SEAL**                                110

Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

A.  declaring that the Abbott-Zenith and Abbott-Geneva Agreements is each a per se violation of S.D. Codified Laws § 37-1-3.1, et seq.;

B.  granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.  awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of S.D. Codified Laws § 37-1-3.1, et seq., in an amount to be determined at trial;

D.  granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

E.  granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

## Q.  WEST VIRGINIA CLASS

***United Wisconsin Services, Inc., et al., v. Abbott Laboratories***
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Market Allocation Agreements
Amount To A *Per Se* Violation Under W. Va. Code §§ 47-18-1, *et seq.*)**

### (Against All Defendants)

211.  West Virginia Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      W. Va. Code § 47-18-3 provides:

(a)      Every contract, combination in the form of trust or otherwise,
or conspiracy in restraint of trade or commerce in this State shall be
unlawful.

(b)      Without limiting the effect of subsection (a) of this section, the
following shall be deemed to restrain trade or commerce unreasonably
and are unlawful:

(1)      A contract, combination or conspiracy between two or more
persons: (A) For the purpose or with the effect of fixing, controlling,
or maintaining the market price, rate or fee of any commodity or
service; or (B) Fixing, controlling, maintaining, limiting or
discontinuing the production, manufacture, mining, sale or supply of
any commodity, or the sale or supply of any service, for the purpose
or with the effect of fixing, controlling or maintaining the market
price, rate or fee of the commodity or service; or (C) Allocating or
dividing customers or markets, functional or geographic, for any
commodity or service.

b.      W. Va. Code § 47-18-9 also provides, in pertinent part:

Any person who shall be injured in his business or property by reason
of a violation of the provisions of this article may bring an action
therefor and shall recover threefold the damages sustained by him,
together with reasonable attorneys' fees, filing fees and reasonable
costs of the action.

c.      The Abbott-Zenith and Abbott-Geneva Agreements each is an agreement

between horizontal competitors in the same chain of distribution, which has the effect of allocating

market share and restraining trade.  Such an allocation is a classic example of a "contract,

combination or conspiracy between two or more persons . . . [f]or the purpose or with the effect of

fixing, controlling, or maintaining the market price . . . of [a] commodity . . .; [f]ixing, controlling,

maintaining, limiting or discontinuing the production, manufacture, . . . sale or supply of [a]

commodity, . . .for the purpose or with the effect of fixing, controlling or maintaining the market

price . . . of the commodity . . .; and/or [a]llocating or dividing customers or markets, functional or

geographic, for [a] commodity . . .," which is per se prohibited under W. Va. Code § 47-18-3.

d.      Plaintiff and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of W. Va. Code § 47-18-1, et seq.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under W. Va. Code §§ 47-18-1, *et seq.*)

### (Against All Defendants)

212.    West Virginia Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in West Virginia, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in West Virginia for Hytrin and its generic bioequivalents.

b.      The foregoing conduct violates W. Va. Code § 47-18-1, et seq.

c.      Plaintiff and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for their injuries caused by these violations.

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under W. Va. Code §§ 47-18-1, *et seq.*)

### (Against Abbott)

213.    West Virginia Plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      W. Va. Code § 47-18-4 provides:

The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful.

b.    Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents.  By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiff and the Class for terazosin remained supra-competitive.

c.    Under W. Va. Code § 47-18-9, Plaintiff and the Class are entitled to three times the damages sustained by them as a result of Abbott's acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

214.    West Virginia Plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

a.    Abbott has benefitted from the overcharges it has have been able to levy for Hytrin resulting from acts alleged in this Complaint and the overpayments by Plaintiff and the Class for Hytrin.

b.    Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva

Agreements. The funds for such payments by Abbott derive from Plaintiff's and the Class' overpayment for Hytrin.

      c.    Plaintiff and the Class have conferred upon Defendants economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiff's and the Class' economic detriment.

      d.    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

      e.    The benefit held by Defendants rightfully belongs to Plaintiff and the Class, as Plaintiff and the Class paid these anticompetitive sums to Defendants during the Class Period, when Abbott, and later Zenith and Geneva, used anticompetitive measures to block generic entry into the market.

      f.    It would be inequitable for Zenith and Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreement.

      g.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements, and the acts alleged herein designed to prevent introduction by other manufacturers of generic bioequivalents to Hytrin.

## PRAYER FOR RELIEF

    WHEREFORE, Plaintiff and the Class pray for a judgment against all Defendants, jointly and severally, as follows:

      A.    declaring that the Abbott-Zenith and Abbott-Geneva Agreements is each a per se violation of W. Va. Code § 47-18-1, et seq.;

B.     granting Plaintiff and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.     awarding Plaintiff and the Class treble damages, jointly and severally, for Defendants' violations of W. Va. Code § 47-18-1, et seq., in an amount to be determined at trial;

D.     granting Plaintiff and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

E.     granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the Class demand trial by jury on all claims for which there is a right to a jury trial.

R.     **WISCONSIN CLASS**

*United Wisconsin Services, Inc., et al., v. Abbott Laboratories, et al.*
Case No. 99-C-7410 (N.D.Ill.)(JBZ)

*Ewald Grosskreuger, et al. v. Abbott Laboratories, et al.*
Case No. 00-C-7883 (N.D.Ill.)(JBZ)

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Market Allocation Agreements Amount To A *Per Se* Violation Under Sections 133.03 & 133.14 of Wisconsin Statutes)

### (Against All Defendants)

215.   Wisconsin Plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.     Wisconsin Statutes § 133.01 provides:

The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition. It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this state . . . .

b.        Wisconsin Statutes § 133.03 also provides, in pertinent part:

(1)       Every contact, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. . . .

(2)       Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce may [be subject to fines and imprisonment].

c.        Wisconsin Statutes § 133.14 further provides, in pertinent part:

All contracts or agreements made by a person while a member of any combination or conspiracy prohibited by § 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person. . . .

d.        Wisconsin Statutes § 133.18 also provides, in pertinent part:

(1)(a)   Except as provided under ¶ (b), any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees. . .

e.        The Abbott-Zenith and Abbott-Geneva Agreements each is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.   Such an allocation is a classic example of a "contract, combination in the form of a trust . . . [and] conspiracy[] in restraint of trade [and] commerce . . ." which is per se prohibited under Wisconsin Statutes §§ 133.03(1) & (2).

f.        Plaintiffs and the Class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Abbott-Zenith and Abbott-Geneva Agreements each is a per se violation of Wisconsin Statutes §§ 133.03(1) & (2).

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Wisconsin Statutes §§ 133.03(1) & (2))

### (Against All Defendants)

216.    Wisconsin Plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      With the specific intent to prevent competition from producers of generic Hytrin and thereby maintain Abbott's monopoly over the market for Hytrin and its generic bioequivalents in Wisconsin, Abbott first monopolized, and then later combined to form a trust and conspired to monopolize or attempt to monopolize said market, as evidenced by the Abbott-Zenith and Abbott-Geneva Agreements, and have thereby succeeded in restraining trade in Wisconsin for Hytrin and its generic bioequivalents.

b.      The foregoing conduct violates Wisconsin Statutes §§ 133.03(1) & (2), 133.14 and contravenes the legislative intent set forth in Wisconsin Statutes § 133.01.

c.      Plaintiffs and the Class have been damaged by Defendants' acts and seek the maximum damages permitted by law for their injuries caused by these violations.

### THIRD CLAIM FOR RELIEF

### (Action for Damages Under Wisconsin Statutes §133.03(2))

### (Against Abbott)

217.    Wisconsin Plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott engaged in the submission of false patent information to the FDA, and the initiation and continued prosecution of baseless, sham patent infringement actions against prospective horizontal competitors, including Zenith and Geneva, solely for the purpose of delaying the entry of other manufacturers' generic versions of Hytrin to the market for Hytrin and its generic bioequivalents. By preventing the entry of bioequivalent generics for Hytrin, Abbott illegally maintained its 100% market share and ensured that prices paid by Plaintiffs and the Class for terazosin remained supra-competitive.

b.      Under Wisconsin Statutes § 133.18, Plaintiffs and the Class are entitled to three times the damages sustained by them as a result of Abbott's acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

218.    Wisconsin Plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

a.      Abbott has benefitted from the overcharges it has been able to levy for Hytrin, resulting from acts alleged in this Complaint, and resulting in overpayments by Plaintiffs and the Class for Hytrin.

b.      Defendants Zenith and Geneva have benefitted from the acts alleged in this Complaint to the extent of the payments they received under the Abbott-Zenith and Abbott-Geneva Agreements.  The funds for such payments by Abbott derived from Plaintiffs' and the Class' overpayments for Hytrin.

c.      Plaintiffs and the Class have conferred upon Defendants an economic benefit in the nature of revenues resulting from unlawful overcharges, to Plaintiffs' and the Class' economic detriment.

d.      The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of the Defendants' anticompetitive behavior restricting competition as set forth above.

e.      The benefit held by Defendants rightfully belongs to Plaintiffs and the Class, as Plaintiffs and the Class paid these anticompetitive sums to Defendants during the Class Period, when Defendants used anticompetitive measures to block generic entry into the market.

f.     It would be inequitable for Zenith or Geneva to be permitted to retain any of the proceeds of the Abbott-Zenith or Abbott-Geneva Agreements.

g.     It would be inequitable for Abbott to be permitted to retain any of the Plaintiffs' and the Class' overpayments for Hytrin derived from its unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Abbott-Zenith and Abbott-Geneva Agreements and the acts alleged herein, designed to prevent introduction of generic bioequivalents to Hytrin into the market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against all Defendants, jointly and severally, as follows:

A.     declaring that the Abbott-Zenith and Abbott-Geneva Agreements is each a per se violation of Wisconsin Statutes §§ 133.03(1) & (2);

B.     granting Plaintiffs and the Class equitable relief in the nature of disgorgement and/or restitution of Defendants' unjust enrichment;

C.     awarding Plaintiffs and the Class treble damages, jointly and severally, for Defendants' violations of Wisconsin Statutes §§ 133.03(1) & (2) & 133.14, in an amount to be determined at trial;

D.     granting Plaintiffs and the Class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

E.     granting such other relief as this Court may deem just and proper under the circumstances.

## XIII.  CLAIMS DISMISSED BY THE ORDERS OF JULY 2, 2001 AND SEPTEMBER 11, 2002 AND NOT REPLED ABOVE

Plaintiffs reassert all claims in their Second Amended Consolidated Complaint and Coordinated Third Amended Class Action Complaint that have not been repled above for purposes of protecting any appeals of the dismissal of these claims by the Court in its Orders of July 2, 2001 and September 11, 2002.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that true and correct copies of the foregoing have been furnished, by Federal Express,[6] to all parties listed on the attached Service List, this _____ day of November, 2002.

ROBERT C. GILBERT, P.A.
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Tel:    (305) 529-9100
Fax:    (305) 529-1612

By:  _____
        Robert C. Gilbert
        Florida Bar No. 561861

*Liaison Counsel for Indirect Purchaser Plaintiffs*

COHEN, MILSTEIN, HAUSFELD & TOLL,
        P.L.L.C.
Michael D. Hausfeld
Sharon A. Snyder (FBN 778036)
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Tel:    (202) 408-4600
Fax:    (202) 408-4699

LOWEY DANNENBERG BEMPORAD
        & SELINGER, P.C.
Stephen Lowey
Richard W. Cohen
Geoffrey M. Horn
The Gateway, 11th Floor
One North Lexington Avenue
White Plains, NY 10601-1714
Tel:    (914) 997-0500
Fax:    (914) 997-0035

---

[6] For this particular document, the parties have agreed to waive the requirement that pleadings also be served via facsimile as set forth in paragraph 2 of the May 15, 2000 Agreed Order Regarding Filings Under Seal and Service of Papers by Facsimile and Overnight Courier, as modified by the September 20, 2000 Corrected Order on Stipulation Regarding Service of Pleadings and Other Papers.

**GAUTHIER, DOWNING, LaBARRE, BEISER & DEAN**
James Dugan
3500 North Hullen Street
Metairie, LA 70002
Tel:    (504) 456-8600
Fax:    (504) 456-8624

*Co-Lead Counsel for Indirect Purchaser Plaintiffs*

**SERVICE LIST** - Case No. 99-MDL 1317 (ALL CASES)

Richard B. Drubel, Esq.
Boies, Schiller & Flexner, LLP
26 South Main Street
Hanover, NH  03755
603-643-9090

Barry S. Taus, Esq.
Garwin, Bronzaft, Gerstein & Fisher, LLP
1501 Broadway, Suite 1416
New York, NY  10036
212-398-0055

Scott E. Perwin, Esq.
Kenny Nachwalter Seymour Arnold
   Critchlow & Spector, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131-4327
305-373-1000

Jason L. Solotaroff, Esq.
Stamell & Schager, LLP
One Liberty Plaza, 35th Floor
New York, NY  10006-1404
212-566-4047

Sharon Snyder, Esq.
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue NW
West Tower, Suite 500
Washington, DC  20005-3964
202-408-4600

Wayne A. Cross, Esq.
White & Case
1155 Avenue of the Americas
New York, NY  10036-2787
212-819-8200

Daniel Berger, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103
215-875-3000

Mitchell W. Berger, Esq.
Berger Singerman
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL  33301
954-525-9900

Steve D. Shadowen, Esq.
Schnader Harrison Segal & Lewis, LLP
30 North Third Street, Suite 700
Harrisburg, PA  17101-1713
717-231-4000

Stephen E. Morrissey, Esq.
Jeffrey I. Weinberger, Esq.
Munger, Tolles & Olson, LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
213-683-9100

Gerson A. Zweifach, Esq.
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, D.C.  20005
202-434-5000

James R. Dugan II, Esq.
Gauthier, Downing, LeBarre, Dean
   & Sulzer, LLP
3500 North Hullen Street
Metairie, LA 70002
504-456-8600

Robert C. Gilbert, Esq.
Law Offices of Robert C. Gilbert, P.A.
220 Alhambra Circle, Suite 400
Coral Gables, Florida  33134
305-529-9100

Barbara B. Smithers, Esq.
Office of the Attorney General
135 West Central Boulevard
Suite 1000, Century Plaza
Orlando, FL 32801
407-999-5588

1418 / LIST / 00056783.WPD v1

Devin Laiho, Esq.
Office of the Attorney General
1525 Sherman Street, 5th Floor
Denver, CO  80203
303-866-4500

Shelly King, Esq.
Office of the Attorney General
120 S.W. 10th Ave., 2nd Floor
Topeka, KS  66612-1597
785-296-2215

Paul A. Shelowitz, Esq.
Akerman, Senterfitt & Eidson, P.A.
One Southeast Third Avenue, 28th Floor
Miami, FL  33131
305-374-5600

Aubrey Calvin, Esq.
The Calvin Law Firm, P.C.
808 Travis Street, Suite 2300
Houston, TX  77002-7321
713-224-5771

Rohit K. Singla, Esq.
Munger, Tolles & Olson LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA  94105
415-512-4000

[vdkttext]

```
                              Case Selection
Dkt type: md    Case Number: 99-1317      Division: 1   Miami

Transaction: seal doc -/-/- - -
                              History Record
Occurrence date:      11/22/02     Service date :              ID#  5484037
                              Document Record
Document number:      903      -1    Document type :doc
Date filed : 11/22/02              Date disposed :           Term # :
Date req :                         Time req :                Flag :
Requested Amt :
+----------------------------------------------------------+
 SEALED DOCUMENT with attachments placed in vault



+editing docket text---------------------------------------+

 Command mode (? for commands)
```

Attached to D.E. # _903_