UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 99-MDL-1317 (ALL CASES) SEITZ/BANDSTRA

NIGHT BOX
FILED

DEC 15 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

IN RE TERAZOSIN HYDROCHLORIDE
ANTITRUST LITIGATION
_____/

**DEFENDANTS' PRELIMINARY PROPOSED
SUBSTANTIVE JURY INSTRUCTIONS AND VERDICT FORM**

## I.      INTRODUCTION

Pursuant to the Court's order dated December 4, 2003, defendants respectfully submit the following preliminary proposed substantive jury instructions and verdict form for purposes of the Court's consideration of an appropriate trial structure.  Defendants expect to modify and/or supplement these documents based upon: (1) discovery developments; (2) clarifications of plaintiffs' theory of liability and damages, (3) the Court's rulings on dispositive motions and other pre-trial motions, (4) class certification developments, and (5) other relevant considerations.  The verdict form and instructions contemplate a consolidated trial of all claims of all parties.[1]

This submission is based on four sources: (1) *Eleventh Circuit Pattern Jury Instructions (Civil Cases)* (1999) [hereinafter, "Eleventh Circuit Pattern Instructions"], available

---

[1] The instructions do not address individual issues that may arise under particular state laws governing Indirect Purchasers' claims, as there has not yet been a determination of class certification or the laws that will apply to the indirect purchasers' claims.  Because the state law versions of Section 1 and Section 2 claims are substantially parallel to the Sherman Act in most cases, defendants believe most (if not all) of the liability instructions likely would apply to any state law claims that may be tried; however, variability among state laws on apportionment, causation and damages would require additional instructions.  The indirect purchasers' unjust enrichment claims are equitable, and would not be tried to a jury.  Additionally, because the Court has not certified any class (and because the Sherman Act Class Plaintiffs have not filed a renewed motion for class certification), direct purchaser class specific issues may need to be addressed in supplemental instructions.

969139.2                                                              1

at http://www.ca11.uscourts.gov /documents/pdfs/civjury.pdf; (2) ABA, *Sample Jury Instructions in Civil Antitrust Cases* (1999) [hereinafter, "ABA Sample Instructions"]; (3) O'Malley, *et al.*, *Federal Jury Practice & Instructions* (5th ed. 1999 & 2003 Supp.) [hereinafter, "Federal Jury Practice & Instructions"]; and (4) the Eleventh Circuit's decisions in the interlocutory appeals in this case and other case law that is relevant to plaintiffs' claims in these cases.

## II.   PROPOSED JURY INSTRUCTIONS

### A.   Liability Instructions

### 1.   Background Instructions.

**Proposed Instruction No. __**

**Introduction**

There are three groups of plaintiffs in this case.  Although all plaintiffs assert antitrust claims, the precise antitrust claims that are asserted differ with the differing plaintiff groups.

First, there are the Individual Sherman Act Plaintiffs.  These plaintiffs allege a claim against Abbott and Geneva under Section 1 of the Sherman Act, and a claim against Abbott under Section 2 of the Sherman Act.

Second, there are the Sherman Act Class Plaintiffs.  These plaintiffs allege a claim against Abbott and Geneva under Section 1 of the Sherman Act.

Third, there are the Indirect Purchaser Plaintiffs.  These plaintiffs allege claim against Abbott and Geneva under various state laws, as follows:  [fill in based upon results of class certification decision].

I will first instruct you on the claims under Section 2 of the Sherman Act.  Next, I will instruct you on the claims under Section 1 of the Sherman Act.  Finally, I will instruct you on the claims under the laws of the states of [fill in depending upon applicable state laws].

**Proposed Instruction No. __**

**<u>Patents and the Antitrust Laws</u>**

Plaintiffs' claims in this case implicate the interplay between the patent laws and the antitrust laws. To evaluate plaintiffs' claims in this case, you must first know about patents.

The U.S. Constitution gives Congress the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their . . . discoveries." To carry out this provision of the Constitution, Congress has enacted the patent laws. The basic policy of the patent laws is to encourage inventors to reveal new, useful, and unobvious technology to the public, in exchange for the grant by the U.S. government of a patent on their invention.

To receive a patent, an inventor pays a fee and submits an application to the U.S. Patent Office. The Patent Office reviews the application and, if it finds that the application adequately describes a new and useful invention, it grants, or "issues," a patent to the inventor. The patent provides inventors with the right, for a specified number of years, to exclude others from making, using, offering for sale, or selling the patented invention throughout the United States without the permission of the owner of the patent. This potential economic reward gives people an incentive to invest their time, money, and effort in research and development efforts.

A patent benefits the public as well as the patent owner. This is so because every inventor who applies for a patent must provide the details of his or her invention to the Patent Office. When the Patent Office issues a patent, a full description of the invention is included in a publicly filed document that precisely defines what the patent covers. This public filing allows anyone to find out exactly what was invented and how it works. Thus, other researchers can learn from a patent owner's work, and can go on to make other inventions of their own.

A person may obtain from the Patent Office a separate patent for each invention that qualifies for a patent. There is no maximum number of patents that a person may obtain.

A person who had obtained a patent on one invention can obtain another patent if he or she invents something that is a nonobvious improvement on an invention described in an earlier patent. When the life of the patent ends, anyone is free to use the earlier invention. But the invention in the later patent, commonly known as an "improvement patent," cannot be used until the life of that patent ends.

Using a patented invention within the applicable time period without the patent owner's petition is called patent infringement or infringing the patent. As mentioned above, for a specified number of years, the patent owner has the right to exclude anyone else from using the patented invention. He or she may enforce this right by bringing a lawsuit to stop the alleged infringement, to recover damages for the alleged infringement, or both.

The law also encourages the settlement of patent litigation. Patent litigation can be complex and expensive. The cost savings of settlement, both to the parties to the litigation and to the public are widely-recognized. Settlements of patent litigation often involve the alleged infringer's agreeing not to market its allegedly infringing product for some period of time.

**Source:       ABA Sample Instructions, Patents –General Instruction 1.**

### Proposed Instruction No. ____

### Relation of Patent Laws to Antitrust Laws

The patent laws complement the antitrust laws in promoting competition. The basic purpose of both sets of laws is to promote innovation, industry, and competition. In general, the antitrust laws seek to promote competition by prohibiting the abuse of monopoly power and restraints on trade that unduly interfere with the competitive process.

The patent laws seek to promote competition by encouraging people to invest in scientific research and product development. These investments can lead to new and better products, better ways of making things, new jobs, and entirely new industries. But a patent necessarily involves a restraint of trade — the right to exclude others from using the patented invention for the duration of the patent. This right to exclude is not an antitrust violation. Congress has decided that the restraint of trade and short-term competition created by the patent is appropriate and lawful because it promotes innovation and long-term competition.

Thus, as long as the patent owner acts only to take full advantage of the right to exclude potentially created by its patent, it does not violate the antitrust laws. If, on the other hand, the patent owner seeks to restrain trade beyond the exclusionary potential of the patent, its conduct may be evaluated under the antitrust laws.

Except in the limited circumstance discussed later in these instructions, it is not a violation of the antitrust laws for a patent owner to bring a lawsuit to stop the alleged infringement of its patent, to recover damages for the alleged infringement, or both. It is also not a violation of the antitrust laws for a patent owner and an alleged infringer to settle patent litigation by agreeing that the alleged infringer will not market its allegedly infringing product for some or all of the patent term. This is true even if the patent holder pays the alleged infringer, and regardless of the amount that the patent holder pays the alleged infringer, in settlement. This is also true even if the patent is later held to be invalid. Patent litigation is too complex and the results are too uncertain for antitrust liability to be imposed based upon a court's subsequently determining that a patent is invalid.

When the Patent Office issues a patent, it files a public document containing two parts. The first part, commonly known as the "specifications," generally describes the subject matter of the invention, what problems the inventor may have been trying to overcome, and a general description of how the invention works. The second part of the invention consists of the numbered "claims." These are the precise descriptions of what, exactly, the invention is. The claims, and not the specifications, define the precise thing over which the patent owner is given his or her right to exclude. This case involves claim 4 of Abbott's `207 patent, which claimed a particular polymorphic form of anhydrous terazosin hydrochloride. It is undisputed that all of the generic terazosin hydrochloride products at issue in this case infringed claim 4 of the `207 patent.

**Source:**      **ABA Sample Instructions, Patents – General Instruction 2; Valley Drug v. Geneva Pharmaceuticals, 344 F.3d 1294 (11th Cir. 2003).**

**2.      Proposed Instructions for Sherman Act Section 2 Claims.**

**Proposed Instruction No. ___**

**Sherman Act Section 2– General**

The Plaintiffs who are pursuing a Section 2 claim allege that Abbott engaged in unlawful monopolization and that they were injured by this alleged conduct.  To establish liability on their claim for monopolization, these plaintiffs must prove each of the following elements by a preponderance of the evidence:

**First**, that Abbott had monopoly power in a relevant market;

**Second**, that Abbott abused that power;

**Third**, that the abuse of monopoly power occurred in or affected interstate commerce.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Abbott and against plaintiffs on plaintiffs' Section 2 claims.

**Source:       ABA Sample Instructions, Monopolization Instruction 1.**

### Proposed Instruction No. ___

### <u>Monopoly Power Defined</u>

Monopoly power is the power to control prices in or to exclude competition from the relevant market.

The power to control prices is the power of a company to establish appreciably higher prices for its goods than those charged by competitors for equivalent goods without a substantial loss of business to competitors.  Thus, if a company that has raised prices eventually has to lower its prices to the level of prices charged by its competitors, it may not have monopoly power in the sense of power to control prices.

The power to exclude competition means the power of a company to dominate a market by eliminating existing competition from the market or by preventing new competition from entering the market.

To establish the possession of monopoly power, a plaintiff need not prove that prices were raised or that competition actually was excluded, but only that a defendant had the power to raise prices or exclude competition.

Further, to conclude that a defendant had monopoly power, you need not find that the defendant could sell at any price it desired or that it had no competition whatsoever.  A company may face some competition in the relevant market and still have monopoly power.  On the other hand, if a company does not have the power to control prices or to exclude competition, it does not have monopoly power.

**Source:       ABA Sample Instructions, Monopolization – General Instruction 2.**

**Proposed Instruction No. \_\_\_**

**Relevant Market — General**

The question of monopoly power must be assessed within an economically meaningful market, or what is called a relevant market.

Defining the relevant market is essential because you are required to make a judgment about whether Abbott had power over prices or competition. To do so, you must be able to determine what economic forces, if any, restrained Abbott's freedom to act as it pleased. The most likely and most important restraining force is competition from other firms and their products. This includes all firms and products that act as real and practical restraints on a company's power to set prices as it pleases. All the firms and products that exert this restraining force are considered to be within what is called the relevant market.

There are two aspects you must consider in defining a relevant market. The first is the relevant product market; the second is the relevant geographic market.

**Source:**      **ABA Sample Instructions, Sherman Act – General Instruction 3,
Monopolization – General Instruction 4.**

**Proposed Instruction No. ___**

**<u>Relevant Product Market</u>**

The basic idea of a relevant product market is that the products within it are reasonable substitutes from a buyer's point of view; that is, the products compete with each other. This does not mean that products must be identical to be in the same relevant product market. It means that, as a matter of practical fact and the actual behavior of buyers, the products are reasonable substitutes for the buyer's needs. In this case, plaintiffs contend that the relevant product market is limited to Hytrin and generic terazosin hydrochloride. On the other hand, Abbott contends that the relevant product market also includes therapeutic substitutes for terazosin hydrochloride in the treatment of benign prostatic hyperplasia, including Cardura, Flomax, Minipress and Proscar.

There are a number of factors you may consider in determining whether products are reasonable substitutes for each other. The basic test is whether changes in the price of one product cause a considerable number of customers to switch from one product to another. If so, the products are in the same market. You also may consider how people in the industry and the public at large view the products; whether the products have the same or similar characteristics or uses; whether the products have similar prices; whether changes in the price of one product are followed by changes in the price of the other product; whether the products are sold to similar customers; and whether they are distributed and sold by the same kinds of distributors or dealers.

In sum, to determine the relevant product market, you must decide which products compete with each other. This is a practical determination. Products do not have to be identical to be in the same relevant market, but they must compete meaningfully with each other.

**Source:**    **ABA Sample Instructions, Sherman Act – General Instruction 3, Monopolization – General Instruction 4.**

**Proposed Instruction No. \_\_\_**

**<u>Relevant Geographic Market</u>**

The other aspect of relevant market to be considered is the geographic area within which products compete.  This relevant geographic market can be as large as the entire world or the United States or as small as a single community.

Here, the parties agree that the relevant geographic market is the entire United States.

**Source:      ABA Sample Instructions, Sherman Act – General Instruction 3, Monopolization – General Instruction 6.**

969139.2

10

**Proposed Instruction ___**

**Existence of Monopoly Power**

If you find that a relevant market has been proven, you should then determine whether Abbott had monopoly power in that market. There are a number of factors you should consider, none of which is necessarily controlling.

For example, you have heard evidence about Abbott's market share. Market share is a firm's share of total industry sales, shipments, production, capacity, or reserves, expressed as a percentage of the whole. There are a variety of ways to measure market share, but whatever measure you use must be reasonable and consistently applied.

If you determine that Abbott's share of the relevant market was less than 50%, that market share by itself does not permit you to infer that Abbott had monopoly power. If you determine that Abbott's market share was somewhere between 50 percent and 80 percent, you may infer the existence of monopoly power from that share, and the inference is stronger the higher the market share within that range. If you determine that Abbott's share of the relevant market was 80% or higher, that is strong but not conclusive evidence of the existence of monopoly power.

You also may consider the trend in Abbott's market share. A declining market share may indicate the absence of monopoly power, though it does not foreclose such a finding, while an increasing market share may indicate the opposite.

Another factor is the number and size of Abbott's competitors. If these are few, weak, or have small or decreasing market shares, so that they do not offer substantial competition in the relevant market, this may tend to indicate that a defendant has monopoly power. If, on the other hand, they are numerous, vigorous, or have large or increasing shares in that market, this may be evidence that a defendant does not have monopoly power.

You also may consider the history of entry into and exit from the market by other companies. Entry of companies into the market may indicate that Abbott lacks monopoly power. On the other hand, departure of companies from the market, or the failure of companies to enter the market, may indicate that a defendant has monopoly power.

The existence of monopoly power also may be shown by evidence that Abbott had the power to raise prices appreciably without a substantial loss of business to competitors or by evidence that a defendant had profit margins that were extraordinarily high or maintained high rates of return over a long period of time.

If you find by a preponderance of the evidence that Abbott had monopoly power, then you consider the remaining elements of the Section 2 claim. If you find that plaintiffs have not proven that Abbott had monopoly power, then you must find that Abbott did not violate Section 2 of the Sherman Act, and you accordingly must find for Abbott and against plaintiffs on the Section 2 claim.

**Source:**     **ABA Sample Instructions, Monopolization – General Instruction 8.**

### Proposed Instruction No. ____

### <u>Maintenance of Lawfully Acquired Monopoly Power</u>

Mere possession of monopoly power, if lawfully acquired, does not violate Section 2. But it is unlawful to abuse monopoly power. The plaintiffs with a Section 2 claim contend that Abbott abused its alleged monopoly power by pursuing "sham" patent litigation with respect to its `207 patent. I will next instruct you on "sham" patent litigation.

**Source:**      **ABA Sample Instructions, Monopolization – General Instruction 10.**

Proposed Instruction No. ___

## Sham Patent Litigation

The Constitution ensures the right of everybody, whether acting alone or in combination or agreement with others, to petition or appeal to the courts for judicial action, recognizing that when people do so, they will naturally seek judicial action that favors them and also may be unfavorable to others. The law provides that the right to use the courts to seek judicial action is an important right, and that the exercise of that right, even by an agreement, does not normally violate the antitrust laws. Consistent with these general principles, a patent owner is entitled to bring a patent infringement suit to protect his or her patent rights, and the bringing of such a suit ordinarily does not violate the antitrust laws, even where the patent is later determined to be invalid or unenforceable.

Instituting, continuing or settling lawsuits against alleged patent infringers does not constitute an abuse of monopoly power unless the suits were sham. To prove that the '207 patent lawsuits challenged by plaintiff were sham, plaintiffs must prove that these lawsuits: (1) were objectively baseless; and (2) were an attempt to harass or interfere directly with the business relationships of one or more competitors through the use of governmental process as opposed to through the potential outcome of the suits.

Just because a defendant's lawsuits were unsuccessful does not mean that the lawsuits were objectively baseless. A lawsuit is objectively baseless only if it was so lacking in merit that no reasonable litigant could realistically expect to win. In other words, if someone in Abbott's position could have had a reasonable belief that there was a chance of winning its '207 lawsuits, the suits were not objectively baseless.

If you find that Abbott's '207 lawsuits were not objectively baseless, you do not need to consider whether those lawsuits were an attempt to harass or interfere directly with the business relation of one or more competitors. Instead, you must find for Abbott and against plaintiffs on the Section 2 claim.

If, however, you find that Abbott's lawsuits were objectively baseless, you must determine whether Abbott's primary objective in bringing the lawsuits obtain the relief sought in the suits or instead to hurt the plaintiffs with a Section 2 claim by pursuing the lawsuits regardless of their outcomes.

This requires you to determine Abbott's good faith or bad faith in bringing the infringement suits. Abbott is entitled to a presumption of good faith. You may disregard this presumption only if you find clear and convincing evidence that Abbott's goal in pursuing the '207 lawsuits was not to win, but was to harass a competitor and deter others from competing, by engaging in the litigation process itself, regardless of the outcome.

The litigation at issue here sought the following judicial relief: declarations that Abbott's '207 patent was valid and infringed by the generic terazosin products and an injunction against marketing the infringing products prior to the expiration of the patent. Abbott contends that the true purpose of the litigation was to secure this relief. The plaintiffs with a Section 2 claim, on the other hand, maintain that Abbott's true purpose in bringing the lawsuits was not to

win favorable judgments, but to harass the generic manufacturers by the process of litigating regardless of the outcome.

In determining Abbott's purpose, you may consider whatever direct evidence of Abbott's motivation is available to you. You also may consider circumstantial evidence.

If you find by clear and convincing evidence that Abbott brought the infringement suits in an attempt to harass or interfere directly with the business relationships of one or more competitors through the use of the process of litigation as opposed to through the use of the hoped-for outcome of the litigation then you must also decide whether the remaining elements of a Section 2 claim have been proved.

**Source:**        **ABA Sample Instructions, Patents – Other Patent Misconduct Instruction 2.**

**Proposed Instruction No. ___**

**<u>Interstate Commerce</u>**

The third element of a Section 2 claim is that the defendant's conduct was imposed directly on goods or services in the flow of interstate commerce or affected interstate commerce. Interstate commerce refers to transactions in goods or services between one or more persons in one state and one or more persons in another state.

Acts that violate Section 2 may have a substantial effect on interstate commerce even though a defendant is not engaged in activities in interstate commerce and even though some or all of the activities may have been carried out wholly within one state.  But the conduct alleged by plaintiff or the activities of defendants that were affected by the conduct at issue must have had some effect upon interstate commerce.

**Source:**        **ABA Sample Instructions, General Instruction 4.**

3.    **Instructions on Section 1 Claims.**

**Proposed Instruction No. ___**

**Sherman Act Section 1 and The Exclusionary Power Of A Patent**


      The plaintiffs who are pursuing a Section 1 claim allege that Abbott and Geneva unreasonably restrained trade in providing in their written agreement dated April 1, 1998 (the "Abbott/Geneva Agreement") that Geneva would not market a terazosin hydrochloride product even after a ruling by the district court in the '207 patent litigation. I will refer to this provision of the Abbott/Geneva Agreement as the "restraint." You should not infer anything negative from my use of this word; it is just a shorthand term.

      To establish liability under Section 1, the plaintiffs with a Section 1 claim must as an initial matter prove by a preponderance of the evidence that the restraint went beyond the exclusionary potential of Abbott's '207 patent. In making this determination, you should consider the possible outcomes of the '207 patent litigation. You should make this determination based only upon the facts as they were known on April 1, 1998, not based upon hindsight. If you find that the restraint did not go beyond the exclusionary potential of Abbott's '207 patent, then you must find for defendants and against plaintiffs on the Section 1 claim.

**Source:**      **Valley Drug v. Geneva Pharmaceuticals, 344 F.3d 1294 (11th Cir. 2003).**

**Proposed Instruction** ____

**<u>Sherman Act Section 1 Elements</u>**

If you find that plaintiffs have proven by a preponderance of the evidence that the restraint went beyond the exclusionary potential of Abbott's '207 patent, then you must consider whether the restraint was unreasonable in so doing.

To show that the restraint was unreasonable in going beyond the exclusionary potential of the '207 patent, a plaintiff must prove actual and substantial harm to competition in a relevant market. To show this, plaintiff must proved by a preponderance of the evidence:

**First**, what the relevant market is;

**Second**, that Abbott and Geneva agreed upon the restraint;

**Third,** that the restraint's going beyond the exclusionary potential of the '207 patent had a substantially harmful effect on competition in the relevant market; and

**Fourth**, that the harmful effect on competition outweighed any beneficial effect on competition.

In the context of the Section 2 claim, I have already instructed you on what a plaintiff must prove to establish a relevant market. That instruction is applicable to the first element on the Section 1 claim as well. Turning to the second element of the Section 1 claim, the parties have stipulated here that Abbott and Geneva agreed upon the restraint.

**Source:       ABA Sample Instructions, General Instruction 3.**

### Proposed Instruction _____

### <u>Sherman Act Section 1 Analysis</u>

If you find that plaintiffs have proven a relevant market, then you must determine whether any aspect in which the restraint went beyond the exclusionary potential of Abbott's '207 patent had an unreasonably harmful effect on competition in the relevant market.

In making this determination, you must consider the extent to which the restraint's going beyond the exclusionary potential of Abbott's '207 patent helped competition or harmed competition. Your task is to balance any aspects in which the restraint went beyond the exclusionary potential of the '207 patent that were helpful to competition against any such aspects that were harmful to competition. In doing so, you should consider such factors as the particular business of defendant; the condition of the market before and after the restraint was imposed; the nature of the restraint and its effect on competition; the history of the restraint; the reason for adopting the restraint; and defendant's purpose or intent. Harm to a plaintiff's business is not necessarily harm to competition.

If you find that the restraint did harm competition in the relevant market by going beyond the exclusionary potential of Abbott's '207 patent, you must then consider the extent of that harm. Only a substantial harm is unreasonable. A slight or insubstantial impact on competition is not unreasonable or unlawful. In making this determination you should consider the defendants' market power and how much of the relevant market was affected by the conduct at issue. If defendants had little market power or the aspect of the restraint that you find went beyond the exclusionary potential of Abbott's '207 patent affected only a small part of the market, then it is less likely that there was a substantial effect on competition in the relevant market. In considering market power, you may consider the defendants' market share, but market share may not always, by itself, show market power.

You also should consider whether any aspect in which you find that the restraint went beyond the exclusionary potential of Abbott's '207 patent influenced or affected the price, output or product quality in the relevant market. Where there is no affect on price, output or product quality, there is unlikely to be substantial harm to competition. If a plaintiff has not proved substantial harm to competition in the relevant market, then you must find in favor of defendants on the Section 1 claim.

If you find that a plaintiff has proved by a preponderance of the evidence that there was a substantial harmful effect on competition in the relevant market, you must also weigh any effects of the restraint that were helpful to competition against the harmful effects that have been proven. For instance, you should consider Abbott's legitimate interests in protecting its presumptively valid patent rights, the risks and uncertainties the parties faced in the '207 patent litigation, Geneva's ability or inability to satisfy a monetary judgment in the event Abbott prevailed in the patent litigation after Geneva began marketing its product, Geneva's ability or inability to market its product absent the settlement, whether Geneva would have taken the risk of marketing a generic terazosin product absent the settlement, the public policy in favor of resolution of patent disputes prior to generic entry, and whether any aspect of the restraint that went beyond the exclusionary potential of Abbott's '207 patent were reasonably ancillary to the benefits to competition of the restraint. All of these may have been beneficial to competition

**4.     Injury & Causation Instructions.**

**Proposed Instruction No. __**

**Injury and Causation**

If you find that there has been proof by a preponderance of the evidence of all of the elements of a violation of Section 1 and/or Section 2 of the Sherman Act, then you must decide if the relevant plaintiffs are entitled to recover damages from the relevant defendants for the violation.

For any plaintiff to establish that it is entitled to recover damages, it must prove that it was injured as a result of a defendant's violation of the antitrust laws. This is sometimes referred to as "causation" or "fact of damage." Proving causation does not require that a plaintiff prove the dollar amount of its injuries. It requires only that a plaintiff prove that it was in fact injured by a defendant's alleged antitrust violations. If you find that a plaintiff has established that it was in fact injured, you must then consider the amount of that plaintiff's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you may not consider the amount of damage unless and until you have concluded that a plaintiff has established that it was in fact injured by an antitrust violation.

To establish injury, a plaintiff must have offered evidence that establishes as a matter of fact and with a fair degree of certainty that conduct you find to have violated the antitrust laws was a material cause of its injuries. This means that a plaintiff must have proved that some damage flowed to it as a result of a defendant's alleged antitrust violations.

A plaintiff is not required to prove that an antitrust violation was the sole cause of its injury; nor need a plaintiff eliminate all other possible causes of injury. It is enough if a plaintiff has proved that an antitrust violation was a material cause of its injury. Injury may be established by inference or circumstantial evidence. A plaintiff's burden may vary in each case, depending upon the type of antitrust violation alleged. However, if you find that a plaintiff's injury was caused solely by something other than an antitrust violation, then you must find that the plaintiff has failed to prove that it is entitled to recover any damages from the defendant.

You must separately determine injury and causation as to each claim – that is, as to the Section 1 claim and as to the Section 2 claim.

**Source:        ABA Sample Instructions, Clayton Act § 4 Requirements Instruction 1.**

If your answer to question 5 is "yes," when do you find that a generic terazosin hydrochloride product would received final FDA approval? _____

If your answer to question 5 is "yes," what generic manufacturer do you find would have received final FDA approval for its generic terazosin hydrochloride product on that date? _____

6.     Do you find by a preponderance of the evidence that, but for Abbott Laboratories' initiating patent infringement claims in the `207 patent litigation, a manufacturer of a generic terazosin hydrochloride product would have had the ability to market its product in the United States before August 1999?

_____      _____
Yes           No

If your answer to question 6 is "yes," when do you find that a generic terazosin hydrochloride manufacturer would have had the ability to market its product in the United States before August 1999?     _____

If your answer to question 6 is "yes," what generic manufacturer do you find would have had the ability to market its generic terazosin hydrochloride product in the United States on that date? _____

7.     Do you find by a preponderance of the evidence that, but for Abbott Laboratories' initiating the `207 patent litigation, a manufacturer of a generic terazosin hydrochloride product actually would begun marketing a generic terazosin hydrochloride product in the United States before August 1999?

_____      _____
Yes           No

If your answer to question 7 is "yes," when do you find that a generic terazosin hydrochloride product would have been marketed in the United States? _____

If your answer to question 7 is "yes," what generic manufacturer do you find would have begun marketing its generic terazosin hydrochloride product in the United States on that date? _____

8.      Do you find by a preponderance of the evidence that Abbott Laboratories' instituting the `207 patent litigation caused each of the following plaintiffs injury that it would not have suffered absent the litigation?

Walgreen Co.            _____      _____
                        Yes           No

*[List any direct purchasers with Section 2 claims remaining in the case at time of trial]*

Cobalt Corp.            _____      _____
                        Yes           No

Ewald Grosskrueger      _____      _____
                        Yes           No

*[List any indirect purchasers remaining in the case at time of trial]*

State of Florida        _____      _____
                        Yes           No

State of Kansas         _____      _____
                        Yes           No

State of Colorado       _____      _____
                        Yes           No

*[If any class is certified, the form would describe the class in accordance with the class definition and the class would be listed in place of the individual class representative]*

**NOTE:  If your answer to the foregoing question was "no" for any plaintiff, you should not answer the following question with respect to that plaintiff**

9.      For any Plaintiff for which you have answered "yes" to each of the foregoing questions, state the amount of damages, if any, that you find by a preponderance of the evidence it suffered on its Section 2 claim:

Walgreen Co.            _____

*[List any direct purchasers with Section 2 claims remaining in the case at time of trial]*

Cobalt Corp.            _____

Ewald Grosskrueger      _____

*[List any indirect purchasers remaining in the case at time of trial]*

State of Florida          _____

State of Kansas           _____

State of Colorado         _____

*[If any class is certified, the form  would describe the class in accordance with the class definition and the class would be listed in place of the individual class representative]*

**NOTE: If you filled in a positive monetary amount in the prior question for any plaintiff, you should not respond to the questions in Section C for that plaintiff.**

**B.    Section 1 claims against defendants Abbott Laboratories and Geneva Pharmaceuticals, Inc.**

10.    Do you find by a preponderance of the evidence that plaintiffs have proven a relevant product market for considering their Section 1 claim?

_____          _____
Yes               No

If your answer is "yes," state the relevant product market plaintiffs have proven

_____

11.    Do you find by a preponderance of the evidence that the provision in the April 1, 1998 agreement between Abbott Laboratories and Geneva Pharmaceuticals, Inc. that Geneva would not market a terazosin hydrochloride product even after a ruling by the district court in the '207 patent litigation ("the Restraint") had anticompetitive effects in the relevant market that exceeded the exclusionary potential of Abbott's `207 patent?

_____          _____
Yes             No

12.    Do you find by a preponderance of the evidence that any anticompetitive effects in the relevant market of the Restraint that exceeded the exclusionary potential of Abbott's '207 patent market substantially outweighed any pro-competitive benefits of the Restraint?

_____          _____
Yes             No

969139.2                         25

13.   Do you find by a preponderance of the evidence that the Restraint had a substantial effect, or the potential of causing a substantial effect, on interstate commerce, and that the activities affected by the Restraint involved a substantial amount of interstate commerce?

_____ Yes          _____ No

**Note:  If your answer to any of questions 10-13 is "no" sign and return the verdict form; if your answer all of those questions is "yes," proceed to the next question.**

14.   Do you find by a preponderance of the evidence that, absent the Restraint, Geneva would have had the ability to market a generic terazosin hydrochloride product in the United States before August 1999?

_____ Yes          _____ No

**Note:  If your answer to number 14 is "yes," state the date that you find that Geneva would have had the ability market its generic terazosin hydrochloride product absent the Restraint?**

_____

15.   Do you find by a preponderance of the evidence that, absent the Restraint, Geneva actually would have had the ability to market a generic terazosin hydrochloride product in the United States before August 1999?

_____ Yes          _____ No

If your answer to number 15 is "yes," state the date that you find that Geneva would have had the ability to market its generic terazosin hydrochloride product absent the Restraint?

_____

16.   Do you find by a preponderance of the evidence that the Restraint caused each of the following Plaintiffs injury that it would not have suffered absent the Restraint?

969139.2

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of **Defendants'**
**Preliminary Proposed Substantive Jury Instructions and Verdict Form** was
furnished by facsimile and email delivery this 15th day of December, 2003 to all counsel
on the attached service list.

STUART N. SENATOR

971066.1