UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**NIGHT BOX
FILED**

OCT - 6 2004

CLARENCE MADDOX
CLERK, USDC / SOFL / MIA

|  |  |  |
|---|---|---|
| In Re Terazosin Hydrochloride Antitrust Litigation | ) ) ) ) | MDL Docket No. 99-MDL-1317 Seitz/Klein |

## INTERVENING COMPLAINT

NOW INTO COURT comes Intervenor Mermel J. Valentine, indirect purchaser Plaintiff dismissed with prejudice by this Court's July 2, 2001 Order published as *In re Terazosin Hydrochloride Antitrust Litigation*, 160 F.Supp.2d 1365 (S.D. Fla. 2001), by and through counsel, and by leave of Court, and files this Complaint in Intervention as a party-Plaintiff in this action, and would show unto this Court:

1.      Intervenor is an individual who resides in Tennessee and brought indirect purchaser class action claims in this litigation against Defendants on behalf of Tennesseans under Tennessee's antitrust statute.

2.      Intervenor is not a member of a certified class in this action, although he was the named plaintiff and representative of a proposed class of similarly situated Tennessee residents in their indirect purchaser class action, dismissed with prejudice by this Court in *In re Terazosin Hydrochloride Antitrust Litigation*, 160 F.Supp.2d 1365 (S.D. Fla. 2001) on July 2, 2001. This Court dismissed Intervenor because it found that the Tennessee Trade Practices Act was limited to transactions that were predominantly intrastate. Current counsel for Intervenor represented Intervenor at that time.

1430

3.      The Court's July 2, 2001 dismissal of Intervenor's claims is in direct contradiction to the decision of the Tennessee Court of Appeals in *Sherwood v. Microsoft Corp.*, 2003 Tenn. App. LEXIS 530, 23 (Tenn. App. 2003). *Sherwood* has clarified Tennessee law and specifically holds that the Tennessee Trade Practices Act is not limited to transactions that are predominantly intrastate, *Id.* at *58.

4.      On April 8, 2004, this Court entered its Order Granting Indirect Purchaser Plaintiffs' Motions for Class Certification of State-Wide Classes, in which the Court certified state classes but denied relief to the indirect purchasers in the state of Tennessee.

5.      Intervention of Right under Rule 24(a) of the Federal Rules of Civil Procedure is appropriate because Intervenor claims an interest relating to the property or transaction which is the subject of this action and is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest. Further, neither the named plaintiffs in this action nor their counsel, Lowey, Dannenberg, Bemporad & Selinger, P.C., are adequately representing Intervenor's interests.

6.      Tennessee consumers will be unable to protect their claimed interests in this matter and against Defendants if Intervenor is not allowed to intervene. It would also be inequitable not to allow the Tennessee consumers to obtain relief now that Tennessee law has been clarified by the Tennessee Court of Appeals and the Tennessee Supreme Court. Further, current counsel for the indirect purchasers in this litigation are inadequate and have failed to adequately represent the interests of Intervenor, including failure to make this Court aware of the clarification of Tennessee law in *Sherwood*.

7.      Additionally, Permissive Intervention under Rule 24(b) of the Federal Rules of Civil Procedure is appropriate due to the common questions of fact in the Intervenor's claims

2

and this action.  Intervenor also contributes unique "full consideration" legal claims to this litigation under Tennessee law that are different from the interests of the class as a whole.

8.      Counsel for Intervenor should be appointed Tennessee lead counsel to protect the interests of Tennessee consumers, whose claims will be lost if intervention is not allowed and whose interests have not been adequately represented by current counsel for the indirect purchasers in this litigation.

9.      Allowance of intervention and appointment as Tennessee lead counsel will not unduly delay or prejudice the adjudication of this action.

10.     This intervention is for purposes of discovery, and does not include settlement, substantive motions or trial, under 28 U.S.C. § 1407 and *Lexecon v. Milberg Weiss Gershad Hynes & Lerach, et al*, 523 U.S. 26 (1998).  Intervenor agrees to be bound by all discovery rulings of this Court.

11.     Intervenor explicitly reserves his rights, including those under 28 U.S.C. § 1407 and *Lexecon v. Milberg Weiss Gershad Hynes & Lerach, et al*, 523 U.S. 26 (1998).  Intervenor also reserves any and all objections to this Court's assertion of jurisdiction over his Tennessee claims and causes of action.  After pre-trial discovery in this matter has concluded, Intervenor will move for remand and removal to proceed with trial or settlement of his claims and causes of action in the Tennessee courts.

12.     Intervenor's claims and causes of action, as set forth in his previous complaint, are set forth herein as follows:

This Complaint is alleged upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, as follows:

## I. NATURE OF ACTION

13.    This case is brought as a Class Action, pursuant to Rule 23 of the Tennessee Rules of Civil Procedure.  Plaintiff seeks to recover damages caused by reason of the Defendants' violations of the antitrust laws and unfair or deceptive trade practices statutes of the Class Jurisdictions, including the Tennessee Trade Practices Act, T.C.A. § 47-25-101, et seq. and the Tennessee Consumer Protection Act of 1977, T.C.A. § 47-18-101, et seq., as well as the Defendants' violations of the common law of all Class Jurisdictions, through a successful conspiracy in restraint of trade to prevent Defendants' competitors from marketing generic Hytrin.

14.    Defendant Abbott Laboratories, Inc. ("Abbott"), is an Illinois-based company, whose registered agent for service as listed with the Tennessee Secretary of State is CT Corporation System, 530 Gay Street, Knoxville, Tennessee.  Abbott is the only manufacturer which sells the chemical compound terazosin hydrochloride in prescription drug form in the United States.  Abbott sells about $540,000,000 worth of terazosin hydrochloride capsules annually in the U. S. under the brand name Hytrin.  Hytrin is used for the treatment of hypertension (high blood pressure) and benign prostatic hyperplasia (enlarged prostate gland).

15.    Defendants Zenith Goldline Pharmaceuticals, Inc. ("Zenith"), whose agent for service of process is Carol J. Gillespie, 4400 Biscayne Blvd., Miami,  FL   33137;  Geneva Pharmaceuticals, Inc. ("Geneva"), whose agent for service of process as listed with the Tennessee Secretary of State is Prentice-Hall Corporation System, Inc., 500 Tallan Building, 2 Union Square, Chattanooga, Tennessee 37402; and at least five (5) other companies could have

4

manufactured and marketed generic bioequivalent versions of Hytrin but for the unfair and deceptive trade practices alleged herein.

16.     The illegal per se horizontal conspiracy alleged herein has been carried out through Defendants' illegal, unfair, or deceptive acts, including paying a bribe to Defendants' Zenith and Geneva to keep those companies from marketing their own developed generic Hytrin. The purposes and effects of the conspiracy have been (a) to preserve the near monopoly enjoyed by Defendant Abbott and (b) to give Defendant Abbott a perpetual monopoly over the worldwide market for Hytrin.

17.     By preserving its dominance over this market, Defendant Abbott perpetuated it's ability to fix the price of Hytrin at an artificially high price, free from competition, with the result that the Plaintiff and Proposed Class, who are purchasers and users of Hytrin, and third-party payers for such purchases, were overcharged.  Worse, some consumers forego treatment of dangerous hypertension and prostate problems due to the high price of Hytrin.  For its role in this illicit deal, Defendants' Zenith and Geneva make a profit of $12,000,000 per year each by insuring that they offer no competitive generic equivalent of Hytrin on the market.  Defendants' unfair trade practices and restraint of trade are causing massive monetary loss to all who pay for Hytrin and irreparable harm to the health of the consuming public for Hytrin.

18.     As set forth below, since at least as early as October 15, 1995, Defendant Abbott has misused two patents, the '615 and '207 Patents (as defined herein), to prevent the sale of any generic bioequivalent to Hytrin.  The '615 Patent was not connected with Hytrin, and the '207 Patent was invalid.  In 1998, after its '615 Patent had been adjudicated legally irrelevant to Hytrin and knowing its "207 Patent was invalid, Abbott began paying generic drug

5

manufacturers Zenith and Geneva tens of millions of dollars not to sell generic versions of Hytrin.

19.     Abbott engaged in the foregoing unfair and deceptive acts and practices in Illinois, emanating from its corporate headquarters in Abbott Park, Illinois, causing substantial effect on the trade and commerce of Tennessee.  In addition, Abbott used the federal courts in Chicago to prosecute baseless patent infringement cases and Zenith, Geneva and other generic drug manufacturers solely to delay introduction in the United States of less expensive generic bioequivalents of Hytrin, long after Abbott's only applicable patents had expired.

## II.   JURISDICTION AND VENUE

20.     The Circuit Court of Cocke County has proper jurisdiction and venue for this suit, pursuant to Tenn. Code Ann. § 20-4-101, because all or part of Defendants' acts and conduct alleged herein occurred in this county.  The United States District Court for the Southern District of Florida has asserted jurisdiction over the pretrial proceedings in the related multidistrict litigation, MDL Docket No. 99-MDL-1317.

21.     A substantial part of the trade and commerce, as well as the injury, conspiracy, unfair or deceptive practices, and/or uniform and common course of conduct giving rise to Plaintiff's claims, occurred within the State of Tennessee.

22.     As a result of the manufacture, distribution, delivery and sales of Hytrin to purchasers within Cocke County and throughout the State of Tennessee, Defendants, directly or through their subsidiaries, affiliates or agents, obtained the benefits of the laws of the State of Tennessee and the Tennessee market for Hytrin.

23.     The total amount in controversy as to the Plaintiff and each individual member of the Proposed Class alleged herein does not exceed seventy-four thousand dollars ($74,000.00)

6

each, even if trebled, exclusive of interest and costs.  Plaintiff therefore disclaims any damages

and/or restitution or for any other recovery or remedy greater than seventy-four thousand dollars

($74,000.00) per individual Proposed Class member, even if such damages are trebled.  Further,

Plaintiff and the Proposed Class assert no federal question or statute, and Plaintiff's state law

causes of action are not federally pre-empted.  Plaintiff's state law causes of action mandate that

this case be heard in a State of Tennessee forum.

24.     Plaintiff brings this action pursuant to §§47-25-101, 47-25-105 and 47-25-106 of

the Tennessee Trade Practices Act, §47-18-109 of the Tennessee Consumer Protection Act of

1977, *Sherwood v. Microsoft Corp.*, 2003 Tenn. App. LEXIS 530, 23 (Tenn. App. 2003), and

*Blake v. Abbott Laboratories*, 1996 WL 134947 (Tenn. Ct. App. 1996).  The *Blake* and

*Sherwood* decisions give indirect purchasers the right to maintain an action under both of the

foregoing Tennessee statutes.

## III.  THE PARTIES

25.     Plaintiff, Mermel  J. Valentine, is a resident of Cocke County, Tennessee.  He

would, but cannot, buy the generic equivalent at a lower price, due to Defendants' illegal conduct

in restraint of trade, which lessens or tends to lessen competition in the relevant product market.

26.     Defendant  Abbott Laboratories, an Illinois-based company with its principal

place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064, is the only manufacturer

which sells the chemical compound terazosin hydrochloride in prescription drug form in the

United States.  Abbott sells about $540,000,000 worth of terazosin hydrochloride capsules

annually in the U. S. under the brand name Hytrin.  Hytrin is used for the treatment of

hypertension (high blood pressure)and benign prostatic hyperplasia (enlarged prostate),

conditions affecting millions of Americans.

7

27.     Defendant Zenith Goldline Pharmaceuticals, Inc. is a Florida corporation with its principal place of business in Miami, Florida.  Zenith is a wholly-owned subsidiary of Ivax Corporation.  Zenith develops, manufactures and markets generic drugs.  Zenith submitted an application to the FDA seeking approval to market a generic version of Hytrin and would have begun marketing that product but for the unlawful conduct described below.

28.     Defendant Geneva Pharmaceuticals, Inc. is a New Jersey corporation with its principal place of business in Broomfield, Colorado.  Geneva develops, manufactures and markets generic drugs.  Geneva sought and received FDA approval to market a generic version of Hytrin and would have begun marketing that product but for the unlawful conduct described below.

29.     Other persons and entities not named as defendants herein have participated as co-conspirators in the antitrust violation described below and have performed acts and made statements in furtherance thereof.

30.     Zenith Goldline, Inc. ("Zenith"), Geneva Pharmaceuticals, Inc. ("Geneva"), and at least five (5) other companies could have manufactured and marketed generic bioequivalent versions of Hytrin but for the unfair and deceptive trade practices of Abbott alleged herein.

31.     The availability of generic bioequivalents for Hytrin would have reduced the amounts paid by the Plaintiff and the Class by hundreds of millions of dollars.

32.     Defendant Abbott is responsible, among other things, for developing, distributing, advertising and selling Hytrin throughout Tennessee.

33      The primary purpose of the conspiracy between Abbot and Zenith, Geneva and the other companies  is to prevent any generic Hytrin from reaching the United States market,

8

depriving all purchasers of the ability to purchase generic Hytrin at a fair price, and thereby

enabling the Defendants to maintain their near monopoly over Hytrin without competition.

## IV.  CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action pursuant to the provisions of Rule 23, Tennessee Rules

of Civil Procedure, on behalf of the following Proposed Class:

> All persons and entities who or which have at any time from October 15, 1995 to
> June 30, 2002, paid all or part of the purchase price of Hytrin or its AB-rated
> generic bioequivalents other than for resale, in Tennessee or via mail for residents
> of Tennessee.  Excluded from the Class are the Defendants, their officers and
> directors, their direct and indirect parent and subsidiary corporations and their
> officers and directors; government entities; entities that purchased Hytrin and its
> generic bioequivalents for resale, to the extent of such purchases for resale; direct
> purchasers of Hytrin and its generic bioequivalents from Defendants, to the extent
> of such direct purchases; and indirect purchasers who suffered no economic injury
> as a result of Defendants' allegedly unlawful conduct.

### A.     Numerosity

35.     The members of the Proposed Class are so numerous that joinder of all members

is impracticable.  While the exact number of Proposed Class members is unknown to Plaintiff at

the present time, there are over 50 million hypertension sufferers in the United States.   Thus, due

to the nature of the trade and commerce involved, Plaintiff believes that the members of the

Proposed Class are so numerous and geographically dispersed as to render joinder of all

Proposed Class members in this action impracticable.

### B.     Common Questions of Law and Fact

36.     There are questions of law and fact common to the Proposed Class, including, but

not limited to the following:

    a.    Whether the antitrust laws and unfair or deceptive trade practices statutes of the Proposed Class Jurisdictions were violated by Defendants' acts, as alleged herein;

    b.    Whether Defendants engaged in an illegal conspiracy, the purpose and effect of which have been to lessen, tend to lessen, and restrain competition for the sale of Hytrin and to deprive the Proposed Class of access to a generic form of Hytrin;

## C.    Typicality

37.    Plaintiff's claims are typical of the claims of the Proposed Class, because Plaintiff and all the Proposed Class members sustained damages in the same way arising out of Defendants' uniform course of wrongful conduct in the conspiracy complained of herein, i.e., they have paid and continue to pay an artificial premium for Hytrin resulting from the Abbott, Zenith and Geneva Defendants' illegally perpetuated ability to fix Hytrin prices at a premium, unaffected by generic competition.

## D.    Adequate Representation

38.    Plaintiff will fully and adequately protect the interests of Proposed Class members. Plaintiff has retained counsel experienced in complex class action, antitrust, and unfair or deceptive trade practice litigation. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff is aware of his fiduciary responsibility to the Proposed Class and is determined to diligently discharge those duties, and has no interests which are adverse to or in conflict with other members of the Proposed Class.

10

**E.**     **Common Questions Predominate**

39.     The questions of law and fact common to the members of the Proposed Class predominate over any questions which may affect only individual members.   The common nucleus of operative facts herein centers upon the conspiracy itself, the effect of which lessens or tends to lessen competition, and is in restraint of trade. The improper course of conduct which demonstrates the conspiracy -- the core liability facts in this case -- constitute a large part of every Proposed Class member's claim.

**F.**     **Superiority**

40.     This class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  This action would permit a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence and effort.   Class treatment also would permit the adjudication of claims by Proposed Class members whose claims are too small and complex to individually litigate against large corporate defendants.   A class action is also superior because:

(a)     Despite the relatively small size of individual Proposed Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation; and

(b)     No unusual difficulties are likely to be encountered in the management of this class action, in that all questions of law or fact to be litigated at the liability stage are common to the Proposed Class.

11

41.     Plaintiff knows of no difficulty to be encountered in the management of this action which would preclude its maintenance as a class action.

## V.   FACTUAL BACKGROUND AND DEFENDANTS' UNLAWFUL CONDUCT

### A.     Federal Regulation of the Pharmaceutical Business

42.     Under the Federal Food, Drug, and Cosmetic Act ("FD&C Act") (21 U.S.C. Sections 301 et seq.), approval by the Federal Food and Drug administration ("FDA") is required before a company may begin selling a new drug.  Pre-market approval for a new drug, often referred to as a "pioneer" drug," must be sought by filing a New Drug Application ("NDA") with the FDA, demonstrating that the drug is safe and effective for its intended use.

43.     New drugs that are approved for sale in the United States by the FDA are typically covered by patents, which provide the patent owner with the exclusive right to make, use and sell that new  or pioneer drug in the United States for the duration of the patents involved, typically 17 years, plus any extension of the original patent period ("FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term restoration Act of 1984, Stat. 1585, 21 U. S. C. Section 355 ("Hatch-Waxman Act").

44.     Generic drugs are drugs which the FDA has found to be bioequivalent to pioneer, brand-name drugs, i.e., generics provide the identical therapeutic benefits as the pioneer, brand-name drugs.

45.     Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of  a doctor who writes a prescription, specifying the drug by name, which must be purchased from a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician unless a generic version of that pioneer drug has been approved.

46.     However, if a generic version of a brand-name drug exists and the physician has not specifically indicated on the prescription "dispense as written" ("DAW"), (a) for customers covered by most insurance plans, the pharmacist will substitute the generic drug, and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing the generic drug at a lower price. Due to Defendants' illegal restraint of trade, no generic version of Hytrin is available in the United States market, so prescriptions for Hytrin cam be filled with the Abbott Defendants' drug only.

47.     Generic drugs are invariably priced below the branded drugs to which are bioequivalent. Typically, the introduction of the first generic results in an immediate drop in prices for the branded drug of at least 30%, then increasingly steeper discounts, as more companies develop competing generics and the price of the branded drug continues to fall to compete with the lower-priced generics. The beneficiaries of this price competition are all purchasers of drugs along the distribution chain, all the way down to consumers, who are able to buy the drugs they need at the lower generic prices. Additionally, many health insurance companies encourage patients to use generic drugs by, among other things, reimbursing patients who choose generics with a greater portion of their out-of-pocket costs than they reimburse to pioneer drug consumers. Hospitals, governmental agencies, and managed -health-care entities generally prefer to purchase generic over pioneer drugs because of the cost-savings involved. Pharmacies are able to obtain increased profit margins on generic drugs which they can purchase at lower prices than brand-name drugs as well as on brand-name drugs whose manufacturers have reduced prices in response to generic competition.

13

48.     The branded pioneer drug ordinarily loses most of its market share to generic competitors within a relatively short time after the introduction into the market of a generic equivalent.

**B.      Abbreviated New Drug Applications (ANDAS) for Generic Drugs**

49.     The Hatch-Waxman Act provides that a party seeking expedited FDA approval of a generic version of a patented drug may, in certain circumstances, file an Abbreviated New Drug Application ("ANDA"), relying on the safety and efficacy data filed with the FDA relating to the pioneer drug.

**C.      Paragraph IV Certification**

50.     When the patents on branded drugs have not expired, the generic ANDA applicant must notify the owner of the pioneer drug of the filing of its ANDA and certify, when appropriate, that the patents covering the pioneer drug (listed in the FDA "Orange Book") are either invalid or not infringed by its generic version of that product or invention (Paragraph IV Certification").

**D.      The Drug Patent Holder's Ability to Delay Paragraph IV ANDA Applications for up to 30 Months.**

51.     The pioneer drug owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has forty-five (45) days to initiate a patent infringement suit against the applicant.  If no action is initiated within 45 days, FDA approval of the generic product proceeds unencumbered by patent issues.  However, if a patent infringement suit is brought within the 45-day window , FDA approval is automatically postponed until the earliest of the expiration of the patents, the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification, or a final judicial determination of non-infringement.

52.    Accordingly, branded drug patent holders need only file a patent infringement lawsuit within 45 days of receipt of a Paragraph IV certification in order to block an ANDA applicant's generic drug from entering the market for up to 30 months.

**E.    The 180-day Exclusivity Period for the First Paragraph IV Generic Drug Applicant**

53.    The FD&C Act, 21 U. S. C. Section 355(j)(4)(B)(iv), grants the first applicant submitting an ANDA with a Paragraph IV Certification for a generic version of a pioneer drug a 180-day period of marketing exclusivity before other ANDAs for the same generic drug can be approved by the FDA. The 180-day period begins when the first ANDA applicant either begins selling the generic drug or obtains a final judgment of non-infringement in a patent infringement suit, whichever occurs first. Thus, the first generic ANDA applicant gets the opportunity to complete directly with the pioneer drug owner for 180 days without competition from other generic producers.

**F.    Terazosin Hydrochloride Prescription Drugs**

54.    Hytrin, a form of terazosin hydrochloride, belongs to a group of drugs known as "alpha blockers", which are used for the treatment of hypertension and other diseases. Although Hytrin is used to treat hypertension, it is marketed today primarily as a treatment for benign prostatic hyperplasia (enlarged prostate gland). Both hypertension and benign prostatic hyperplasia are chronic conditions that affect millions of Americans, many of whom are senior citizens living on a fixed income.

55.    Hytrin, which contains terazosin hydrochloride and is manufactured by Defendant Abbott, was the pioneer new drug in the United States for treating hypertension and benign prostatic hyperplasia.

15

56. Abbott has received a number of patents for terazosin hydrochloride, both alone and in combination with other substances. In 1977, Abbott received U.S. Patent No. 4,026,894 (the "894 patent"), which covers the compound terazosin hydrochloride itself. That patent expired on or about May 31, 1994. In 1978, Abbott received U.S. Patent 4,112,097 (the "097 patent"), covering a pharmaceutical composition containing terazosin hydrochloride, as well as a method of treating hypertension by the administration of terazosin hydrochloride. The "097" patent expired on October 14, 1995.

57. The "894" and "097" patents are the only patents broad enough to prevent any generic version of Hytrin from coming to market. Both patents had expired by October, 1995. By 1996, a generic manufacturer could and would have begun marketing a generic version of Hytrin if it had not been prevented from doing so by Abbott's unlawful efforts to extend its patent monopoly beyond the expiration of these patents.

58. In 1981, Abbott was issued U.S. Patent No. 4,251,532 (the "532 patent"), covering terazosin hydrochloride dihydrate, which is the specific chemical compound marketed as Hytrin. On August 7, 1987, Abbott received FDA approval to market Hytrin in the United States, and Abbott began marketing terazosin hydrochloride dihydrate as Hytrin shortly thereafter. The "532" patent is scheduled to expire on February 17, 2000. Other patents which Abbott claims are applicable to Hytrin include U.S. Patents No. 5,294,615 (the "615 Patent"), No. 5,212,176 (the "176 Patent"), No. 5,412,095 (the "095 Patent") and No. 5,504,207 (the "207 Patent"). Prior to April, 1995, the "894", "097" and "532" patents were the only patents claimed to be applicable to Hytrin that Abbott had submitted for listing in the Orange Book. In particular, Abbott had not submitted the "615" patent for inclusion in the Orange Book prior to 1995.

16

### G.   Generic Terazosin Hydrochloride (Zenith)

59.     On or about June 2, 1994, Zenith filed an ANDA with the FDA seeking permission to market a generic version of anhydrous terazosin hydrochloride which, unlike terazosin hydrochloride dihydrate (Hytrin), contains no water molecules.

60.     In submitting its ANDA, Zenith made several certifications to the FDA pursuant to the Hatch-Waxman Act, including a Paragraph IV certification with respect to Abbott's "532" patent which covers terazosin hydrochloride dihydrate. Zenith's Paragraph IV certification stated that its proposed generic product would not infringe the "532" patent because Zenith's proposed generic product was a form of anhydrous terazosin hydrochloride rather than a form of terazosin hydrochloride dihydrate. Zenith's ANDA did not address potential infringement of the "615" patent, which Abbott had not submitted for listing in the Orange Book.

61.     On or about November 14, 1994, Abbott filed a complaint against Zenith in the United States District Court for the Southern District of Illinois, alleging that Zenith's application infringed the "615" Patent, a patent which Abbott had failed to submit for listing in the Orange Book prior to Zenith's application. Pursuant to Zenith's motion, the complaint was dismissed on March 15, 1995, for failure to state a claim, based on Abbott's failure to submit the "615" Patent for listing in the Orange Book. Abbott appealed the dismissal. Abbott's 1994 action against Zenith, and its subsequent appeal in that action, required the FDA to delay approval of Zenith's ANDA.

62.     In April, 1995, Abbott belatedly submitted the "615" Patent for inclusion in the Orange Book. On or about June 5, 1995, Abbott filed a second complaint against Zenith in the United States District Court for the Northern District of Illinois, again alleging that Zenith's proposed generic product infringed upon the "615" Patent. Zenith again moved to dismiss for

17

failure to state a claim.  On September 28, 1995, the District Court in Illinois issued an order

dismissing Abbot's complaint for failure to state a claim, based on the Court's holding that the

listing of the "615" Patent in the Orange Book was untimely.  Abbott appealed.  Abbott's

submission of the "615" Patent to the FDA, its 1995 action against Zenith and its subsequent

appeal in that action required the FDA to delay approval of Zenith's ANDA.

63.    During 1995 and 1996, Abbott submitted the "176', "095", and "207" Patents to

the FDA for inclusion in the Orange Book.  Because of Abbott's submissions, the FDA required

Zenith to resubmit its ANDA and include certifications with respect to these three patents before

it would consider Zenith's application.

64.    In April, 1996, Zenith filed a complaint against Abbott in the United States

District Court for the District of New Jersey seeking, among other forms of relief, a declaration

that Abbott's submission of the "097", "615", "176", "095" and "207" Patents for listing in the

Orange Book was improper, and an injunction ordering Abbott to delist those five patents.

65.    On August 7, 1996, the District Court in New Jersey denied Abbott's motion to

dismiss.  On or about August 20, 1996, Abbott filed an answer and counterclaims against Zenith

for infringement of the "615", the "207", and "097" Patents.  On October 2, 1997, the Court

denied a motion filed by Zenith seeking to preliminarily enjoin Abbott  from continuing to list

the "207" and the "097" Patents in the Orange Book, a ruling which Zenith appealed.  The New

Jersey litigation remained pending until Zenith and Abbott entered into the unlawful agreement

described below.

66.    Zenith consistently took the position throughout 1995, 1996 and 1997 that its

proposed generic product did not infringe any valid patent owned by Abbott, including

specifically the "532" Patent covering terazosin hydrochloride dihydrate.  Zenith certified to the

18

FDA at the time it filed its ANDA that its proposed generic product would not infringe the "532" Patent, and Abbott has never challenged that certification in any of its patent litigation with Zenith.  Nevertheless, as described below, Abbott and Zenith ultimately entered into an agreement under which Abbott agreed to pay Zenith $24,000,000 per year not to market its generic version of Hytrin until the expiration of the "532" Patent in February 2000.

**H.  Generic Terazosin Hydrochloride (Geneva)**

67.     In the latter part of 1995, Geneva filed an ANDA for a generic version of terazosin hydrochloride and made the necessary certifications to the FDA, including a certification that Abbott's "097" Patent would expire in October, 1995, prior to Geneva's marketing of its proposed generic product.  On November 16, 1995, Abbott filed a patent infringement action against Geneva in the United States District Court for the Northern District of Illinois based on its contention that the "097" Patent would not expire until 1997.  That action was consolidated with a similar action filed by Abbott against Novopharm Ltd. (Novopharm").

68.     Abbott's position that the "097" patent would remain in effect until 1997 was reflected in the patent information Abbott had provided to the FDA for inclusion in the Orange Book, which the FDA was required to accept as true.  Abbott's submission of false expiration information to the FDA, and its commencement of the 1995 patent infringement action against Geneva, required the FDA to delay approval of Geneva's ANDA.

69.     On March 15, 1996, the Illinois District Court ruled that Abbott's "097" Patent had expired on October 14, 1995, as Geneva and Novopharm had contended.  On April 9, 1996, the Illinois District Court amended its judgment by ordering Abbott to delist the expired "097" Patent from the Orange Book.  Abbott appealed both rulings and, on January 14, 1997, the United States Court of appeals for the Federal Circuit affirmed the District court's rulings in all

respects. *Abbott Laboratories v. Novopharm Ltd.*, 104 F.3d 1305 (Fed. cir. 1997). Abbott's appeal of the District Court's decision required the FDA to delay approval of Geneva's ANDA.

70.     In April, 1996, Geneva filed a second ANDA for a generic version of anhydrous terazosin hydrochloride. Geneva's ANDA contained a Paragraph IV certification stating that its proposed generic product did not infringe the "207" Patent and, on April 29, 1996, Geneva sent the statutorily required notice of its Paragraph IV certification to Abbott. On June 4, 1996, Abbott brought a second patent infringement action against Geneva in the United States District Court for the Northern District of Illinois, alleging that Geneva's proposed product infringed the "207" Patent. On September 1, 1998, the District Court in Illinois held that the "207" Patent to be invalid. On July 1, 1999, the federal circuit affirmed the District Court's ruling in all respects. Abbott Laboratories v. Geneva Pharmaceuticals, Inc. et al, Case No. 98-1593 (Fed. Cir. July 1, 1999).

71.     Abbott's 1996 action against Geneva, and its subsequent appeal in that case, required the FDA to delay approval of Geneva's ANDA.

72.     On or about March 30, 1998, the FDA approved Geneva's ANDA and allowed Geneva to market its generic version of Hytrin in the United States beginning October 29, 1998, a date that was delayed for several years because of Abbott's baseless litigation and regulatory stalling actions. Although that date has come and gone, Geneva has nevertheless chosen not to market its generic product solely as a result of the unlawful agreement as described below.

**I. Generic Terazosin Hydrochloride (Novopharm et al)**

73.     In the latter part of 1995, at approximately the same time as Geneva's first ANDA, Novopharm submitted an ANDA for a generic version of terazosin hydrochloride. Abbott subsequently filed a patent infringement action against Novopharm in the United States

District Court for the Northern District of Illinois that was consolidated with Abbott's similar action against Geneva. As noted above, the District Court in that case ruled against Abbott, and in early 1997 that ruling was affirmed by the Federal Court.

74.     Novopharm filed a second ANDA in 1996, shortly after Geneva filed its second ANDA. Three additional generic manufacturers, Invamed, Inc. ("Invamed"), Mylan Pharmaceuticals, Inc. ("Mylan") and Warner Chilcott, Inc. ("Warner"), filed similar ANDAs at approximately the same time as Novopharm. Abbott sued each company for patent infringement in the United States District Court for the Northern District of Illinois. The actions against Invamed and Novopharm were consolidated with Abbott's second action against Geneva and, as noted above, the Illinois district court ruled on September 1, 1998, that Abbott's patent is invalid. On July 1, 1999, that ruling was affirmed by the Federal Circuit Court.

75.     Since the September 1, 1998 ruling was issued, the judges hearing Abbott's actions against Mylan and Warner have held that Abbott is bound by the finding of invalidity under the doctrine of collateral estoppel, and each judge has granted summary judgment against Abbott.

## J.      The Defendants Engage in Unfair Trade Practices and Conspire to Prevent Competition in the Hytrin Market

76.     Between November, 1994 and April, 1998, Abbott filed no fewer than nine (9) patent infringement suits against potential generic competitors seeking to market a generic version of Hytrin: two against Zenith; two against Geneva; two against Novopharm; one against Invamed; one against Mylan; and one against Warner. Abbott has lost all nine lawsuits at the district court level on a motion to dismiss oral motion for summary judgment. When it has chosen to appeal those district court rulings, Abbott has lost at the appellate level as well.

21

Although Abbott has been uniformly unsuccessful in obtaining legal relief, its nine lawsuits succeeded in delaying for more than two (2) years the entry of a generic competitor to Hytrin. These lawsuits had this effect because the mere pendency of the litigation prevented the FDA from permitting the generic competitors from entering the market.

77.     Each of the nine patent infringement actions brought by Abbott against it generic competitors has been objectively baseless; no reasonable litigant could have realistically expected success on the merits. Each action lacked probable cause.

78.     Moreover, Abbott's purpose in bringing each of the nine (9) patent infringement lawsuits has been to use the litigation process, rather than the outcome of that process, as an anti-competition weapon and strategy. The purpose of filing each action has not been to obtain the relief requested in the complaint, but rather to trigger legally required delays in the FDA approval process thereby stymying the introduction of generic Hytrin on the market by Abbott's competitors. Abbott was subjectively aware that its patent infringement actions would not succeed and were mere stalling actions.

79.     In addition to bringing baseless litigation, Abbott has submitted false information to the FDA which the FDA was required to accept as true, and on the basis of which the FDA was required to delay or withhold approval of proposed generic products. Its purpose in providing false information to the FDA has not been to obtain favorable rulings from the FDA (rulings which the FDA is incapable of giving), but merely to trigger legally required regulatory delays and force its competitors to seek relief in court.

80.     The purpose and effect of Abbott's regulatory and litigation efforts have been to extend its patent monopoly beyond the statutory term to which it was lawfully entitled, to delay the commencement of generic competition and to maintain supracompetitive profits on sales of

22

Hytrin.  Those efforts were successful in delaying FDA approval of a generic version of Hytrin from 1996 until October 29, 1998, the date on which the FDA permitted Geneva to begin marketing its product.  When it became clear that those efforts had run their course, Abbott turned from unilateral anti-competitive conduct to conspiracy.

### K.    The Defendants' Agreement - An Illegal and Unconscionable Combination  in Restraint of Trade

81.    The Defendants Abbott, Zenith and Geneva have, at least since March 31, 1998, engaged in a conspiracy and a course of conduct that was intended to prevent, by any means possible, the ability of any other company to market  Hytrin.

82.    On or about March 31, 1998, Defendants Abbott and Zenith entered into an agreement under which Abbott agreed to pay Zenith $6,000,000 per quarter beginning July 15, 1998, in exchange  for Zenith's agreement not to market its generic version of Hytrin until the expiration of the "532" Patent on February 17, 2000.  As noted above, neither Abbott nor Zenith has ever contended that Zenith's proposed generic product would infringe the "532" Patent.

83.    On or about April 1, 1998, Defendants Abbott and Geneva entered into an agreement under which Abbott agreed to make monthly payments to Geneva beginning October 29, 1998, in exchange for Geneva's agreement not to market its FDA-approved generic version of Hytrin until the conclusion of Abbott's 1996 patent infringement lawsuit against Geneva.

84.    Because of the 180-day period of exclusivity described above, Defendants' illegal conduct has prevented any other generic competitor (such as Novopharm, Invamed, Mylan or Warner) from marketing a generic version of Hytrin.  The net result of Defendants' conduct is that today there is no generic version of Hytrin available on the market, despite the fact that the underlying patents on Hytrin expired several years ago.

85.     The collusive and anti-competition agreements between the Defendants has had the effect and purpose of allowing Defendant Abbott to set artificially high prices for Hytrin throughout the United States, untouched by generic competition.

86.     The agreements between Abbott and Zenith and Geneva constitute a horizontal combination between so-called competitors resulting in an illegal, unfair or deceptive and per se unlawful restraint of trade that assures that Defendant Abbott can continue to set and maintain artificially high prices for Hytrin, thereby continuing to reap monopoly-like profits.

**L.  Anti-competition Effects**

87.     The Defendants' combinations, conspiracies, and their resulting exclusionary and unlawful trade restraints described above have had the following anti-competitive and inequitable effects, among others:

> a.  The prices for Hytrin, the dominant product in the  market with 60% market share, have been fixed, raised, maintained and stabilized at artificially high and noncompetitive levels by the Defendants free from normal competition, thus causing consumers, pharmacies, insurers and others who purchase or pay for others to purchase Hytrin in the Proposed Class Jurisdictions, including many senior citizens and others on fixed incomes, to pay many millions of dollars more for Hytrin than they would have had to pay under natural conditions of competition in the absence of such illegal restraints of trade; and
>
> b.  Competition in the generic Hytrin sub-market has been barred by Defendants' illegal restraint of trade to the detriment of all purchasers of Hytrin in the Proposed Class Jurisdictions.

88.     Abbott's actions as alleged above were intended, served and are serving to unlawfully extend Abbott's dominance over the Hytrin market and to perpetuate a Hytrin monopoly in the market.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### (Violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §§47-25-101, 104, 105 and 106 As a Result of the Defendant's Agreements)

89.     Plaintiff repeats and realleges each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

90.     The uniform and common course of conduct of Defendants constitute an unlawful arrangement, contract, trust, or combination, in violation of the Tennessee Trade Practices Act §47-25-101, et seq.

91.     With the specific intent to restrain, lessen, or tend to lessen competition from producers of Hytrin and thereby maintain the Abbott's dominance over the Hytrin Market and to create a perpetual monopoly for Abbott in the market for Hytrin in the Class Jurisdictions, the Defendants have engaged in the exclusionary, predatory, and anticompetitive acts described above, and have thereby succeeded in restraining trade in the Hytrin Market.

92.     The Defendants have created an illegal per se trust because these ostensibly horizontal competitors have engaged in a combination of capital and acts, as reflected by the Defendants' Agreements, for the purposes of (a) creating and carrying out restrictions in trade or commerce; (b) limiting or reducing the production of Generic Hytrin and increasing the price of Hytrin; and (c) preventing competition in the manufacture and sale of Hytrin.

25

93.     The Defendants' Agreements are the product of an illegal per se trust between the Defendants because it is a contract which binds Zenith and Geneva not to sell generic Hytrin in commerce; is an agreement intended to keep the price of Hytrin at levels fixed by the Defendants; and precludes free and unrestricted competition between the Abbott and Zenith and Geneva or any other manufacturers of generic Hytrin.

94.     By reason of the violations of the Tennessee Trade Practices Act (Tenn. Code Ann. §§ 47-25-101, et seq.),  Plaintiff and other members of the Proposed Class have been injured in that they have paid more for Hytrin than they would have in the absence of the unlawful arrangement, contract, agreement, trust, or combination.  Defendants are thus in violation of the following provision of the Tennessee Trade Practices Act:

Tenn. Code Ann. § 47-25-101:

"All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful and void."

95.     By virtue of the foregoing unlawful conduct, Defendants are also subject to and must suffer the penalties for violation of the following provisions.

Tenn. Code Ann. Section 47-25-104:

a.     Any corporation chartered under the laws of the state which violates any of the provisions of either Section 47-25-101 or Section 47-25-102 shall thereby forfeit its charter and its franchise, and its corporate existence shall thereupon cease.

b.     Every foreign corporation which commits such a violation is denied the right to do, and is prohibited from doing, business in this state.

96.     By virtue of the foregoing unlawful conduct, all of the Defendants are also jointly and severally liable to the Plaintiff and Proposed Class pursuant to Tenn. Code Ann. § 47-25-105:

> "All persons and corporations, and the officers and the stockholders of all corporations, that become or continue to be members of, or in any way connected with or concerned in, any such trust, contract, agreement, or combination, shall be jointly and severally liable to pay all the debts, obligations, and liabilities of each and every person and corporation that become or continue to be a member thereof, connected therewith, or concerned therein, as fully as if all were partners in the creation of such debts, obligations, and liabilities.

97.     Plaintiff brings this antitrust cause of action pursuant to Tenn. Code Ann. § 47-25-106:

> "Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust."

98.     The foregoing conduct of the Defendants predominantly and substantially affects the State of Tennessee.

## SECOND CAUSE OF ACTION

### (For Violation of the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, et seq.)

99.     Plaintiff repeats and realleges each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

100.    The conduct described above constitutes unfair or deceptive trade practices predominantly and substantially affecting the conduct of trade or commerce in the State of Tennessee in violation of Section 47-18-109 of the Tennessee Consumer Protection Act of 1977.

27

101.    By reason of the violations of the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. §§ 47-18-101, et seq.), Plaintiff and other members of the Proposed Class have been injured in that they have paid more for Hytrin than they would have in the absence of the Defendants' unfair or deceptive trade practices.

102.    The illegal conduct alleged in this complaint is continuing, with no indication that Defendants will cease.

103.    Plaintiff and affected consumers in the Proposed Class Jurisdictions have been and will continue to be injured in their money and property, and hypertension and prostatic hyperplasia sufferers who cannot afford to purchase Hytrin will continue to be irreparably harmed by the illegally secured absence of any generic version in the marketplace of Hytrin.

104.    Pursuant to Tenn. Code Ann. §47-18-109, Plaintiff demands treble damages and restitution from the Defendants of all monies illegally acquired by them as a result of the absence of generic competition caused by their withdrawal of the right of reference.

## THIRD CAUSE OF ACTION

### (For Unjust Enrichment)

105.    Plaintiff repeats and realleges each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

106.    Defendants Abbott, Zenith and Geneva have benefitted from their illegal restraints of trade and acts which lessen or tend to lessen competition through the overpayment by Plaintiff and the Proposed Class for Hytrin, resulting from the Abbott's illegally maintained dominance over the Hytrin market.

107.    Defendants Zenith and Geneva have benefited from their illegal restraint of trade and acts which lessen or tend to lessen competition effected through the Abbott, Zenith and

28

Geneva Agreements to the extent of the payments they have received and will continue to receive under the Abbott, Zenith and Geneva Agreements. The funds for such payments by Abbott are derived from the Proposed Plaintiff Class's overpayment for Hytrin.

108.    It would be inequitable for Zenith or Geneva to be permitted to retain any of the proceeds of the Abbott, Zenith and Geneva Agreements.

109.    It would be inequitable for Abbott to be permitted to retain any of the Plaintiff's and other purchasers' overpayment for Hytrin derived from it's unfair or deceptive trade practices, including the Abbott, Zenith and Geneva Agreement and the withdrawal of the right of reference.

## FOURTH CAUSE OF ACTION

### Money Had and Received

110.    Plaintiff realleges as if fully set forth, each allegation contained in the foregoing paragraphs.

111.    Plaintiff's fourth cause of action is for money had and received. Based upon the foregoing fraudulent, illegal, unfair or deceptive conduct of Defendant and their co-conspirators, and the resulting overpayments made by Plaintiff and the members of the Proposed Class, Defendants owe  Plaintiff and the Proposed Class for  sums to be determined at trial for money had and received.

## FIFTH CAUSE OF ACTION

### (Civil Conspiracy)

112.    Plaintiff repeats and realleges each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

29

113.   Plaintiff's fourth cause of action is for civil conspiracy.  The Tennessee common law of civil conspiracy is similar, if not identical to the common law of conspiracy in every state.

114.   In committing the wrongful acts alleged, Defendants have pursued a common plan, design, and course of conduct, acted in concert with, aided and abetted, and otherwise conspired with one another, in furtherance of their common design or scheme, as outlined herein.

115.   Defendants have conspired to purposely conceal the practice by which it artificially inflated the price of Hytrin purchased by Plaintiff and the Proposed Class.

116.     In furtherance of this conspiracy, in spite of it's knowledge of such facts, Defendants never informed Plaintiff and the Proposed Class that the prices charged for Hytrin purchased by Plaintiff and the Proposed Class were artificially inflated.

117.     The intended common purpose of this conspiracy was to deceive Proposed Class members and the public as to the true cost of Hytrin, which was artificially increased because of the conduct of the Defendants.

118.     The further effect of this conspiracy was to violate state law.

## VII. FRAUDULENT CONCEALMENT

119.     Any applicable statutes of limitation have been tolled by Defendants affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal. Through such affirmative acts of fraudulent concealment and continuing sales, Defendants have been able to conceal from Plaintiff and the public the truth about charging artificially inflated prices for Hytrin, thereby tolling the running of the applicable statutes of limitation.

120.     Plaintiff and the Proposed Class could not reasonably have discovered Defendant's practices of charging artificially inflated prices for Hytrin.

121.     Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

122.     Until shortly before the filing of the original complaint, Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein.

123.     Because of the self-concealing nature of Defendants actions, and their affirmative acts of concealment, Plaintiff asserts the tolling of any applicable statutes of limitations affecting his claims.

## VIII. PUNITIVE DAMAGES

124.    Plaintiffs reallege, as if fully set forth, each allegation contained in the foregoing paragraphs.

125.    If the trier of fact finds that the Defendants misconduct constitutes willful, wanton, intentional and/or reckless conduct which directly and proximately caused damage to the Plaintiffs, Defendants are liable to the Plaintiffs for punitive damages.  Defendants conduct is at least reckless, since Defendants have so consciously and blatantly disregarded the rights of the Plaintiffs solely to justify their own economic interests.

126.    Punitive damages are required here to punish Defendants for their unlawful conduct and the harm caused by it, and to deter Defendants and others from repeating the misconduct complained of here.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.      On the First Cause of Action, that this Court find, adjudge and decree that Defendants engaged in fraudulent conduct violative of Tenn. Code Ann. §47-25-101, et seq. and that the Court award Plaintiff and the Proposed Class the full consideration paid by the Plaintiff and Proposed Class pursuant to T.C.A. §47-25-106.

B.      On the Second Cause of Action, that the Court find, adjudge and decree that the aforesaid unfair or deceptive acts or practices of Defendants violated the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, et seq., and award Plaintiff and the Proposed Class (i) actual damages in an amount to be proved at trial as a result of the wrongful conduct alleged, plus interest and costs; (ii) treble damages, where appropriate, against Defendants for all losses and injuries suffered as a result of Defendants' illegal actions, with the

amount of damages (before trebling) to be determined at trial; appropriate restitution, recession or any other remedy pursuant to the Tennessee Consumer Act.

C.    On the Third Cause of Action, that the Court find, adjudge and decree that each Defendant pay compensatory and punitive damages to the Plaintiff and the Class in amounts to be determined at trial, as a result of the intentional, wilful and wanton nature of their conduct, which has enriched the Defendants at the expense of Plaintiff and the Class' economic well-being;

D.    On the Fourth Cause of Action, that the Court find, adjudge and decree that Defendants have received overpayments from the Plaintiff and the Proposed Class that they were not justly entitled to receive, and that the Court award Plaintiff and the Proposed Class compensatory and punitive damages to the extent of the money had and received by the Defendant.

E.    That the Court order such other, further and general relief as the Court may deem just and proper.

Respectfully submitted, this the 6th day of October, 2004.

Gordon Ball
Bank of America Center
550 Main Avenue, Suite 750
Knoxville, TN 37902
(865) 525-7028

## CERTIFICATE OF SERVICE

I, Gordon Ball, do hereby certify that a copy of the foregoing has been sent via U.S. Mail,

sufficient postage prepaid, to the following:

### [See Attached Service List]

This 6th day of October, 2004.

Gordon Ball

IN RE TERAZOSIN HYDROCHOLORIDE ANTITRUST LITIGATION
CASE: 99-MDL-1317 SEITZ/KLEIN

## SERVICE LIST

Richard B. Drubel, Esq.
Kimberly Schultz, Esq.
Bryant McCulley, Esq.
BOIES, SCHILLER & FLEXNER, L.L.P.
26 South Main Street
Hanover, NH 03755
Phone: (603) 643-9090
Fax:   (603) 643-9010
*Co-Counsel for Sherman Act Class Plaintiffs*

Daniel Berger, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: (215) 875-3000
Fax:   (215) 875-4604
*Counsel for Valley Drug Co.*

Mitchell W. Berger, Esq.
Rene D. Harrod, Esq.
BERGER SINGERMAN
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Phone: (954) 525-9900
Fax:   (954) 523-2872
*Liaison Counsel For Sherman Act Class Plaintiffs*
*Counsel For Valley Drug Company*

Joseph T. Lukens, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
Phone: (215) 496-7032
Fax:   (215) 568-0300
*Counsel for Rite Aid Corp. & CVS Meridian, Inc.*

W. Scott Simmer, Esq.
Kathleen Pitzer, Esq.
ROBINS KAPLAN MILLER & CIRESI, LLP
1801 K Street, N.W., Suite 1200
Washington, DC 20006
Phone: (202) 775-0725
Fax:   (202) 223-8604
*Counsel for Kaiser Foundation Health Plan, Inc.*

Barry S. Taus, Esq.
Bruce Gerstein, Esq.
GARWIN, BRONZAFT, GERSTEIN & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10036
Phone: (212) 398-0055
Fax:   (212) 764-6620
*Co-Counsel for Sherman Act Class Plaintiffs*
*Counsel for Louisiana Wholesale*

Aubrey B. Calvin, Esq.
THE CALVIN LAW FIRM, P.C.
Niels Esperson Building
808 Travis, Suite 2300
Houston, TX 77002
Phone: (713) 224-5771
Fax:   (713) 225-0038
*Counsel for Louisiana Wholesale Drug Co.*

Scott E. Perwin, Esq.
KENNY NACHWALTER, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327
Phone: (305) 373-1000
Fax:   (305) 372-1861
*Counsel for Walgreen Plaintiffs*

Steve D. Shadowen, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
30 North Third Street, Suite 700
Harrisburg, PA 17101-1701
Phone: (717) 364-1030
Fax:   (717) 364-1020
*Counsel for Rite Aid Corp. & CVS Meridian, Inc.*

Scott R. Strand, Esq.
ROBINS KAPLAN MILLER & CIRESI, LLP
1800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Phone: (612) 349-8440
Fax:   (612) 339-4181
*Counsel for Kaiser Foundation Health Plan, Inc.*

Barbara Smithers, Esq.
OFFICE OF THE ATTORNEY GENERAL
135 West Central Boulevard, Suite 1000
Orlando, FL 32801
Phone: (407) 317-7007
Fax:    (407) 316-3584
*Counsel for the Attorney General of Florida*

Daniel A. Small, Esq.
Robert Wozniak, Esq.
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3934
Phone: (202) 408-4600
Fax:    (202) 408-4699
*Co-Lead Counsel for Indirect Purchaser Plaintiffs*

Kimberly West, Esq.
Matt Fridy, Esq.
WALLACE JORDAN RATLIFFE & BRANDT, LLC
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209
Phone: (205) 870-0555
Fax:    (205) 871-7534
*Co-Lead Counsel for Indirect Purchaser Plaintiffs*
*Counsel for Blue Cross Blue Shield of Michigan*

Robert C. Gilbert, Esq.
ROBERT C. GILBERT, P.A
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Phone: (305) 529-9100
Fax:    (305) 529-1612
*Liaison Counsel for Indirect Purchaser Plaintiffs*

Jeffrey I. Weinberger, Esq.
Stuart N. Senator, Esq.
David Rosenzweig, Esq.
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Phone: (213) 683-9127
Fax:    (213) 683-5127
*Counsel for Abbott Laboratories*

Wayne A. Cross, Esq.
Robert A. Milne, Esq.
Brendan G. Woodard, Esq.
WHITE & CASE, LLP
1155 Avenue of the Americas
New York, NY 10036
Phone: (212) 819-8200
Fax:    (212) 354-8113
*Counsel for Geneva Pharmaceuticals*

David S. Mandel, Esq.
MANDEL & CALE LLP
169 East Flagler Street, Suite 1200
Miami, FL 33131
Phone: (305) 374-7771
Fax:    (305) 374-7776
*Counsel for Char-Mar Pharm., Inc.*

Stephen Lowey, Esq.
Richard Cohen, Esq.
Geoffrey Horn, Esq.
LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
The Gateway, 11th Floor
One North Lexington Avenue
White Plains, NY 10601
Phone: (914) 997-0500
Fax:(914) 997-0035
*Co-Lead Counsel for Indirect Purchaser Plaintiffs*
*Counsel for Cobalt Corp.*

Pamela B. Slate, Esq.
SLATE KENNEDY, LLC
Park Place Tower
2001 Park Place North, Suite 450
Birmingham, AL 35203
Phone: (205) 328-7700
Fax:    (205) 328-7701
*Counsel for Indirect Purchaser Plaintiffs*
*Counsel for Blue Cross Blue Shield of Alabama*

Rohit K. Singla , Esq.
Stuart Weinstein, Esq.
MUNGER, TOLLES & OLSON LLP
33 New Montgomery Street
San Francisco, CA 94105
Phone: (415) 512-4000
Fax:    (415) 644-6932
*Counsel for Abbott Laboratories*

Jon W. Zeder, Esq.
Ferrell Schultz Carter & Fertel, P.A.
201 South Biscayne Blvd.
34th Floor, Miami Center
Miami, FL 33131
Tel:    (305) 371-8585
Fax:    (305) 371-5732
*Co-Counsel for Abbott Laboratories*